1  Dimitrios P. Biller, Bar No. 142,730
   E-mail: biller_ldtconsulting@verizon.net
2  906 Kagawa Street
   Pacific Palisades, CA 90272
3  Telephone: (310) 459-9870
   Facsimile: (310) 459-9879
4

5

6  Attorney for Plaintiff, Pro Per

7

8                    UNITED STATES DISTRICT COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11                         Case No.: CV09-03079-GHK (RZx)

12 Dimitrios P. Biller,

13          Plaintiff,        COMPLAINT FOR: **(A)** WRONGFUL
                              DISCHARGE IN VIOLATION OF
14     vs.                   PUBLIC POLICY; **(B)**
                              DISCRIMINATION IN VIOLATION
15 Los Angeles County, Los   OF THE AMERICAN'S WITH
   Angeles District          DISABILITIES ACT;
16 Attorney's Office, Victor **(C)** NEGLIGENCE; **(D)**
   Rodriguez, and Pam        INTENTIONAL INTERFERENCE
17 Brookwell, Does 1 - 10,   WITH PROSPECTIVE ECONOMIC
                              ADVANTAGE; **(E)** NEGLIGENT
18                           INTERFERENCE WITH
                              PROSPECTIVE ECONOMIC
19          Defendant.       ADVANTAGE; **(F)** INTENTIONAL
                              INTERFERENCE WITH BUSINESS
20                           RELATIONSHIP; NEGLIGENT
                              INTERFERENCE WITH BUSINESS
21                           RELATIONS; **(G)** INTENTIONAL
                              INFLICTION OF EMOTIONAL
22                           DISTRESS; **(H)** NEGLIGENT
                              INFLICTION OF EMOTIONAL
23                           DISTRESS; **(I)** DEFAMATION
                              AND SLANDER PER SE; **(J)**
24                           ILLEGAL AND UNFAIR BUSINESS
                              PRACTICES IN VIOLATION OF
25                           BUSINESS & PROFESSIONS CODE
                              SECTION 17200 SEEKING
26                           INJUNCTIVE RELIEF AND **(K)**
                              PRAYER FOR PUNITIVE DAMAGES
27
                              **DEMAND FOR JURY TRIAL**
28

Complaint - 1

5/1/2009 2:50:12 PM  Receipt #: 5823
        Cashier : LLUNG [LA 11-1]
Paid by: DP BILLER
2:CV09-03079
2009-086900        5 - Civil Filing Fee(1)
                                    $60.00
Amount :
2:CV09-03079
2009-510000       11 - Special Fund F/F(1)
                                   $190.00
Amount :
2:CV09-03079
2009-086400        Filing Fee - Special(1)
                                   $100.00
Amount :
Credit card Payment : 3009 555747 / 350.
00

NOW COMES DIMITRIOS P. BILLER ("Plaintiff" or "Plaintiff") to file and serve his complaint against (a) the County of Los Angeles (Defendant County of Los Angeles), (b) Victor Rodriguez ("Defendant Rodriguez" or "Defendant Rodriguez"), (c) Pam Brookwell (Defendant "Brookwell" or "Pam Brookwell") and Does 1 through 20.

## I.

## SUBJECT MATTER JURISDICTION

1.    The United States District for the Central District of California ("USDCDC") has personal jurisdiction over all Defendants and subject matter jurisdiction over this complaint.    All Defendants live in the County of Los Angeles and has it principle place of business in Los Angeles.    The USDCDC has Original Jurisdiction over this complaint.    The USDCDC has subject matter jurisdiction over this complaint because the First Cause of Action involves a Federal Question; did Defendant County of Los Angeles violate Plaintiff's rights under the American's with

Disabilities Act pursuant to 42 U.S.C. 12101-12213?

The USDCDC also has Supplemental Jurisdiction over the

remaining claims under 28 U.S.C. 1367. The remaining

claims are so related to claim under the American's

with Disabilities Act that the other claims form part

of the same cases and controversy under Article III of

the United States Constitution. Plaintiff filed a

claim pursuant to the Fair Employment & Housing Act

because Defendants violated Plaintiff's rights

protected by the Americans with Disabilities Act.

**(Exhibit "1")** On December 8, 2008, the Department of

Fair Employment & Housing sent Plaintiff a "right to

sue" letter. **(Exhibit "2")** Furthermore, Plaintiff

filed a claim with the City of Los Angeles. **(Exhibit**

**"3")** and that claim was denied on December 8, 2008.

**(Exhibit "4")** The claims Plaintiff filed with the City

of Los Angeles are set forth in Exhibit "3" and

Plaintiff refers to those claims and hereby

incorporates those claims as though fully set forth

herein. On March 24, 2008, Defendant filed a complaint

with the Equal Employment Opportunity Commission.

**(Exhibit "5")**    Plaintiff refers to that complaint and hereby incorporates that complaint as though fully set forth herein.    Plaintiff received a right to sue letter on April 15, 2009.    **(Exhibit "6")**

## II.

## PERSONAL JURISDICTION OVER THE PARTIES

**(Plaintiff hereby refers to and incorporates herein paragraphs 1 as though fully set forth herein)**

2.    Plaintiff is a resident in the County of Los Angeles, California.    Plaintiff worked for the Los Angeles District Attorney's Office (LADA's Office) between May 6, 2008 and August 21, 2008 as a Deputy District Attorney I ("DDA I").    Plaintiff worked in the East Los Angeles Office of the LADA's Office from June 6, 2008 to August 21, 2008.    Plaintiff is seeking relief for himself in his individual capacity, and as a Private Attorney General for the People of the State of California.

3.    Defendant County of Los Angeles has its principle place of business in Los Angeles County and is responsible for the acts, actions, omissions, conduct, behavior and policies, procedures and statements of the LADA's Office and Duties District Attorneys within the LADA's Office.   The LADA's Office is located in the City of Los Angeles, County of Los Angeles, and State of California.

4.    Defendant Victor Rodriguez is employed with and has been employed with the LADA's Office before, during and after the LADA's Office employed Plaintiff. Defendant Victor Rodriquez is a resident of the County of Los Angeles.   He is a managing agent for the LADA's Office with substantial authority.

5.    Pam Brookwell is employed with and has been employed with the Los Angeles Sheriff's Department before, during, and after Plaintiff worked for the LADA's Office.   Defendant Pam Brookwell is a resident of the County of Los Angeles.

6.    Does 1 through 20 are residents of the County of Los Angeles.    Plaintiff does not know their names at this time but will amend this complaint to name such defendants once Plaintiffs learns their names.

7.    Defendants Rodriguez, Brookwell and Does 1 through 20 acted as the agents, servants, representatives, managing agents, and employees for Defendant County of Los Angeles at all relevant times in relation to the facts in this case.    Furthermore, Defendants Rodriguez, Brookwell and Does 1 through20 organized a conspiracy to get Plaintiff fired: (a) they came to an agreement on how to achieve this goal, (b) each Defendant committed an actor omission in furtherance of the conspiracy and (a) they acted in concert to achieve the goal of the conspiracy. Defendant County of Los Angeles knew about their conduct and ratified, agreed, and participated by allowing Plaintiff to be wrongfully terminated.

**III.**

**VENUE**

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-7 as though fully set forth herein)**

8.    All the acts, events, discriminatory actions, false representations, defamatory statements, slanderous per se statements, wrongful conduct, omissions, violations of public policies, and wrongful termination of Plaintiff and events described below took place in the City of Los Angeles in the LADA's Office.    Therefore, the United States District Court for the Central District of California the proper venue for this dispute.

## IV.

## GENERAL ALLEGATIONS

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-8 as though fully set forth herein)**

9.    The LADA's Office hired Plaintiff to be a "DDA I" and Plaintiff completed a 30 days training course with the Training Division of the LADA's Office on or about June 6, 2008.    During the first year of his scheduled employment after the one month

training period, Plaintiff and all his classmates had to go through a three rotations in which Plaintiff would work in one office of the LADA's Office for 3 months, then transfer to another office for three months, and finish the one year probationary period in a 6 month assignment.  The LADA's Office assigned Plaintiff to work at the East Los Angeles LADA's Office under the supervision of Defendant Victor Rodriguez.  Plaintiff was assigned to the East Los Angeles LADA's Office for a 3 month rotation from June 9, 2008 to approximately September 5, 2008.

10.  However, the LADA's Office put Plaintiff on paid leave of absence on August 14, 2009 and fired Plaintiff on August 21, 2008, so he did not finish his three month rotation.  Plaintiff worked for the LADA's Office for approximately 9 weeks.  The LADA's Office gave Plaintiff an August 21, 2008 Memo written by Victor Rodriguez (Deputy-In-Charge for the East Los Angeles Office of the District Attorney and Plaintiff's supervisor).  Plaintiff was also given an

August 21, 2008 Termination Letter containing the

same contentions as the memo.  The memo sets forth

the alleged reasons why Plaintiff's evaluation was so

negative.  This letter will set forth detailed facts

showing the memo contains false, untruthful,

deceptive, misleading, and incorrect facts.

11. Essentially, LADA's Office terminated

Plaintiff  because: (1) Defendant Rodriguez believed

that Plaintiff was incompetent to perform the duties

of a Deputy District Attorney I; (2) Plaintiff was

emotionally unstable; and (3) Plaintiff could not get

along with law enforcement personnel.  The detailed

facts and exhibits set forth below will prove that

these reasons are illegal in violation of the

Americans with Disabilities Act; based on false,

untruthful and misleading material facts and omission

of facts related to Plaintiff's performance as a

Deputy District Attorney I; and Plaintiff was fired

to prevent Plaintiff from complaining about Sheriff's

Deputies engaging in illegal acts in violation of

public policy. Essentially, Plaintiff was fired because he would not tolerate Sheriff's Deputies failing to appear in court or showing up late, and failing to bring to court essential evidence to prove beyond reasonable doubts that criminal defendants were guilty of violating the law or should be held to answer a Felony Information/Complaint.

12. First, Plaintiff is suffering from depression/Major Depressive Disorder (Organic Brain Syndrome) and is dyslexic. He has been suffering from these conditions for most of his life. When Plaintiff was hired to be a Deputy District Attorney, he informed the physician for the County of Los Angeles that he was suffering from serious and major depression. Plaintiff also informed the County physician that Plaintiff was taking medication because of his serious and chronic depression. Plaintiff continues to see his psychiatrist and he is under medication. Additionally, Plaintiff informed Defendant Rodriguez and Judge Injenikian that he is

dyslexic.   Therefore, the "emotional reaction" and "inability to control his emotions", as described in the August 21, 2008 memo Defendant Rodriguez wrote, were a direct consequence of Plaintiff's mental disability and learning disability.   Defendant Rodriguez' behavior toward Plaintiff and the wrongful actions of Defendant Brookwell triggered the emotional experiences described in the memo.

13.   These mental and intellectual conditions have been deemed "disabilities" protected under the Americans with Disabilities Act.   Vollmert v. Wisconsin Dept. of Transp.   197 F3d 293,298 (7th Cir. 1999) and Mustafa v. Clark County School Dist., 157 F3d 1169, 1174-1175 (9th Cir. 1998).   Consequently, Defendant Rodriguez and the District Attorney's Office did not make any reasonable accommodations for Plaintiff and acted in total disregard to the health and safety of Plaintiff.

14.   Second, the August 21, 2008 memo is laced with false material facts.   Defendant Rodriguez'

contentions are not supported by any facts and

evidence.  He and Defendant Brookwell (Subpoena

Control Officer for the Los Angeles Sheriff's

Department in East Los Angeles) both fabricated facts

that Plaintiff was demeaning, unprofessional, easily

angered, unreasonable, and too demanding  towards law

enforcement and he could not adjust to the realities

of being a Deputy District Attorney.  Defendant

Rodriguez and the Subpoena Control Officer for the

Los Angeles Sheriff's Department retaliated against

Plaintiff because Plaintiff complained about Deputies

failing to appear in Court on the dates scheduled or

when ordered by the Court to do so, or when they were

late causing a delay in the proceedings.  Plaintiff

also complained about Sheriff's Deputies failing to

bring to court essential evidence.

15. Third, Plaintiff's evaluation and the memo

setting forth examples of Plaintiff's performance

were drafted to get Plaintiff wrongfully terminated.

Those documents were not an honest assessment of

Plaintiff's talents as a trial attorney or Deputy District Attorney I.  Plaintiff is not a first or second year attorney right out of law school; he is a very skilled trial attorney who has succeeded in every position he has held as an attorney.  He has practiced as a trial attorney for 20 years.

16. Defendants acted in concert with each other in the wrongful discharge of Plaintiff against Public Policy and in violation of the American's with Disabilities Act.  Defendant Rodriguez was the agent, servant, employee, and representative of the LADA's Office, so his actions, statements, conduct, acts, omissions, wrongful conduct and false representations are attributable to the LADA's Office and the County of Los Angeles through the concept of respondeat superior.  Consequently, Defendant Los Angeles County is responsible for the actions, statements, conduct, acts, omissions, wrongful conduct and false representations of Defendant Rodriguez.  Furthermore, Defendant Brookwell was the agent, servant, employee,

and representative of the Los Angeles Sheriff's Department, which is under the jurisdiction of Defendant Los Angeles County, so her actions, statements, conduct, acts, omissions, wrongful conduct and false representations are attributable to the County of Los Angeles through the concept of respondeant superior.    Consequently, Defendant Los Angeles County is responsible for the actions, statements, conduct, acts, omissions, wrongful conduct and false representations of Defendant Brookwell.    Furthermore, Defendants had evil, dishonest, and vindictive motivating reasons for their wrongful conduct.    Defendant the County of Los Angeles is Vicariously  Liable for the actions, statements, misrepresentations, conduct, omissions, and inaction of Defendants Rodriguez and Brookwell because:  Plaintiff was harmed by the employees/agents of Defendant County of Los Angeles; Defendants Rodriguez and Brookwell  were acting for the Defendant County of Los Angeles as employees,

servants, representatives and agents; Defendant County of Los Angeles is responsible for the harm Plaintiff sustained because   (a) Defendants Rodriguez and Brookwell were agents and employees of Defendant County of Los Angeles and (b) Defendants Rodriguez and Brookwell were acting within the scope of their employment within the LADA's Office and the Los Angeles Sherriff's Department.   The wrongful conduct alleged in the complaint was reasonably related to the type of tasks the employee was employed to perform and (b) was reasonably foreseeable in light of employee's job responsibilities.   Lastly, Defendants Rodriguez and Brookwell intended to act on behalf of Defendant County of Los Angeles, Defendant County of Los Angeles learned of their conduct after it occurred, and the Defendant County of Los Angeles approved of its employees' conduct.

17. Defendants are co-conspirators and came to an agreement to terminate Plaintiff's employment with the LADA's Office.   They took specific actions in

order to commit the conspiracy to have Plaintiff terminated from the LADA's Office.  Those actions were committed in furtherance of the conspiracy to have Plaintiff terminated from the LADA's Office.

## V.

## DETAILED FACTS

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-17 as though fully set forth herein)**

A. Background of Termination

18.  On August 14, 2008 Plaintiff's Supervisor informed Plaintiff that Defendant Brookwell filed a formal complaint about Plaintiff's behavior and attitude towards law enforcement.  When Plaintiff denied the allegations, Defendant Rodriguez told him there was going to be a "full investigation" and the dispute had to go to his boss, Janet Moore in the downtown office of the LADA Office.  **Plaintiff specifically asked Defendant Rodriguez if Plaintiff would have an opportunity to talk to Mrs. Moore to give his side of the story.  Defendant Rodriguez said**

1   **"yes."**   During this meeting Plaintiff had an

2   emotional breakdown triggered by Pam Brookwell's

3   meritless complaint because Plaintiff is suffering

4

5   from Major Depressive Disorder.   Plaintiff asked if

6   he could go home to calm himself, and Defendant

7

8   Rodriguez said "no" because he believed Plaintiff was

9   a liability to the LADA Office.

10      19.  Later that afternoon, Carole Burke and two DA

11  Investigators arrived at the East Los Angeles

12

13  District Attorney's Office.   Plaintiff started to

14  give his side of the story, but **Mrs. Burke said "this**

15

16  **is not the time or the place."   She said "that**

17  **opportunity will come later."**   Plaintiff asked Mrs.

18  Burke if he was going to have an opportunity to give

19

20  his side of the story, and Mrs. Burke said "yes."

21  Plaintiff was instructed to call Defendant Rodriguez

22

23  everyday to check in regarding the investigation

24  until Plaintiff returned to work on August 20, 2008.

25

26

27

28

20. In an effort to get rid of Plaintiff and to legitimize his termination, Victor Rodriguez and/or Pam Brookwell did the following:

- Filed a meritless and frivolous complaint filled with general and untruthful allegations against Plaintiff related to the events that took place on August 14, 2008;

- Did not conduct a fair and independent investigation of that complaint before informing Plaintiff about the complaint;

- Lied to Plaintiff when Defendant Rodriguez and Mrs. Burke said there would be a "full investigation" by his boss Janet Moore and Plaintiff would be given the opportunity to talk to Mrs. Moore;

- Fabricated facts to give the false impression that there were legitimate grounds to terminate Plaintiff's employment; and

- Mistreated Plaintiff to trigger emotional reactions caused by his Major Depressive Disorder.

21. Furthermore, there are two very important events that prove Pam Brookwell and Defendant Rodriguez were motivated to file a complaint based on false and untruthful allegations leading up to Plaintiff's termination and to use the complaint as the foundation to wrongfully discharge Plaintiff. The first incident involves Sheriff's Deputy Detective Aquire's failure to appear in Court on time, and the investigation Judge Injenikian conducted following that incident. The second incident involved a complaint that Plaintiff lodged with Pam Brookwell regarding the failure of Sheriff's Deputies to either not appear in court or appear late when they were subpoenaed, and the failure of Sheriff's Deputies to bring evidence in court.

22. On August 21, 2008 Plaintiff met with Jacquelyn Lacey, Assistant District Attorney, and

Julie Silva-Dixon, Counsel for the Los Angeles

District Attorney's Office.  Plaintiff was expecting

to be interviewed regarding the formal complaint Pam

Brookwell filed.  Instead, he was presented with a

letter of termination, an evaluation by Defendant

Rodriguez and a memo containing false statements

regarding Plaintiff's performance while a Deputy

District Attorney I in the East Los Angeles Office.

23.  Plaintiff was not interviewed regarding the

"complaint" Pam Brookwell filed.  Julie Silva said

"we are not going to discuss the facts in the memo."

Plaintiff asked if he could read the documents to get

an understanding as to why he was terminated.  When

he returned to talk to Mrs. Moore and Mrs. Silva,

Plaintiff was told that he had two options.  First,

he could sign a letter of resignation, the materials

would then be shredded, and the County would provide

Plaintiff with two additional weeks of paid and

medical benefits. Second, if Plaintiff did not sign a

letter of resignation, then he would be terminated,

he would not receive any additional pay or benefits and all three documents would go into his personnel file.  Mrs. Moore also stated that the second option would result in prospective employers to gain access to the documents upon request.  Mrs. Moore stated that this was a one day offer.

24.  Plaintiff asked to re-read the materials again before making a decision.  After reading the documents for the second time, Plaintiff decided he could not sign a letter of resignation under these circumstances because the documents contained false facts and he felt that the LADA Office was applying pressure to cause Plaintiff to feel duress.

25.  Plaintiff returned to the office to speak to Mrs. Silva and Mrs. Moore.  Plaintiff said he could not sign a letter of resignation under these circumstances because the bases of that resignation were documents that were false.  Mrs. Silva then said every prospective employer will have access to these documents if Plaintiff signed a release of employment

records because the DA's Office would release the

documents.   This statement was clearly designed to

put even more pressure on Plaintiff because the

documents would destroy any hope of Plaintiff gaining

employment as a lawyer with a law firm or

corporation.   Mrs. Moore then said that the County

might be able to provide him with a month's salary

and benefits.

26.  Plaintiff said "if I was advising a client

under these circumstances and he felt the same

pressures that I'm feeling, I would recommend that he

not sign a letter of resignation."  Plaintiff then

told Mrs. Moore and Mrs. Silva that he was not

signing a letter of resignation.   Instead, he would

appeal and, if necessary, file a law suit.

**B. Plaintiff Complained to Pam Brookwell About Deputies**
   **Not Appearing in Court**

27.  Following the trial in <u>People v. Martinez</u>

that resulted in a Not Guilty verdict on June 30,

2008, Plaintiff called Pam Brookwell to complain that

Deputies Herrera and Masquera failed to appear in

court on June 27, 2008.  Commissioner Baird ordered

them to return to court when called to do so after

they testified on or about June 25, 2008.  On June

26, 2008 Plaintiff called both Deputies and requested

their appearance on June 27, 2008 because Plaintiff

needed to provide to the jury with testimony in the

People's rebuttal case to impeach the testimony of

the Defendant and his witnesses.  The Not Guilty

verdict resulted because the testimony provided by

Defendant and witnesses for the Defendant was not

refuted.  The People could not carry the burden of

proof beyond a reasonable doubt because the People

could not present evidence that Defendant and his

witnesses were not being truthful.  Deputies Herrera

and Mosquera could have provided this testimony if

they had honored their legal duties to appear when

called.

28.  During the same telephone call with Defendant

Brookwell, Plaintiff complained about other Deputies

not appearing in Court as obligated under subpoenas.

Plaintiff talked to Defendant Rodriguez about this

problem and Defendant Rodriguez told Plaintiff to

write a memo regarding the conversation and he would

give it to the Sheriff's Department.   Plaintiff wrote

the memo.    But Defendant Rodriguez never gave it to

the Sheriff's Department.

**C. Sheriff Deputies Confronted and Surrounded Plaintiff**
   **Outside of Dept. 5 in a Threatening and Hostile**
   **Manner Because He Asked the Judge to Order them Back**
   **to Court**

29.  On or about July 1, 2008, Plaintiff was

assigned to Preliminary Hearing Court in Dept. 5.

There were numerous cases scheduled for Preliminary

Hearing.   However, only one young female Deputy was in

Court on time.   Plaintiff repeatedly asked her to

contact the other Deputies and find out when they were

going to arrive.

30.  Judge Injenikian took the bench at

approximately 9:00 a.m. and called the calendar for

all the cases.  Plaintiff could not announce ready to proceed with any Preliminary Hearings because the Deputies in those cases were not present to provide testimony.

31.  Detective Aquire and the other Deputies finally appeared at approximately 10:00 a.m.  The Judge was engaged in other matters, so Plaintiff could not tell the Judge the hearing had to be continued for lack of evidence.  At approximately 11:30 Plaintiff informed the Court that the case had to be continued, and he requested that the Deputies be ordered back to court.  Judge Injenikian issued that order.

32. As Detective Aquire was stepping down from the jury box inside the Courtroom, he confronted Plaintiff.  In a loud voice, Detective Aquire told Plaintiff "never ask a judge to order me back; that is not the way it's done; you will learn how it's done the hard way; you're young and you'll have to learn the hard way."  Because Detective Aquire was

making a spectacle in front of the Judge, Court Staff, witnesses and the public, Plaintiff requested that they go outside the courtroom to further discuss the issues.

33. Outside the courtroom, Detective Aquire and another Deputy became even more vocal and aggressive by surrounding Plaintiff and repeating the same comments. Four or five other Sheriff Deputies also surrounded the two most aggressive Deputies. Plaintiff attempted to explain why he had to ask the Judge to order the Deputies back, but they would not listen. A defense attorney seeing the confrontation went inside the courtroom and told Plaintiff's colleague that she needed to call Plaintiff inside the courtroom because he was being confronted in a hostile manner by the Deputies. Plaintiff went inside the courtroom when called by his colleague.

34. Judge Injenikian was clearly upset. She called Defendant Victor Rodriguez into her Chambers. Judge Injenikian then called Glenn Sproul (Subpoena

Liaison for the Sheriff's Department who has his office in the DA's Office) into her Chambers. Judge Injenikian then called a Sheriff's Captain and Commander, or two Captains into her Chambers. Plaintiff was told by the law clerks that were in Dept. 5 that for at least seven weeks this situation was waiting to happen because the Sheriff's Deputies had not appeared when subpoenaed or they had been consistently late. Judge Injenikian did not call Plaintiff into her Chambers.

35. This situation occurred on Plaintiff's second day in Preliminary Hearing Court. Detective Aquire's threats that Plaintiff would have to learn the hard way proved correct because he was terminated. The efforts of Pam Brookwell and Defendant Rodriguez were in motion to get Plaintiff fired.

**D. Memo Regarding False Facts Allegedly Justifying Plaintiff's Termination**

36. The August 21, 2008 memo signed by Janet S. Moore, Pamela Booth, and Jacquelyn Lacey regarding

the termination of Dimitrios P. Biller contains

numerous false and untruthful statements that form

the foundation for Plaintiff's termination.

37.  Plaintiff's supervisor (Victor Rodriguez) has

made these false statements to protect a

dysfunctional system involving the Los Angeles

Sheriff's Department.  The Deputies in the East Los

Angeles Sheriff's Station regularly and routinely

failed to appear in court as scheduled when

subpoenaed.  Plaintiff brought this problem to the

attention of Defendant Rodriguez, the Subpoena

Control Officer (Pam Brookwell) and the Subpoena

Liaison for the Sheriff's Department at the DA's

Office in East Los Angeles (Glen Sproul).  Since

Plaintiff was not going to allow Deputies to ignore

their subpoenas, and he was complaining about this

problem, the memo regarding Plaintiff's termination

was drafted to cover up this serious problem.  It was

simply easier to terminate Plaintiff than to disrupt

the lives of Deputies who did not want to appear in

Court as subpoenaed.

**E.    PART I OF THE MEMO REGARDING "PROFESSIONAL SKILLS"
– PAGE 2**

38.  There are four paragraphs in the first part

of the August 21, 2008 memo (**Exhibit "7", page 2 or

5, page 1 is a cover page)**.  All of the paragraphs

contain false statements.  The false statements are

in red and bold print.

**(i)  Paragraph One**

39.  The first section entitled "PROFESSIONAL

SKILLS" contains false statements.  The first false

statement is:

> **"Over the 90 day period, Plaintiff's supervisor
> observed that Plaintiff repeatedly struggled with
> questioning witnesses on both direct and cross-
> examination.  His questions were often confusing,
> disjointed, and disorganize.**

40.  This statement is false.  Defendant Rodriguez

did not observe Plaintiff over a 90 day period.

Plaintiff started work in the ELA District Attorney's Office on June 9, 2008 and his last day in the office was August 14, 2008.   Therefore, Defendant Rodriguez supervised Plaintiff periodically for only 9 weeks (66 days).   Defendant Rodriguez was supposed to supervise Plaintiff for 90 days, and then give an evaluation.   Additionally, for the first month, Plaintiff was working in Misdemeanor Court and he did not conduct any examination of witnesses for two weeks.   Moreover, Plaintiff worked in Drug Court for approximately 2 weeks, and he did not conduct any cross or direct examination of any witnesses. Therefore, Defendant Rodriquez had only 5 weeks to observe Plaintiff perform direct and cross examinations, and Defendant Rodriquez was not supervising Plaintiff all the time while he conducted direct and cross examinations in Misdemeanor Court, trials, or Preliminary Court.

41.   Plaintiff was in Misdemeanor Court from June 9, 2008 to June 27, 2008.   During this time,

Plaintiff opposed a Motion to Suppress Evidence in People v. Richard Ortiz.   The People had the burden of proof once the motion is filed.   This was the only case during this period where Plaintiff had an opportunity to present direct and cross examination of witnesses in Dept. 4.   Plaintiff conducted direct examination of two witnesses, and cross examination of two witnesses.   Plaintiff obtained a denial of Plaintiff's Motion to Suppress Evidence because the Judge did not believe the Defendant's witnesses due to Plaintiff cross-examinations and she believed the Deputies that Plaintiff directly examined.

42. On June 11, 2008, Plaintiff crossed examined witness Padilla called on behalf of Defendant Ortiz. During that cross examination, Plaintiff was successful in destroying the credibility of Mr. Padilla.   Judge Lu eventually ruled that she did not find the Defendant and Mr. Padilla "credible" and she denied the Motion to Suppress.   In other words, Plaintiff was successful in his cross examinations.

Additionally, Plaintiff put on Deputy Castillo on June 11, 2008 to prove the initial stop was justified and later put on Deputy Melgoza to substantiate this position.   Thus, Plaintiff's direct examination of both Deputies was successful.   Plaintiff never saw Defendant Rodriguez supervise him before Judge Lu.

43.  Third, Plaintiff was the trial counsel in the case of People v. Melendez in Dept. 7.   During the course of that trial, Plaintiff presented 5 witnesses on direct examination, and cross examined the Defendant and 2 other defense witnesses.   After the cross examination of Defendant, the Bailiff in Dept. 7 approached Plaintiff and told him that was a "great cross examination" and he said Plaintiff was like a karate Black-belt performer because Plaintiff took the Defendant's story apart piece by piece.

44.  The cross examination of the Defendant laid the foundation to ultimately impeach the Defendant when Plaintiff put on the 911 caller to the accident. He provided testimony that was inconsistent with the

Defendant's testimony that Plaintiff brought out in his cross examination. As a result, the jury found the Defendant dishonest. The People prevailed in that case and the Defendant was found Guilty on all counts. The trial Judge took into consideration during the penalty phase the fact the jury did not believe Defendant.

45. Plaintiff's skills in cross examination of Defendant made the direct examination of the 911 caller very good. During cross examination of Defendant Plaintiff boxed him in a corner and got the Defendant to testify to facts that would be contradicted by the 911 caller. As planned, Plaintiff's direct examination of the 911 caller impeached the Defendant. Defendant Rodriguez was present during that direct examination and he told Plaintiff that he knew the case was over once the 911 caller testified.

46. Fourth, in People v. Bobadilla the Defendant was charged with possession of sale of narcotics.

The Defendant's brother took the witness stand during the Preliminary Hearing and testified that the narcotics belonged to him, not the Defendant, so the Defendant should be released.  The Defendant and his brother came up with this ploy because the Defendant was looking at 25 years to life if convicted (this conviction would have been his third strike) and the brother was only looking at felony probation.

47.  Plaintiff's cross examination of the Defendant's brother was, in the words of Defendant Rodriguez, "excellent" and "too good."  Judge Injenikian said she did not find the brother credible and she held the Defendant to answer the Felony Information.  Counsel for Defendant told Plaintiff that the cross examination totally discredited the brother and the Defendant could not possibly call him as a witness and present the same defense at trial because "he was so unbelievable and his credibility was destroyed."  Therefore, Plaintiff's cross-

examination skills directly led to the Defendant being held to answer.

48.  Fifth, the Deputy District Attorneys in the Training Program praised Plaintiff for his excellent skills in both direct and cross examination.  They used his performance to teach the other new hires how to conduct direct and cross examination.  If the District Attorney's Office would have taken the time to check with the Trainers and read their evaluations of Plaintiff, the DA's Office would have realized that Defendant Rodriguez' "observations" were NOT accurate, but in fact deliberately false.

49.  The second false statements in the first full paragraph on page 2 include the following:

> **"Opening statements were inappropriately argumentative.  Closing arguments were also confusing and unpersuasive.  During one closing argument, Plaintiff inappropriately shifted the burden of proof to the defendant thus risking possible reversal of the conviction."**

50.  This false statement refers to Plaintiff's opening statement and closing arguments in People v. Melendez.  After Plaintiff's opening statement, Defendant Rodriguez told Plaintiff that his opening statement "came close to being argumentative, but did not cross the line."  Furthermore, Plaintiff's closing argument was persuasive because the jury unanimously convicted the Defendant beyond a reasonable doubt.

51.  Lastly, the second sentence in the above paragraph is also false and untruthful.  Plaintiff did NOT come close to shifting the burden of proof to the Defendant because the Defendant testified that another person was driving his car when the accident occurred so he could not be found guilty of DUI or Hit and Run; that other person was working in Bakersfield 30 days before the trial; that other person talked to Defendant 30 days before trial, but Defendant did not disclose that other person until he

testified; Defendant did not subpoena that other person to testify.  Defendant Rodriguez did not know of this testimony until Plaintiff told him after the trial.  Defendant Rodriguez then admitted to Plaintiff that Plaintiff did not shift the burden of proof under this scenario.  Under these circumstances Plaintiff was free to argue to the jury that the other person did not exist because he did not testify on behalf of Defendant and Defendant failed to produce the alleged driver as a witness.  Defendant Rodriguez agreed.

52. The third false statement in the first paragraph of Section I include the following:

"**On another occasion, a preliminary hearing involving forgery and counterfeiting was dismissed <u>because Plaintiff called an unqualified witness to the stand to render expert testimony after the witness had clearly told Plaintiff that he could not give the expert opinion.</u>**"  (Emphasis added.)

53.  This statement is untrue and false.  First, in the case of <u>People v. MacCloud</u>, an expert witness from the Secret Service was presented at the Preliminary Hearing.  He was "qualified" to provide expert witness testimony because he worked in the Counterfeit Unit of the Secret Service, and Judge Injenikian did in fact allow him to provide expert opinion.  Therefore, the statement "Plaintiff called and "**unqualified witness to the stand to render expert testimony**" belies the record and is simply false.

54.  Second, the expert gave the opinion that the photocopies of the counterfeit money indicated to him that the currency was counterfeit.  However, he needed to see the reverse side of the money to be 100% sure.  That is not the standard for expert opinion testimony.  The standard is whether the opinion is within a reasonable degree of probability based on scientific principles on how to determine whether currency is counterfeit.

55. Third, the expert witness NEVER told Plaintiff before or during the Preliminary Hearing that "he could not give the expert opinion." In fact, before the Preliminary Hearing started Plaintiff showed the expert photocopies of the counterfeit currency and the expert told Plaintiff that it was in fact counterfeit and he could render that opinion.

56. Fourth, the Los Angeles Sheriff's Department failed to bring the actual counterfeit money to the Preliminary Hearing for the expert to examine. Detective Magnolano of the LASD assigned to the case told Plaintiff that the actual counterfeit was not in the evidence room. The Arresting Deputy told Plaintiff the actual counterfeit was not in the evidence room located in the Sheriff's Station within one block of the court house. However, the actual counterfeit money was in fact located in the Evidence Room at the East Los Angeles Sheriff's Station. The Detective and Deputy were simply too lazy to retrieve

the evidence for the Preliminary Hearing.  Defendant

Rodriguez told Plaintiff that Detective Magnolano is

"the laziest son-of-a-bitch.  He commits malpractice

every day.  He should be fired."

57.  Lastly, there were two days left and the

complaint could have been re-filed, so the dismissal

was only temporary as long as the complaint was re-

filed on the day of the Preliminary Hearing.

However, Victor Rodriguez and the Filing Deputy had a

disagreement as to whether counterfeit charges could

be filed in State Court.  Plaintiff gave the Filing

Deputy a Supreme Court case that indicated such

charges could in fact be filed under the same Penal

Code Section that the MacCloud case was filed in

State Court.  The Filing Deputy had the opinion that

counterfeiting was a Federal crime, but Victor

Rodriguez had the opinion it was a State crime.  It

was their decision not to re-file the complaint and

make the dismissal permanent.  In other words,

Defendant Rodriguez and the Filing Deputy allowed the case to be dismissed, not Plaintiff.

### (ii) Paragraph Two

58.  Plaintiff cannot address the first part of the second full paragraph because he was not privy to that conversation between Defendant Rodriguez and the Commissioner.  However, the following statement the Commissioner allegedly made was false and untruthful:

**"Plaintiff had done a 'very bad job' and she was concerned about how close Plaintiff had come to committing prosecutorial misconduct by arguing facts not in evidence."**

59.  Immediately after the trial Plaintiff reported to Defendant Rodriguez that Commissioner Braid committed reversible error because she allowed the Defendant's attorney to:  (1) instruct the jury on the law of criminal negligence, (2) instruct the jury regarding criminal negligence that was inconsistent with the jury instructions, and (3) tell the jury about other forms of burdens of proof

unrelated to criminal cases to make the argument it would be impossible to find a defendant guilty beyond a reasonable doubt.  It is basic trial practice and trial legal principles that only the Judge instructs the jury on the law, and the attorneys are not permitted to instruct the jury on the law or give inconsistent statements of the law that contradict the jury instructions.

60. Based on Plaintiff's complaints about Commissioner Baird, Defendant Rodriguez got very concerned and told Plaintiff that he would talk to Commissioner Baird about his complaints.  Defendant Rodriguez told Plaintiff after the meeting that Commissioner Baird said Plaintiff was right and she should have sustained his objections raised in closing argument about the Defendant's counsel improperly instructing the jury.  Defendant Rodriguez never told Plaintiff about the alleged statement Defendant Rodriguez attributed to Commission Baird. When Commissioner Baird's criticisms of Plaintiff are

put in this context then it is obvious that her

criticisms were not objective and truthful.

61. The second half of that paragraph is

misleading.  The false statement is:

"**Another judge before whom Plaintiff repeatedly**

**appeared to conduct preliminary hearings expressed**

**concerns over Plaintiff's 'incompetence' and 'bad**

**attitude' summing up her observations of his**

**courtroom performance by saying that 'he just**

**doesn't get it.'"**

62. Plaintiff started to work in the Preliminary

Hearing Court (Dept. 5) before Judge Injenikian on

June 30, 2008.  His first Preliminary Hearing was on

July 1, 2008.  Between July 1, 2008 and August 11,

2008, Plaintiff conducted approximately 14

Preliminary Hearings, and 12 cases were "Held to

Answer."  A Deputy District Attorney's job is to

convince a judge that there is probable cause to hold

the Defendant to answer a Felony Information.

63. Plaintiff was actually in Preliminary Hearing Court approximately 3 or 3 ½ weeks and not the entire 6 weeks between July 1, 2008 and August 11, 2008 because he was assigned to Drug Court for approximately 2 or 3 weeks.  There was a learning curve for Plaintiff because he never conducted Preliminary Hearings during his 20 years as a civil trial attorney.  Preliminary Hearings are very different from criminal or civil trials because the judges don't want to hear a lot of details and the nature of the questions have to go directly to facts regarding the elements of proof.

64. It is true that Defendant Rodriguez reported these comments to Plaintiff.  The comments were made during Plaintiff's first week or week and a half (4 to 7 days after Plaintiff was assigned to Preliminary Hearing Court).  However, on August 8, 2008 Plaintiff proved he was competent during the Preliminary Hearing.  Defendant Rodriguez observed Plaintiff that day and gave him a note that stated:  **"Very Good!"**

(Emphasis added.)   The note had a smiley face under the words **"Very Good!"   (Exhibit "7")**

65.   In the afternoon following that Preliminary Hearing, Judge Injenikian called Plaintiff to her bench.   She said the following:

> **"Mr. Biller, do you know what we (the court staff and the judge) have been talking about during lunch?  We have been talking about you and your performance this morning.  We could not believe how well you did and how well you have improved.  Keep up the good work.  We will make a criminal lawyer out of you yet." (Emphasis added)**

66.   Those comments and Defendant Rodriguez' note were provided to Plaintiff during his third week in Preliminary Hearing Court.   Consequently, Plaintiff showed substantial improvement – not **"slight and inconsistent progress"** as stated in the memo.   Clearly by the third week in Preliminary Hearing Court Plaintiff substantially improved.   He would have

continued to improve if he was not prematurely
terminated.

### (iii)    Paragraph 3

67.  The third paragraph also contains a false
statement.  That statement is **"Plaintiff had
difficulty organizing his materials in order to be
properly prepared for court."**

68.  Plaintiff arrived at work every day at 6:00
a.m. to prepare for Preliminary Hearings that
commenced at 9:00 a.m. to 9:15 a.m.  During those 3
hours, Plaintiff reviewed the cases scheduled for
Preliminary Hearing he was handling; he highlighted
the material information in the Police Reports; he
wrote out his questions for each witness as required
by Defendant Rodriguez; he photocopied the jury
instructions on the charges/crimes at issue so all
the required elements of proof would be at
Plaintiff's finger tips; and he organized this
material in the files and in the order of the
witnesses he would call.  When Plaintiff arrived in

Dept. 5, he would lay out on the table all the cases being called in alphabetical order so he could easily find the files.

69. However, Terry Mitchell (the Deputy supervising Dept. 5) would come into the courtroom late and scramble all the files when searching for the cases she would handle. As a result, the DA's counsel table consistently looked messy. Plaintiff would clean the table numerous times a day because Mrs. Mitchell was not in Dept. 5 all the time during the day. However, every time she appeared in Dept. 5 she would scramble the files to find the files she was handling.

**(iv) Paragraph Four**

70. The fourth paragraph is misleading and false. That paragraph states:

"**Plaintiff was repeatedly counseled and on all (sic) of these performance issues and given advice and direction on how to improve. However, despite these efforts to assist Plaintiff in improving his**

**performance, only slight and inconsistent progress was observed."**

71. Defendant Rodriguez talked (actually yelled at) Plaintiff regarding a couple of the above issues and once for each issue, not "repeatedly." With regard to the Preliminary Hearing Court, Defendant Rodriguez recognized Plaintiff's substantial improvement by writing a note on August 8, 2008 to him stating: "Very Good!" with a smiley face. On that same day, Judge Injenikian called Plaintiff to the bench and praised him on how well he improved in Preliminary Court. Four days later, Plaintiff was put on paid leave of absence because of Pam Brookwell's complaint. Plaintiff was given only three to three and a half weeks in Preliminary Court to perfect his skills in Preliminary Hearing Court, and when he finally did so he was terminated.

72. When Defendant Rodriguez "counseled" Plaintiff, he yelled at him and used demeaning and unprofessional language. He attached inappropriate

adjectives to his criticisms.  Defendant Rodriguez told Plaintiff: (1) you will never make the transition from civil practice to criminal practice, (2) you are incompetent, (3) you don't know the rules of evidence, (4) you are too formal, (5) you don't need to stand up when addressing the court, (6) you have to unbutton your jacket because you look too stiff, (7) that was the worst performance I have ever seen, (8) that performance was "less painful"  and (9) civil trial lawyers don't know how to try cases.

73.  His "counseling", "advice" and "direction" was not informative, but insulting, demoralizing and degrading.  While he made these comments he was actually yelling at Plaintiff.  Defendant Rodriguez was angry: his facial expressions looked mean; he had foam at the sides of his mouth, his eyes were bulging and his eyelids were wide open; and he leaned forward over his desk with his arms stretched out to the sides.

74. When Defendant Rodriguez attempted to provide constructive criticism, it was laced with insults, yelling and talking at a frustrated and fast pace. Additionally, Defendant Rodriguez told Plaintiff to prepare all his questions for each Preliminary Hearing in writing and give the outlines of questions to him and/or Mrs. Mitchell to review.  Plaintiff told him that he was dyslexic, so it would take longer for Plaintiff to read questions and the questions would not be fluid.  Additionally this practice was inconsistent with the training the DA's Office provided Plaintiff (the new Deputy District Attorneys were instructed to NOT write out questions).  However, Defendant Rodriguez was unsympathetic, did not care of Plaintiff's inability to read fluidly and dyslexia and demanded that Plaintiff with his orders.  However, Defendant Rodriguez and Terry Mitchell (Supervisor for Dept. 5) never gave Plaintiff any feedback on the questions and outlines he prepared.

75. Furthermore, Defendant Rodriguez gave Plaintiff incorrect advice. Plaintiff told Defendant Rodriguez that Judge Injenikian did not want any experts excused from the courtroom, and she did not want any hypothetical questions asked to elicit opinion testimony. Defendant Rodriguez told Plaintiff to ignore those instructions, and when the Judge instructed him not to give hypothetical questions Defendant Rodriguez told Plaintiff to ignore the Judge and proceed with hypothetical questions. Defendant Rodriguez also instructed Plaintiff to tell the Judge that "the law required hypothetical questions."

76. When Plaintiff followed these instructions, Judge Injenikian came down on Plaintiff and instructed him to proceed without any hypothetical questions. Later that afternoon, Defendant Rodriguez informed Plaintiff that he "was wrong", and hypothetical questions are not necessary.

77.  Plaintiff has been a civil trial attorney for 20 years.  He was a Partner at one of the largest law firms in the country and he practiced law there for 14 years.  Plaintiff tried 6 cases while at Pillsbury Winthrop.  He was Managing Counsel at Toyota for 4 and half years.  He managed 12 complicated cases through trial in 36 months.  During his career Plaintiff made the transition from simple tort claims involving slip and falls, to complex litigation and class actions.  This history proves Plaintiff would have substantially improved his performance if given the opportunity.  He already was improving as of August 8, 2008 because both Defendant Rodriguez and Judge Injenikian praised him.

78. On August 7, 2008 Plaintiff had lunch with one of the trainers at the District Attorney's Office leading the Training Program that Plaintiff and other new hires were required to take.  She was the person who trained Plaintiff on Preliminary Hearings. During lunch Plaintiff explained the difficulties he

was having in Preliminary Hearing Court. She told him

to just continue to work hard and everything would

fall in place.  She went on to say Plaintiff would be

in felony trial courts soon.  She was right with

regard to Preliminary Hearing Court.  The next day

after Plaintiff's Preliminary Hearing he received

praise from both Mr. Rodriquez and Judge Injenkian.

**F. PART TWO OF THE MEMO REGARDING ADAPTABILITY &
PERSONAL RELATIONS – PAGES 3-5**

79. This paragraph contains mischaracterizations,

false, untruthful and misleading statements of

Plaintiff's behavior and attitude.

**"[Plaintiff] often became unduly enraged over
situations which are common occurrences in the life
of a deputy district attorney." [Furthermore,]
"His reactions to difficulties and disappointments
were inappropriately extreme. He seemed unable to
control his emotions." "[L]aw enforcement reported
that Plaintiff was unreasonably demanding, unable
to deal with problematic issues without becoming**

angry, and often treated law enforcement personnel in a rude and condescending manner."

80. This paragraph is false and untruthful.

### (i)    Second Full Paragraph

81. The first sentence in the first paragraph is not true.  That sentence states:

"On June 26, 2008, Plaintiff became enraged over erroneous rulings made by the judge in a child endangerment case."

82. Plaintiff did NOT become "enraged over erroneous rulings."  Plaintiff expressed frustration over the fact that two Sheriff Deputies failed to appear in court, the Judge ordered the Deputies to appear in court when called to testify, and Plaintiff called the Deputies the night before they needed to testify.  However, Deputies Herrera and Mosquera did not appear in Court.  As a result, Plaintiff had to rest his case and could not present to the jury a rebuttal case and present evidence that the Defendant

and his witnesses were untruthful during the Defendant's case.

83. The jury returned a Not Guilty verdict. Plaintiff informed Defendant Rodriguez that the Deputies did not show up. Defendant Rodriguez instructed Plaintiff to prepare a memo so he could file it with the Sheriff's Department.  Plaintiff did prepare that memo and gave it to Defendant Rodriguez. However, he did not give the memo to the Sheriff's Department.

**(ii) Third Full Paragraph**

84. In the third full paragraph on page 3 or 5, the memo states that Plaintiff rejected assistance from Terry Mitchell.  The memo states:

**"[During a Preliminary Hearing] Grade III DDA saw that Plaintiff had not properly laid the foundation for the enhancement and that the People were going to lose it if the state of the evidence remained as it was.  The Grade III attempted to prompt and direct Plaintiff as to**

the questions that needed to be asked.  Rather
than welcome the assistance from this senior DDA,
Plaintiff became indignant and resistant.  When
Plaintiff returned to the office, he angrily
complained to his supervisor about the senior DDA
'lecturing' during the prelim.'  The supervisor
described his demeanor as 'livid.'  Plaintiff
only calmed down when it was made clear to him
that the senior DDA's 'interference' actually
prevented dismissal of the gang enhancement."

85.  This paragraph contains false and misleading
statements.  First, Terry Mitchell "attempted to
prompt and direct Plaintiff as to the questions that
needed to be asked", however, she also stood next to
Plaintiff and lectured him during the Preliminary
Hearing "why" the questions needed to be asked and
explained the legal reasoning in a condescending
manner.  When Terry Mitchell pointed to the questions
on the DA's Form Outline that Plaintiff missed, he

said "thank you" and attempted to proceed to ask

those questions.  Terry Mitchell prevented Plaintiff

from asking the questions because she insisted on

explaining in a loud, rude and frustrated voice "why"

the questions needed to be asked.  The Judge and

witness were waiting for the next questions to be

asked, but Terry Mitchell simply ignored the

courtroom environment and insisted on explaining the

legal reasoning behind the questions.  This lecture

took 2 or 3 minutes, and Plaintiff had to say "I

understand.  Please let me ask the questions."

86.  Plaintiff did not "angrily complain" about

the above incident.  He merely asked Defendant

Rodriguez to tell Mrs. Mitchell not to lecture him

during the Preliminary Hearing as to the reasons and

legal basis to ask questions that he missed.

Plaintiff told Defendant Rodriguez that he

appreciated the help and thanked Mrs. Mitchell; he

also said that he wanted the help.  But merely

pointing out the questions written on the outline was

enough and she could then talk to Plaintiff later,

outside of Court and the presence of the Judge,

witnesses and the public.

87. Terry Mitchell has a habit of interfering

with new Deputy District Attorneys while they conduct

Preliminary Hearings. Numerous DDAs complained to

Plaintiff about her nervous, panicked, frantic,

anxious, and premature interference that interfered

with their Preliminary Hearings. Plaintiff was

simply bringing this issue to the attention of

Defendant Rodriguez.

**(iii)     Paragraph Four**

88. Paragraph four on page 3 or 5 contains

misleading facts and omits material information that

paints a completely different picture. The case

involved People v. Bobavilla. The Defendant called

his brother as a witness to testify that he, not the

Defendant, owned the heroin and cocaine for personal

use. The People alleged that the Defendant owned the

heroin and cocaine for sale. Plaintiff's cross

examination of the Defendant's brother was so compelling and convincing, Judge Injenikian said she could not give that testimony any weight and stated he lacked credibility.  On that basis the Defendant was held to answer to a felony Information.

89. After the Preliminary Hearing, the attorney for Defendant praised Plaintiff for his cross examination.  He further told Plaintiff that the Defendant was not going to call his brother as a witness because Plaintiff "thoroughly destroyed his credibility."

90. Defendant Rodriguez called Plaintiff into his office after the hearing and told him that the cross examination was "excellent" but he did "too good of a job" because charges could not be filed against the brother.  Defendant Rodriguez said that "we" had to dismiss the case.  Defendant Rodriguez said that the Deputy-In-Charge in the Norwalk DA's Office did not want to prosecute challenging cases because he **"had to keep up his conviction rate at 75%."**  Defendant

Rodriguez acknowledged that this practice was inappropriate, but he had to work with that Deputy-In-Charge.  Defendant Rodriguez further told Plaintiff that the Deputy-In-Charge in Norwalk would not prosecute the case, so "we" needed to dismiss the case.  Plaintiff informed Defendant Rodriguez of the conversation he had with the Defendant's attorney, but that did not convince him to not dismiss the case.  Plaintiff volunteered to take the case to trial because he was convinced that the Defendant was guilty beyond a reasonable doubt.  But Defendant Rodriguez ignored this request.

91.  Defendant Rodriguez never explained to Plaintiff that either he or Terry Mitchell had to inform the Court that the case was being dismissed and the 3 Strike Defendant needed to be released. Defendant Rodriguez never told Plaintiff that he needed to put certain statements on the record to make sure the dismissal did not come back to harm his office if the Defendant killed somebody.  Defendant

Rodriguez never instructed Plaintiff to not dismiss the case because he or Mrs. Mitchell had to personally dismiss it.    Defendant Rodriguez told Plaintiff that "we" needed to dismiss the case; it was reasonable for Plaintiff to conclude that he or Defendant Rodriguez had to dismiss the case when called.

92.    When Judge Injenikian called the case and brought the Defendant up out of lock up, Plaintiff and another young DDA were the only Deputy DAs in the courtroom.    The Defendant's attorney announced ready. Judge Injenikian looked at Plaintiff and was waiting for Plaintiff to make his appearance.    Plaintiff stated his appearance.    Judge Injenikian then stated "well, do you have something for me."    Plaintiff then moved to dismiss the case.

93.    Within a minute, Defendant Rodriguez and Mrs. Mitchell entered the courtroom.    Defendant Rodriguez looked at Plaintiff with a very angry facial expression (wide open eye lids, bulging eyes, and

foam at the sides of his month, intense facial/body

language leaning forward towards Plaintiff).  He said

"Did you dismiss the case?  Why did you dismiss the

case?"  Defendant Rodriguez then went on to tell

Plaintiff in a loud voice in open court that he

"should not have dismissed the case" because he

needed to put something on the record to make the

dismissal appear appropriate.

94.  Plaintiff said:  "You told me that 'we'

needed to dismiss the case.  I handled the

Preliminary Hearing.  The case was called, the

Defendant was out of lock up and Defendant's counsel

announced ready so Judge Injenikian looked at me to

make an appearance.  You were not in court.  Mrs.

Mitchell was not in court. You never told me not to

dismiss the case and that you or Terry needed to

dismiss it.  I was the only Deputy District Attorney

in court to appear."

95. Realizing that Defendant Rodriguez was

unprofessional, rude and angry, he called Plaintiff

into the witness interviewing room.  He then went on
to explain that a dismissal of a 3 strike Defendant
when the Court held him to answer the Felony
Information was a "serious matter", and he needed to
put something on the record to make it look like the
dismissal was appropriate.  Defendant Rodriguez then
explained that he had to write a "memo to the file to
cover [his] ass because if the Defendant goes out and
kills somebody then [he] would be in big trouble."

96.  Terry Mitchell told Plaintiff at the meeting
in the witness interview room that the situation was
not his fault.  She explained that there was an
agreement between the Defendant's attorney and Mrs.
Mitchell that the Defendant would be brought up at a
certain time and he would announce ready at a certain
time.  However, the Defendant's attorney arrived
early, requested the Defendant to be brought up from
lock up early, and he announced ready early.  Mrs.
Mitchell said the situation was the fault of the
Defendant's attorney.

97.  During this meeting, Plaintiff did briefly cry.  He came to tears because Defendant Rodriguez came down so hard on him inside the courtroom, and because he failed to communicate that he or Terry Mitchell had to dismiss the case.  Defendant Rodriguez was shifting the blame to Plaintiff when he and/or Mrs. Mitchell made the mistake by not communicating the plan to Plaintiff and appearing late to dismiss the case.

## G. THE REAL FACTS OF AUGUST 14, 2008

98.  Page 4 or 5 contains false statements of fact, and omissions of material facts that completely change the events of August 14, 2008 as described on page 4 - 5.  Furthermore, the false statements are general comments without any specific facts to describe the conclusionary untruthful statements. Other than the events of August 14, 2008 the statements below are vague and ambiguous.  These false statements do not refer to any specific event other than August 14, 2008.  Plaintiff can only

address that event.  Again, there is not any

substance to these false statements because they did

not happen.  The following statements on pages 4 - 5

are simply false:

1. "Plaintiff did not work cooperatively with her court

   liaison deputy.  He often jumped the chain of command

   to come directly to her with requests for assistance,

   such as getting evidence into court or locating

   missing deputies, thus inappropriately involving her

   with matters that could and should be handled by the

   court liaison.  Plaintiff was often inflexible when

   dealing with her deputies."


2. In other situations, when all efforts to produce the

   item or person requested had failed, Plaintiff would

   express severe frustration and anger.  Plaintiff did

   not seem to grasp that what could be done had been

   done and that he would have to proceed without the

   desired item or person. . . .  Plaintiff's

interactions with her deputies were often rude, demeaning, and condescending."

3. "When the court liaison deputy said that he would try to get it but that it would take a little time, Plaintiff dismissed him and said that he intended to go over to the station himself right then and there to get it (evidence).  The deputy assigned to the case offered to go to the station to look for the tape but Plaintiff insisted that he would get it himself.  The court deputy asked Plaintiff if he could help to which Plaintiff replied 'Do I look like I need help?'  Both deputies accompanied Plaintiff to the station because they were concerned that he would create a scene in the detective division."

(i) Deputies Failed to Appear in Court

99. On the morning of August 14, 2008 Plaintiff had a Preliminary Hearing in <u>People v. Lara/Chipres</u> in Dept. 5.  When he started to review the file, he noticed that the subpoenas for Deputies Michael

Hernandez and Sanchez were issued on August 4, 2008. They were ordered to appear via subpoena to be in court at 8:30 a.m. in Dept. 5 on August 14, 2008.

100. At 9:10 a.m. they did not appear in Court as ordered and Lara/Chipres was called for Preliminary Hearing. Plaintiff requested 2nd call. He then went down to the Sheriff's Liaison Office in the DA's Office to find out why the Deputies did not appear.

**(ii) Deputy Glenn Sproul's Efforts to Locate the Deputies**

101. Glenn Sproul was present sitting at his desk not doing anything. Plaintiff said good morning. He looked at the book identifying all Deputies who were subpoenaed to appear. He saw the names of both Deputies Sanchez and Hernandez' in the book. Plaintiff asked Glenn why "didn't Sanchez and Hernandez appear in Dept. 5." Mr. Sproul asked Plaintiff "who"? Plaintiff repeated the question. He said he did not know, so Plaintiff asked him to

locate the Deputies.  Then Plaintiff went back to court.

102. Approximately one hour later, Plaintiff went back to Mr. Sproul's office and asked him if he got hold of Deputies Sanchez and Hernandez.  Mr. Sproul said: "who's Hernandez"?  Plaintiff said "Michael Hernandez the second Deputy who was subpoenaed to appear in court at 8:30 a.m."  Then Glenn said he did not know anything about him and that he was needed.  Plaintiff said he didn't know who was needed because he has not had the opportunity to talk to either Deputy.  Plaintiff needed to talk to both of them to determine who was needed for the Preliminary Hearing.  Plaintiff then returned to Dept. 5.

**(iii)  Deputy Sanchez Stated He Cannot be in Court**
        **Until the Afternoon**

103. Within 5 minutes, Mr. Sproul came to Dept. 5 to inform Plaintiff that he got hold of Deputy Sanchez.  Plaintiff followed Glenn to his office, and Plaintiff called Deputy Sanchez.  Deputy Sanchez told

Plaintiff he could not be in court until 1:30 p.m.

Plaintiff said that was fine.

### (iv) Plaintiff Requested Evidence to be Produced Before the Preliminary Hearing

104. Plaintiff later told Mr. Sproul that

Plaintiff also needed to produce the videotape of the

images and conversations of the Defendants inside the

stolen car to comply with the DA's discovery

obligations. Plaintiff told Mr. Sproul he needed the

videotape before 1:30 p.m. so that the Public

Defenders could review the tape before the

Preliminary Hearing.  If Plaintiff did not give them

the tape, then the Preliminary Hearing would be

continued.

105. Mr. Sproul told Plaintiff to call the

Investigating Officer on the case.  Plaintiff did

make that call, but he did not answer.  Plaintiff

left a message.  Plaintiff then called Deputy Sanchez

and asked him to get the tape and make copies for the

Defendants.  At first, Deputy Sanchez said his

station did not have the tape.  Plaintiff asked him

to please make sure he was correct, and if the

Sheriff's Station had the tape, then two copies and

the original were needed at 1:30 p.m.  Deputy Sanchez

told Plaintiff that his office did not have the

ability to make copies.  Mr. Sproul told Plaintiff

while he was talking to Deputy Sanchez that the

Detective's Bureau had the equipment to make copies

of the tape.  Plaintiff repeated this information to

Deputy Sanchez and he said he would check it out.

### (v)  **Plaintiff Walked to the Sheriff's Station Alone, Not with Mr. Sproul or Rich**

106. Mr. Sproul said the IO should be doing this

work.  Plaintiff said "I understand, but the IO is

not around."  Plaintiff told Mr. Sproul "I don't mind

walking to the Sheriff's Station to retrieve the

tapes", and Mr. Sproul asked him if he needed help.

Plaintiff said "no.  Why would I need help"?  Mr.

Sproul then said "o.k."  Rich, the other liaison

Deputy for the Sheriff's Department said: "you are

going to need his help." Plaintiff was confused and said "really?" Rich made the same statement again, and Plaintiff said to Mr. Sproul "o.k. Glenn, can you come with me"? He said "no. My offer was a onetime offer." Rich then repeated the same statement. Mr. Sproul did not go to the Sheriff's Station with Plaintiff.

### (vi) Plaintiff Talked to Deputy Sanchez at the Sheriff's Station

107. Plaintiff walked alone (not with Mr. Sproul or Rich as the memo claims) to the Sheriff's Station. He requested to speak to Deputy Sanchez. Deputy Sanchez came to the reception area and said he found the tape. Plaintiff asked him if the Deputy could make copies, and he said he could not. Plaintiff asked him if he checked with the Detective's Bureau for copying equipment and he said no. Plaintiff asked him to please check if the Detective's Bureau had the equipment. Deputy Sanchez said even if the equipment was there, he still needed tapes and he did

not think there were any tapes.  Plaintiff asked him
to please check if there were any tapes.

108. Plaintiff went on to explain that if the
Detective's Bureau did not have either the equipment
or the blank tapes, then he would go make copies.
Plaintiff explained he did not mind going to a
business to make copies.  Plaintiff merely said that
he wanted the copies made as soon as possible because
the Defendants' attorneys needed to review the tape
before 1:30 p.m.  Deputy Sanchez agreed to check the
Detective's Bureau.

**(vii)  Mr. Sproul Arrived at the Sheriff's Station**

109. While Deputy Sanchez was checking the
Detective's Bureau for the equipment and tapes, Mr.
Sproul came to the station.  He asked Plaintiff if
Deputy Sanchez found the tape.  Plaintiff said "yes",
but he was checking if the Detective Bureau had the
equipment to copy the tapes and blank tapes.  Mr.
Sproul then said "come with me."  Plaintiff followed

Mr. Sproul into the Detective's Bureau and Deputy

Sanchez was in the process of making copies.

### (viii) Deputy Sanchez Made Statements Indicating Mr. Sproul Failed to Serve Him in a Timely Manner

110. Mr. Sproul and Plaintiff walked to Deputy

Sanchez and Plaintiff thanked him for copying the

tapes.  While Sanchez was copying the tape, Sanchez

said to Glenn **"next time don't serve me with a**

**subpoena the day before the preliminary hearing**

**(August 13, 2008)."**  Mr. Sproul made a facial

expression and gave a wink of the eye essentially

telling Sanchez non-verbally "don't say anything."  I

did not say anything because it was clear Deputy

Sanchez was unhappy about being served on August 13,

2008.  Additionally, Mr. Sproul clearly did not do

his job and he wanted to hide that fact from me.

111. The subpoena should have been served on

August 4 or 5, 2008 because it was issued on August

4, 2008.  Plaintiff confirmed this with Victor

Rodriguez and asked him why wasn't the subpoena

served timely.  Defendant Rodriguez then said "I don't know."

### (ix) Plaintiff and Sheriff's Personnel Had Fun and Joked Around

112. While at the station, Mr. Sproul, Deputy Sanchez, the Sergeant supervising the Detective's Bureau and Plaintiff joked around.  Plaintiff said "I can't believe that the county cannot provide law enforcement with the basic equipment to do its job." The Sgt. said she does not even have a fax machine that can fax outside the 323 area code.  Plaintiff then responded that a fax machine only cost $150.00, and she said then "buy me one."  She went on to say "you don't know the half of it."

113. The Sgt. said to Plaintiff "what's up with that guy 'Robert' (Filing Deputy DA) at your office? He's a weird dude."  Plaintiff did not say anything, but Mr. Sproul put his index finger to his lips to gesture "stop talking."  The subject was dropped immediately.

114. During the time Deputy Sanchez was making duplicate copies, all four of us talked and joked around in a very relaxed environment. Plaintiff thanked Deputy Sanchez after he was finished copying the tape. Mr. Sproul and Plaintiff walked back to the office together talking about life, marriage, the freedoms that come along with being single, why Glenn never got married, his desire not to have children, his dating of young woman in their 20's, and the challenges of being married.

115. Mr.Sproul never told Plaintiff that he was "huffy", "demeaning", "unreasonable", made a "big deal out of minor problems", was bossing the Deputies around too much, and that he had an "anger management control" problem. Furthermore, Rich never came to the Sheriff's Station with Plaintiff or Glenn on August 14, 2008 at any time.

**(x)    Defendant Rodriguez Prematurely Told Plaintiff That Pam Brookwell Filed a Formal Complaint**

116. Later Victor Rodriquez called Plaintiff into his office.  He told Plaintiff that Pam Brookwell had filed a formal complaint against him.  He told Plaintiff that there were two parts of the complaint. **He said he was not concerned about the first part because "we are trial lawyers and sometimes we have to get evidence in a way that does not follow procedure."**  He said, however, he was very concerned about the second part.

117. Pam Brookwell called him while Plaintiff and Mr. Sproul were at the station to lodge a complaint that Plaintiff was: (1) "huffy", (2) "demeaning to officers", (3) "made a big deal out of small problems", (4) "was unreasonable", (5) "was bossing the Deputies around" (6) "had an attitude problem" and (7) "had anger management issues."  She told Defendant Rodriguez that Plaintiff exhibited this behavior while at the Sheriff's Department.

118. Defendant Rodriguez told Plaintiff that these types of complaints have to be reported to his boss,