and it was now out of his hands.  Plaintiff

immediately denied these accusations as "lies" and

"fabrications."  Plaintiff went on to tell Defendant

Rodriguez everything that happened at the station

that day requiring him to go to the Sheriff's

Station.

**(xi)    Plaintiff had an Emotional Breakdown**

119. Plaintiff then had an emotional breakdown

because:  (1) Pam Brookwell lied and fabricated the

above complaint only because Plaintiff called her on

one occasion to complain about four Deputies who did

not fulfill their duties regarding court appearances;

(2) he was wrongfully being accused of bad behavior

that would damage his reputation and that is the only

asset an attorney has; (3) Defendant Rodriguez had

been riding him with consistent rude, unprofessional,

insulting criticisms for a while that were

unwarranted and Plaintiff  had simply listened in an

effort to improve; (4) this was his first assignment

and he felt his record at the DA's Office had a

blemish; (5) he felt his reputation as a DA was damaged; and (6) Defendant Rodriguez was working with Pam Brookwell to get Plaintiff fired.  These concerns caused Plaintiff to have an emotional breakdown because he suffers from depression.

### (xii)  Plaintiff Denies the Vague and General Allegations

120. Plaintiff told Defendant Rodriguez that what Mrs. Brookwell said was not true and he would do anything to clear his name.  Plaintiff swore on his life and the lives of his children that he did not act in the manner as she described.  Plaintiff told Defendant Rodriguez that he would take a lie detector's test to prove she was lying.  Plaintiff told him that he would do anything he wanted to clear his name and prove the complaint was filled with false allegations.

121. Plaintiff asked Defendant Rodriguez to speak to Mr. Sproul, Deputy Sanchez, the Sgt. in the Detective's Bureau, and Rich to confirm his version

of events.   Defendant Rodriguez said that he should
have talked to Mr. Sproul first before approaching
Plaintiff and that was his mistake.   Defendant
Rodriguez promised to talk to everybody Plaintiff
asked him to talk to.   Plaintiff asked Defendant
Rodriguez "if you were in my position, wouldn't you
be upset."   Victor said "yes."

### (xiii) Plaintiff Has Always Taken Responsibility for His Mistakes

122. Plaintiff told Defendant Rodriguez that Mr.
Rodriguez had been very critical of him and quite
brutal in the manner he had criticized Plaintiff.
Defendant Rodriguez agreed.   Plaintiff then reminded
Defendant Rodriguez that he always took his
criticisms with a positive attitude and accepted
responsibility to improve.   Defendant Rodriguez
agreed.   Plaintiff reminded him that Judge Injenikian
had also been very critical of his performance for 2
1/2 weeks, but Plaintiff also accepted her criticisms

and tried to incorporate them into his approach to Preliminary Hearings. Defendant Rodriguez agreed.

123. Defendant Rodriguez agreed on both statements and said that Plaintiff has had a "great attitude." Plaintiff went on to say, if Defendant Brookwell's comments were true then he would accept those criticisms and take responsibility just like he has done in the past while at ELA and during his entire career.  However, Plaintiff told Defendant Rodriguez that he was not going to take responsibility for something he did not do.

**(xiv)  Pam Brookwell's Complaint was Filed to Get Plaintiff Fired**

124. Plaintiff further informed Defendant Rodriguez that the complaint was vindictive and spiteful because Plaintiff complained to Pam Brookwell about Deputies not appearing in Court at all or on time.  He reminded Defendant Rodriguez that he prepared a memo confirming his discussions with Pam Brookwell.  Plaintiff then asked to see the memo

and Defendant Rodriguez handed him the memo.
Defendant Rodriguez stated he never sent the memo to
the Sheriff's Department as promised.

### (xv) Defendant Rodriguez Informed Plaintiff that He would Have His Day to be Heard and There would be a Full Investigation

125. Defendant Rodriguez told Plaintiff that he
just wanted to talk to him about a better way of
dealing with the Sheriff's Department, but since he
was denying the allegations his boss (Janet Moore)
had to handle the complaint.  Defendant Rodriguez
said that there would be a full investigation by
Janet Moore.  Plaintiff asked him if he was going to
be given the opportunity to talk to Janet Moore, and
Defendant Rodriguez said "absolutely.  She is going
talk to you.  She will hear your side of the story."

### (xvi) Plaintiff Asked Defendant Rodriguez if He could go Home, and It was NOT Defendant Rodriguez' Suggestion as Alleged in the Memo

126. Plaintiff asked Defendant Rodriguez if he could go home.  Defendant Rodriguez said "yes", but said he wanted Plaintiff to calm down and he could not let Plaintiff go home alone because there was liability exposure if he got into an accident. Defendant Rodriguez told Plaintiff to relax, and he called his supervisor to inform her of the situation. There was a delay in contacting her.  Defendant Rodriguez said that Carole Burke, Janet Moore's assistant, was coming with a couple of deputies.

**(vxii)    Defendant Rodriguez Could Not Give Plaintiff Any Specific Information Regarding the Complaint**

127. When Plaintiff stopped crying, he asked Defendant Rodriguez to tell him again what the complaint was about.  Defendant Rodriguez repeated the complaint.  Plaintiff asked him what does "huffy" mean.  Defendant Rodriguez did not know. Plaintiff asked him for a dictionary and he looked up the word. He read the definition from Defendant Rodriguez'

small Oxford Dictionary.  Defendant Rodriguez agreed

the definition of the word did not rise to the level

of making a complaint - even if true.

128. Plaintiff asked Defendant Rodriguez what Pam

Brookwell said specifically to back up her complaint.

Victor told him "nothing" and her comments "were

general."

### (xviii)  Plaintiff Was Allowed to go Home and put on Paid Leave of Absence

129. Carol Burke from the downtown DA's Office and

two DA investigators came to Defendant Rodriguez'

office.  Plaintiff introduced himself.  Mrs. Burke

told Plaintiff that she wanted him to take four days

off as a paid leave of absence.  She said that they

needed time to do an investigation.  One of the

investigators said to Plaintiff "you've had a long

career as a lawyer" and Plaintiff acknowledged this

comment by saying he was a Partner at Pillsbury

Winthrop and he worked there for 14 years.  The

Investigator then asked "didn't you work at Toyota"?

And Plaintiff said "Yes, for about 4 ½ years." He then asked Plaintiff if he knew Barbara Arnold, and he said "yes." The investigator then told Plaintiff that one of the attorneys at the DA's office was married to her.

130. Then he asked Plaintiff if he had ever cried before. Plaintiff said "yes" and "of course" because problems arise in life that people cry over. Then he clarified by asking Plaintiff if he had ever had an emotional breakdown at work before. Plaintiff initially said no, but he later corrected himself after he had time to further calm down.

131. Plaintiff told everybody that he did have an emotional breakdown when he was at Toyota, but it was confidential and he could not get into details. Plaintiff told them that he had to voluntarily resign. Plaintiff also told them that he has a letter of recommendation from Toyota describing how his performances saved the company millions of dollars. (Exhibit "C") The Investigator declined to

see the letter and did not want to talk about any
confidential information.

132. He said to Plaintiff that "this job is not
for everybody." Plaintiff then said he loves this
job. It was the best job he ever had in almost 20
years as a lawyer; he gets up at 5:00 a.m. to be at
work at 6:00 a.m. because he loves the job. He has a
lot of energy because he has a lot of enthusiasm for
the job. Plaintiff regularly worked 11 hours a day.

133. Plaintiff then turned to Carol Burke and told
her that he was so upset because a lawyer's
reputation is the only thing that he has. Once that
reputation is damaged then the most important asset
of the lawyer is damaged for good. Plaintiff looked
at her in the eye and said "Pam's complaint is full
of lies and fabrications. I will do anything to
prove she is wrong and I would take a lie detector's
test. I want my name cleared."

134. Carol Burke said that "this is not the time
or place to talk about the complaint. The most

important thing at this point is to get you home safely." She asked Plaintiff if he could drive or did he need an escort or somebody to drive him home. Plaintiff told her that he was fine to drive home, but he needed 10 to 15 minutes to calm down and get his things together before he left.

**F. PLAINTIFF IS NOT THE FIRST DEPUTY DISTRICT ATTORNEY TO CRY AT THE EAST LOS ANGELES DA's OFFICE**

135. A week before August 8, 2008 Defendant Rodriguez told Plaintiff that he thought Judge Injenikian's criticisms had broken Plaintiff and he had lost confidence, so Defendant Rodriguez wanted to move him out of Dept. 5. Defendant Rodriguez went on to explain that many young Deputy District Attorneys have cried in his office because of the way she has treated them.

136. Plaintiff told Defendant Rodriguez that he really liked Judge Injenikian and that her criticisms were well taken. He further told him that Judge Injenikian's was teaching him how to conduct a

Preliminary Hearing, so removing him from her

Courtroom would eliminate further teaching

opportunities.   Plaintiff asked Defendant Rodriguez

to let him stay in Dept. 5.   Plaintiff's approach and

desires proved to be correct because within one week

both Defendant Rodriguez and Judge Injenikian praised

him for his performance in Preliminary Court.

**G. DEFENDANT RODRIGUEZ AND PAM BROOKWELL'S MISTREATMENT OF PLAINTIFF TRIGGERED HIS EMOTIONAL BREAKDOWN**

137. Defendant Rodriguez wrote regarding the

incident on June 26, 2008 that Plaintiff had a

"contorted expression on his face;" "Plaintiff's body

language and demeanor was that of a person out of

control."

138. Defendant Rodriguez wrote at the bottom of

page 4 or 5 in the memo regarding the dismissal of

the Third Strike Defendant (Bobadilla) that

"Plaintiff became distraught and cried in his

supervisor's presence."

139. Regarding the August 14, 2008 incident Mr. Rodriquez wrote "Plaintiff was so out of control"; "Plaintiff was so overcome and distraught that the supervisor feared for his safety . . . "; "Plaintiff's inability to control his emotions, his extreme reactions to routine commonplace set-backs, and his unpredictable and violent outbursts when upset pose the potential for serious harm to himself and others."  Pam Brookwell claimed Plaintiff had "anger management" issues.

140. First, some of the above descriptions are exaggerations and not true.  Plaintiff never had a "violent outburst."  Plaintiff never posed "the potential for serious harm to himself and others." These conclusionary statements are not supported by any facts.

141. Getting "upset", being "distraught", "crying" or "sobbing", "not being able to control emotions" are not examples of "violent outbursts" or "somebody who is a serious harm to himself and others."

Plaintiff did not exhibit any "violent outbursts." Plaintiff has never been a threat to himself or others because of his depression.  The remaining words and phrases only describe emotional reactions. These words and phrases describe a person who is suffering from depression.  These words and phrases describe the symptoms of depression when triggered by demoralizing, degrading, and wrongful conduct by others.

142. Second, the above emotions were triggered by Defendant Rodriguez' unprofessional, angry, rude and overly critical treatment of Plaintiff,  Pam Brookwell's filing of a meritless complaint based on fabricated facts and Mr. Rodriquez' poor handling of that complaint and failure to properly investigate the allegations that caused these emotions.

143. Third, on what basis does Pam Brookwell have the ability to describe Plaintiff as having "anger management issues"?  How many times has she talked to Plaintiff and sat down with Plaintiff in person?

What is her background to diagnosis somebody with "anger management issues." Plaintiff has seen Pam Brookwell on **one occasion** when she spoke to all the new hires. Plaintiff spoke to Pam Brookwell by telephone once when he complained about Deputies not appearing in court. It is simply unreasonable for Defendant Rodriguez to accept her description of Plaintiff having "anger management issues" based on this limited contact.

144. Fourth, the emotional conditions described above are the result of Plaintiff's depression triggered of the mistreatment by Defendant Rodriguez and Pam Brookwell. Instead of reviewing Plaintiff's own employment records and medical examination report that the County of Los Angeles performed in Plaintiff's employment file, Defendant Rodriguez attempted to describe Plaintiff as an emotionally unstable person who was going to physically harm himself or others. This conclusion was reckless, negligent, and in violation of Plaintiff rights under

the American Disability Act.  Defendant Rodriguez,

Pam Brookwell, and the Los Angeles District

Attorney's Office discriminated against Plaintiff

because he became emotional due to his depression

triggered by the wrongful conduct of others.

## VI.

## FIRST CAUSE OF ACTION (WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY AGAINST DEFENDANT COUNTY OF LOS ANGELES)

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-144 as though fully set forth herein)**

145. When Plaintiff applied for a position as a

Deputy District Attorney, Plaintiff submitted to a

physical examination in which he was asked questions

about his mental health.  Plaintiff told the County

physician that (1) he was suffering from major and

serious depression, (2) he was seeing his

psychiatrist once a week or every other week, and (3)

he was taking medication.  Plaintiff has been

suffering from depression and/or "organic brain syndrome", and has been under psychiatric care since October 2005.

146. Under Gov. Code Section 12926(i) these mental conditions are protected disabilities. <u>Diaz v. Federal Express Corp.</u>, 239 F3d 1128-1135 (CD Cal. 2005) holds: "depression and its related manifestations can meet the definition of disability under antidiscrimination laws." Plaintiff is a qualified person because he has never been a threat to himself or others.

147. The Los Angeles District's Attorney Office had an affirmative duty to make reasonable accommodations for Plaintiff. <u>Priliman v. United Air Lines, Inc.</u> (1997) 53 CA 4th 935, 949-950. A very short paid leave of absence is a reasonable accommodation. <u>Jensen v. Wells Fargo Bank</u> (2000) 85 CA 4th 245,263. All Plaintiff needed on the two occasions he cried was some time alone. Defendant Rodriguez brutal and unfair criticisms and the

meritless complaint Pam Brookwell filed on August 14, 2008.

148. If fact, Plaintiff simply asked Defendant Rodriguez on August 14, 2008 if he could go home, but he said not until he talked to his boss because Plaintiff was a liability to the office if he got into an accident. The LADA's Office did give Plaintiff 4 days paid leave of absence, but then he was terminated. The failure of Defendant Rodriguez and the Los Angeles District Attorney's Office to allow Plaintiff back to work was a discriminatory action. <u>County of Fresno v. Fair Employment & Housing Comm'n</u> (1991) 226 CA3d 1541, 1555.

149. Defendant County of Los Angeles through the LADA's Office employed Plaintiff. Defendant County of Los Angeles discharged Plaintiff because of his emotional instability (Discrimination/Disability). Defendant County of Los Angeles and Defendant Rodriguez refused to engage in an interactive process to address Plaintiff's disabilities (major & severe

Depression, organic brain disorder, and dyslexia).
Instead, they required Plaintiff to do acts that were
directly detrimental to his mental health.    The
discharge caused Plaintiff harm in the form of past
and future loss wages and benefits, and earning
capacity, emotional distress, and damage to his
reputation.

150. Plaintiff informed Defendant Rodriguez that
he suffers from dyslexia when Defendant Rodriguez
demanded that he read questions from a list of
questions Plaintiff had to prepare before each
Preliminary Hearing.   When Plaintiff told Defendant
Rodriguez that reading from a list of questions was
too difficult because of his dyslexia, Defendant
Rodriguez insisted that Plaintiff prepare a list of
questions before each Preliminary Hearing, provide
that list to Terry Mitchell or Defendant Rodriguez
for their approval, and read the questions on direct
examination to witnesses.   Defendant Rodriguez
refused to even listen to Plaintiff's concerns about

not being able to read questions in a fluid manner because of his dyslexia. He did not engage in an interactive process to find a reasonable accommodation for Plaintiff. He refused to engage in such a process. Consequently, Plaintiff had to read questions to witnesses during direct examination.

151. Defendants owe Plaintiff a duty of care to provide him with reasonable accommodations related to his disabilities, to conduct proper and complete investigations of any complaints before terminating Plaintiff, to give him an opportunity to be heard regarding any complaints, to be truthful and honest in his evaluations of performance and not to supply false, misleading, dishonest, fabricated, statements and representations regarding Plaintiff's performance and his relationship with law enforcement.

152. It was reasonably foreseeable that Plaintiff would, and he did, sustain harm by the actions, statements, misrepresentations, omissions, and wrongful conduct of Defendants. Consequently,

Defendants breached their duty of care to Plaintiff, and the breach of their duty of care to Plaintiff was the proximate cause/substantial factor in causing Plaintiff substantial damages and harm.

## VII.

## SECOND CAUSE OF ACTION (DISCRIMINATION BASED ON PLAINTIFF'S DISABILITIES IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AGAINST DEFENDANT COUNTY OF LOS ANGELES)

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-152 as though fully set forth herein)**

153. Defendant County of Los Angeles through the LADA's Office was an employer.    Plaintiff was an employee of Defendant.  Plaintiff has mental disabilities that were known to Defendants County of Los Angeles and Rodriguez.  Plaintiff requested reasonable accommodations for his disability so that he could perform essential job requirements. Specifically, Plaintiff requested a very short leave of

absence when he had an emotional breakdown; he requested not to have to read questions when conducting direct examinations of witnesses.  Defendants County of Los Angeles and Rodriguez failed to participate in a timely good-faith interactive process with Plaintiff to determine whether reasonable accommodations could be made.  Plaintiff was harmed and the failure to engage in a good-faith interactive process was a substantial factor in causing Plaintiff's harm and damages.

154. Reasonable accommodations were available to allow Plaintiff to perform the essential duties of his job or allowed Plaintiff to enjoy the same benefits and privileges of employment that are available to employees without disabilities.

## VIII.

## THIRD CAUSE OF ACTION (DEFAMATION AND SLANDEROUS PER SE AGAINST ALL DEFENDANTS)

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-154 as though fully set forth herein)**

155. Defendant Rodriguez and employees of the LADA's Office made one or more statements to another and the others reasonably understood that the statement was about Plaintiff.  The statements are identified above and indicated with red print.  The statements were false.  Defendants failed to use reasonable care to determine the truth or falsity of the statements.  The false statements were a substantial factor in causing harm to Plaintiff's reputation, business/profession, shame/mortification or hurt feelings.

## IX.

## FOURTH CAUSE OF ACTION (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST DEFENDANTS RODRIGUEZ AND BROOKWELL)

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-155 as though fully set forth herein)**

156. Plaintiff suffered harm from the wrongful conduct of Defendants Rodriguez and Brookwell described above.  Defendants intentionally interfered with a

prospective contractual or economic relationship

between Plaintiff and Defendant LADA's Office.   The

interference was wrongful by some measure other than

the fact of interference because the conduct

constituted defamation, slanderous per se comments and

negligence as described above.   Plaintiff sustained

damages.

## X.

## FIFTH CAUSE OF ACTION (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS (AGAINST DEFENDANTS RODRIGUEZ AND BROOKWELL)

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-156 as though fully set forth herein)**

157. Plaintiff and Defendant LADA's Office were in

an economic relationship that would have resulted in an

economic benefit to Plaintiff.   Defendants Rodriguez

and Brookwell knew of this relationship.   Defendants

Rodriguez and Brookwell intended to disrupt the

relationship.   Defendants Rodriguez and Brookwell

engaged in wrongful conduct through fraud,

misrepresentation or violation of statute or other

wrongful conduct.  That relationship was disrupted,

Plaintiff was harmed and the wrongful conduct was a

substantial factor in causing Plaintiff's harm.

### XI.

### SIXTH CAUSE OF ACTION (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS (AGAINST DEFENDANTS RODRIGUEZ AND BROOKWELL)

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-157 as though fully set forth herein)**

158. Plaintiff and the LADA's Office were in an economic relationship that would have resulted in an economic benefit to Plaintiff.  Defendants Rodriguez and Brookwell knew or should have known of this relationship.  Defendants knew or should have known this relationship would have been disrupted if Defendants failed to act with reasonable care. Defendants failed to act with reasonable care.

Defendants engaged in wrongful conduct through misrepresentations or violation of statute or other wrongful conduct. That relationship was disrupted. Plaintiff was harmed and the wrongful conduct was a substantial factor in causing Plaintiff's harm.

## XII.

## SEVENTH CAUSE OF ACTION (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS)

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-158 as though fully set forth herein)**

159. The conduct of Defendants described above was outrageous. Defendants intended to cause emotional distress and/or Defendants acted with reckless disregard of the probability that Plaintiff would suffer emotional distress knowing that Plaintiff was present when the conduct occurred. Plaintiff suffered severe emotional distress. Defendants' conduct was a substantial factor in causing Plaintiff's severe emotional distress.

## XIII.

## EIGHTH CAUSE OF ACTION (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS)

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-159 as though fully set forth herein)**

160. Defendants were negligent.  Plaintiff suffered serious emotional distress due to Defendants' negligence.  Defendants' negligence was a substantial factor in causing Plaintiff's serious emotional distress.

## XIV.

## ILLEGAL & UNFAIR BUSINESS PRACTICE

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-160 as though fully set forth herein)**

161. Defendants' have been engaged in illegal business practices by allowing Sheriff's Deputies to avoid appearing in Court or being late in violation of the statutes regulating the appearance of witnesses to

appear in Court when subpoenaed or Ordered by the Court to do so.

162. Furthermore, Defendants retaliated against Plaintiff when he complained about this illegal business practice. Defendants fabricated facts about Plaintiff's skills as a trial attorney and gave him negative evaluations that were false, untrue and dishonest to justify Plaintiff's termination. Such retaliation is an unfair business practice.

### XV.

### PUNITIVE DAMAGES (AGAINST ALL DEFENDANTS)

### (Plaintiff hereby refers to and incorporates herein paragraphs 1-162 as though fully set forth herein)

163. Plaintiff was harmed. Defendants acted with Malice (intent to cause injury or those Defendants' conduct was so despicable and was done with a willful and knowing disregard of the rights or safety of another). Defendants acted with "Oppression" (the conduct was despicable and subjected Plaintiff to cruel

and unjust hardship in knowing disregard to his rights). Defendants' conduct was so "Despicable" because it was so vile, base, or contemptible that it would be looked down upon and despised by reasonable persons. Defendants acted with Fraud. Defendants Rodriguez and Brookwell were managing agents of Defendant Los Angeles County. Defendant County of Los Angeles had advance knowledge of the unfitness of Defendants Rodriguez and Brookwell, but Defendant County of Los Angeles employed them with a knowing disregard of the rights or safety or others. Defendants' conduct constituted malice, oppression and/or fraud was authorized by managing agents of Defendant County of Los Angeles or the managing agent of Defendant knew of the Defendants' conduct of malice, oppression or fraud and adopted or approved of it after it occurred.

## XV.

## PRAYER FOR RELIEF

**(Plaintiff hereby refers to and incorporates herein paragraphs 1-158 as though fully set forth herein)**

164.    Based on the above allegations and causes of action, Plaintiff seeks to recover the following damages:

- Compensatory Damages for Lost Past and Future Earnings ($3,000,000.00);

- Compensatory Damages for Lost Future Earning Capacity ($2,000,000);

- Damages for harm caused to Plaintiff's reputation and standing in the legal community of Los Angeles; ($5,000,000.00);

- General Damages for Emotional Distress, pain and suffering; ($1,000,000.00);

- Punitive Damages; (4 times the compensatory and general damages);

- Attorney Fees; (to be proven at trial);

- Litigation Costs; (to be proven at trial);

- Injunctive Relief for an Order expunging Plaintiff's personnel files with the LADA's Office and requiring the Los Angeles Sheriff's Department to implement procedures that will result in Sheriff Deputies complying with the law and showing up in Court when subpoenaed.

- And any other form of relief that the Court may deem appropriate;

DATED:   April 23, 2009

Respectfully submitted,
DIMITRIOS P. BILLER

_____

ATTORNEY FOR PLAINTIFF
DIMITRIOS P. BILLER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**\* \* \* EMPLOYMENT \* \* \***

COMPLAINT OF DISCRIMINATION UNDER
THE PROVISIONS OF THE CALIFORNIA
FAIR EMPLOYMENT AND HOUSING ACT

DFEH # *E2L0809R-0884-00-pc*

DFEH USE ONLY

---

### CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

YOUR NAME (indicate Mr. or Ms.) *DIMITRIOS PETER BILLER*     TELEPHONE NUMBER (INCLUDE AREA CODE) *(310) 459-9870*

ADDRESS *906 KAGAWA ST.*

CITY/STATE/ZIP *PACIFIC PALISADES CA. 90272*   COUNTY *LOS ANGELES*  COUNTY CODE

NAMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

NAME *LOS ANGELES DISTRICT ATTORNEY'S OFFICE*   TELEPHONE NUMBER (include Area Code) *(213) 974-3508*

ADDRESS *210 W TEMPLE STREET*                    DFEH USE ONLY

CITY/STATE/ZIP *LOS ANGELES CA. 90012*   COUNTY *LOS ANGELES*   COUNTY CODE

NO. OF EMPLOYEES/MEMBERS (if known)   DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (month, day, and year)   RESPONDENT CODE

THE PARTICULARS ARE:
I allege that on *8-21-2008*, the
following conduct occurred:

- [X] termination
- [ ] lay-off
- [ ] demotion
- [ ] harassment
- [ ] genetic characteristics testing
- [ ] constructive discharge (forced to quit)
- [ ] impermissible non-job-related inquiry

- [ ] denial of employment
- [ ] denial of promotion
- [ ] denial of transfer
- [ ] denial of accommodation
- [ ] failure to prevent discrimination or retaliation
- [ ] retaliation
- [ ] other (specify) _____

- [ ] denial of family or medical leave
- [ ] denial of pregnancy leave
- [ ] denial of equal pay
- [ ] denial of right to wear pants
- [ ] denial of pregnancy accommodation

by *VICTOR RODRIGUEZ, DEPUTY-IN-CHARGE IN EAST LA*
    Name of Person                Job Title (supervisor/manager/personnel director/etc.)   *OFFICE OF DISTRICT ATTORNEY*

because of:
- [ ] sex
- [ ] age
- [ ] religion
- [ ] race/color
- [ ] national origin/ancestry
- [ ] marital status
- [ ] sexual orientation
- [ ] association
- [X] disability (physical or mental)
- [ ] medical condition (cancer or genetic characteristic)
- [ ] retaliation for engaging in protected activity or requesting a protected leave or accommodation

State what you
believe to be the
reason(s) for
discrimination

*SEE ATTACHMENT*

---

I wish to pursue this matter in court. I hereby request that the Department of Fair Employment and Housing provide a right-to-sue notice. I understand that if I want a federal notice of right-to-sue, I must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of the DFEH "Notice of Case Closure," or within 300 days of the alleged discriminatory act, whichever is earlier.

I have not been coerced into making this request, nor do I make it based on fear of retaliation if I do not do so. I understand it is the Department of Fair Employment and Housing's policy to not process or reopen a complaint once the complaint has been closed on the basis of "Complainant Elected Court Action."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own knowledge except as to matters stated on my information and belief, and as to those matters I believe it to be true.

Dated *10-29-08*

COMPLAINANT'S SIGNATURE

At *PACIFIC PALISADES*
   City

DATE FILED: *November 13, 2008*

RECEIVED

NOV 13 2008

Department of Fair Employment
and Housing

STATE OF CALIFORNIA

DFEH-300-03 (04/08)
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICE                                    ARNOLD SCHWARZENEGGER, Governor

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

611 West Sixth Street, Suite 1500 ,Los Angeles, CA  90017
(213) 439-6770 (800) 700-2320 Fax (213) 439-6780



December 8, 2008


Dimitrios P. Biller
Attorney

906 Kagawa Street
Pacific Palisades, CA 90272

RE:    E200809R0884-00-pc
       <u>BILLER/LOS ANGELES DISTRICT ATTORNEY'S OFFICE</u>

Dear Dimitrios P. Biller:

## NOTICE OF CASE CLOSURE

This letter informs that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective November 13, 2008 because an immediate right-to-sue notice was requested. DFEH will take no further action on the complaint.

This letter is also the Right-To-Sue Notice.  According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint.  The civil action must be filed within one year from the date of this letter.

If a federal notice of Right-To-Sue is wanted, the U.S. Equal Employment Opportunity Commission (EEOC) must be visited to file a complaint within 30 days of receipt of this DFEH *Notice of Case Closure* or within 300 days of the alleged discriminatory act, whichever is earlier.

Notice of Case Closure
Page Two

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,

*Tina Walker*

Tina Walker
District Administrator

cc:    Case File

Executive Officer
LOS ANGELES DISTRICT ATTORNEY'S OFFICE
210 W. Temple Street
Los Angeles, CA  90012

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                                ARNOLD SCHWARZENEGGER, Governor

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING
611 West Sixth Street, Suite 1500 ,Los Angeles, CA 90017
(213) 439-6770 (800) 700-2320 Fax (213) 439-6780

December 8, 2008

Dimitrios P. Biller
Attorney

906 Kagawa Street
Pacific Palisades, CA 90272

RE:  E200809R0884-00-pc
    BILLER/LOS ANGELES DISTRICT ATTORNEY'S OFFICE

Dear Dimitrios P. Biller:

# NOTICE TO COMPLAINANT'S ATTORNEY

Enclosed is a copy of your client's complaint of discrimination filed with the Department of Fair Employment and Housing on 11/13/2008 pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq.  Also enclosed is a copy of your client's Notice of Case Closure, which constitutes your client's right-to-sue notice.

Please note that under Government Code section 12962, you are responsible for **service of the complaint** on respondent(s). You should also enclose a copy of the Notice of Case Closure along with the complaint.  These documents must be served within **60 days** of the filing date of the complaint.  Government Code section 12962(b) further provides that complaints must be served either personally or by certified mail with return receipt requested.

For additional information, please read the enclosed Notice of Case Closure that explains the conditions for filing a private lawsuit in the State of California.

Sincerely,

Tina Walker

Tina Walker
District Administrator

Enclosure:  Complaint of Discrimination
          Notice of Case Closure

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):* | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|

DIMITRIOS P. BILLER (310)459-9870
906 KAGAWA CT.
PACIFIC PALISADES, CA 90272

ATTORNEY FOR *(Name):* DIMITRIOS P. BILLER

Insert name of court and name of judicial district and branch court, if any:
SUPERIOR COURT FOR THE STATE OF
CALIFORNIA LOS ANGELES CENTRAL DISTRICT

REC'D

NOV 07 2008

FILING WINDOW

PLAINTIFF/PETITIONER: DIMITRIOS P. BILLER

DEFENDANT/RESPONDENT: Victor Rodriguez, Pam
Brookwell, County of Los Angeles

**REQUEST FOR DISMISSAL**
- [ ] **Personal Injury, Property Damage, or Wrongful Death**
  - [ ] **Motor Vehicle**    [ ] **Other**
- [ ] **Family Law**
- [ ] **Eminent Domain**
- [X] **Other (specify):** PETITION TO PRESERVE EVIDENCE

CASE NUMBER:
BS116860

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [ ] With prejudice    (2) [ ] Without prejudice
   b. (1) [ ] Complaint    (2) [X] Petition
      (3) [ ] Cross-complaint filed by *(name):*      on *(date):*
      (4) [ ] Cross-complaint filed by *(name):*      on *(date):*
      (5) [ ] Entire action of all parties and all causes of action
      (6) [ ] Other *(specify):**

Date: DIMITRIOS P. BILLER

DIMITRIOS P. BILLER
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
*If dismissal requested is of specified parties only of specified causes of
action only, or of specified cross-complaints only, so state and identify
the parties, causes of action, or cross-complaints to be dismissed.

(SIGNATURE)
Attorney or party without attorney for:
[X] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross - complainant

2. **TO THE CLERK:** Consent to the above dismissal is hereby given.**
   Date: 10|29|08

Ann D. Wu
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
** If a cross-complaint or Response (Family Law) seeking affirmative
relief -is on file, the attorney for cross-complainant (respondent) must
sign this consent if required by Code of Civil Procedure section 581 (i)
or (j).

(SIGNATURE)
Attorney or party without attorney for:
[ ] Plaintiff/Petitioner    [X] Defendant/Respondent
[ ] Cross - complainant

*(To be completed by clerk)*
3. [ ] Dismissal entered as requested on *(date):*
4. [ ] Dismissal entered on *(date):*    as to only *(name):*
5. [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

6. [ ] a. Attorney or party without attorney notified on *(date):*
   b. Attorney or party without attorney not notified. Filing party failed to provide
     [ ] a copy to conformed [ ] means to return conformed copy

Date:      Clerk, by _____, Deputy

Page 1 of 1

| Form Adopted for Mandatory use<br>Judicial Council of California<br>CIV-110 [Rev. January 1, 2007] | **REQUEST FOR DISMISSAL** | Code of Civil Procedure, § 581 et seq.;<br>Cal. Rules of Court, rule 3.1390<br>www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.FormsWorkflow.com

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):* | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|

DIMITRIOS P. BILLER  (310)459-9870
906 KAGAWA CT.
PACIFIC PALISADES, CA 90272

ATTORNEY FOR *(Name)*: DIMITRIOS P. BILLER

Insert name of court and name of judicial district and branch court, if any
SUPERIOR COURT FOR THE STATE OF
CALIFORNIA LOS ANGELES CENTRAL DISTRICT

PLAINTIFF/PETITIONER: DIMITRIOS P. BILLER

DEFENDANT/RESPONDENT: VICTOR RODRIGUEZ, PAM
BROOKWELL, COUNTY OF LOS ANGELES

REC'D
NOV 0 1 2008
FILING WINDOW

**REQUEST FOR DISMISSAL**
- [ ] **Personal Injury, Property Damage, or Wrongful Death**
  - [ ] **Motor Vehicle**  [ ] **Other**
- [ ] **Family Law**
- [ ] **Eminent Domain**
- [X] **Other** *(specify):* PETITION TO PRESERVE EVIDENCE

CASE NUMBER:
BS116860

*- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -*

1. **TO THE CLERK: Please dismiss this action as follows:**
   a. (1) [ ] With prejudice   (2) [ ] Without prejudice
   b. (1) [ ] Complaint   (2) [X] Petition
      (3) [ ] Cross-complaint filed by *(name):*                   on *(date):*
      (4) [ ] Cross-complaint filed by *(name):*                   on *(date):*
      (5) [ ] Entire action of all parties and all causes of action
      (6) [ ] Other *(specify):**

Date: DIMITRIOS P. BILLER

(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
*If dismissal requested is of specified parties only or specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

(SIGNATURE)
Attorney or party without attorney for:
[X] Plaintiff/Petitioner    [ ] Defendant/Respondent
[ ] Cross - complainant

2. **TO THE CLERK: Consent to the above dismissal is hereby given.**
   Date: 10|29|08
   Ann D. Wu

(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
** If a cross-complaint-or Response (Family Law) seeking affirmative relief -is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

(SIGNATURE)
Attorney or party without attorney for:
[ ] Plaintiff/Petitioner    [X] Defendant/Respondent
[ ] Cross - complainant

*(To be completed by clerk)*
3. [ ] Dismissal entered as requested on *(date):*
4. [ ] Dismissal entered on *(date):*                        as to only *(name):*
5. [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

6. [ ] a. Attorney or party without attorney notified on *(date):*
       b. Attorney or party without attorney not notified. Filing party failed to provide
          [ ] a copy to conformed [ ] means to return conformed copy

Date:                          Clerk, by _____, Deputy

Page 1 of 1

Form Adopted for Mandatory use
Judicial Council of California
CIV-110 [Rev. January 1, 2007]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;
Cal. Rules of Court, rule 3.1390
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):* | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|

DIMITRIOS P. BILLER (310)459-9870
906 KAGAWA CT.
PACIFIC PALISADES, CA 90272

ATTORNEY FOR *(Name):* DIMITRIOS P. BILLER

Insert name of court and name of judicial district and branch court, if any:
SUPERIOR COURT FOR THE STATE OF
CALIFORNIA LOS ANGELE CENTRAL DISTRICT

PLAINTIFF/PETITIONER: DIMITRIOS P. BILLER

DEFENDANT/ RESPONDENT: VICTOR RODRIGUEZ, PAM
BROOKWELL, COUNTY OF LOS ANGELES

**REC'D**

NOV 07 2008

**FILING WINDOW**

**REQUEST FOR DISMISSAL**

☐ Personal Injury, Property Damage, or Wrongful Death
    ☐ Motor Vehicle   ☐ Other
☐ Family Law
☐ Eminent Domain
☒ Other *(specify):* PETITION TO PRESERVE EVIDENCE

CASE NUMBER:
BS116860

*- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -*

1. TO THE CLERK: Please **dismiss** this action as follows:
  a. (1) ☐ With prejudice   (2) ☐ Without prejudice
  b. (1) ☐ Complaint   (2) ☒ Petition
    (3) ☐ Cross-complaint filed by *(name):*           on *(date):*
    (4) ☐ Cross-complaint filed by *(name):*           on *(date):*
    (5) ☐ Entire action of all parties and all causes of action
    (6) ☐ Other *(specify):**

Date: _____
DIMITRIOS P. BILLER   ▶ *(signature)*

(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)         (SIGNATURE)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
☒ Plaintiff/Petitioner     ☐ Defendant/Respondent
☐ Cross - complainant

2. **TO THE CLERK:** Consent to the above dismissal is hereby given.**
Date: 10/29/08
Ann D. Wu   ▶ *(signature)*

(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)         (SIGNATURE)

** If a cross-complaint·or Response (Family Law) seeking affirmative relief ·is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
☐ Plaintiff/Petitioner     ☒ Defendant/Respondent
☐ Cross - complainant

*(To be completed by clerk)*
3. ☐ Dismissal entered as requested on *(date):*
4. ☐ Dismissal entered on *(date):*     as to only *(name):*
5. ☐ Dismissal **not entered** as requested for the following reasons *(specify):*

6. ☐ a. Attorney or party without attorney notified on *(date):*
    b. Attorney or party without attorney not notified. Filing party failed to provide
    ☐ a copy to conformed ☐ means to return conformed copy

Date: _____     Clerk, by _____ , Deputy

Page 1 of 1

| Form Adopted for Mandatory use<br>Judicial Council of California<br>CIV-110 [Rev. January 1, 2007] | **REQUEST FOR DISMISSAL** | Code of Civil Procedure, § 581 et seq.;<br>Cal. Rules of Court, rule 3.1390<br>*www.courtinfo.ca.gov* |
|---|---|---|

American LegalNet, Inc.
www.FormsWorkflow.com

FORM CONT. 100-A (Rev. 7/85)

# CLAIM FOR DAMAGES
## TO PERSON OR PROPERTY

RESERVE FOR FILING STAMP
CLAIM NO. _____

### INSTRUCTIONS

1. Claims for death, injury to person or to personal property must be filed not later than six months after the occurrence. (Gov. Code Sec. 911.2).
2. Claims for damages relating to any other type of occurrence must be filed not later than one year after the occurrence. (Gov. Code Sec. 911.2).
3. Read entire claim before filing. Claim can be mailed or filed in person. No faxes accepted.
4. See Page 3 for diagram upon which to locate place of accident.
5. This claim form must be signed on Page 3 at bottom.
6. Attach separate sheets, if necessary, to give full details. SIGN EACH SHEET.
7. Fill out in duplicate. ONE COPY TO BE RETAINED BY CLAIMANT.
8. Claim must be filed with CITY CLERK, (Gov. Code Sec. 915A).
   200 NORTH SPRING STREET, ROOM 395, CITY HALL, LOS ANGELES, CA 90012

2008 NOV – 7 PM 12: 53

TO: CITY OF LOS ANGELES

| Name of Claimant | Age of Claimant |
|---|---|
| DIMITRIOS PETER BILLER | 46 |

| Home address of Claimant | City, State and Zip Code | Home Telephone Number |
|---|---|---|
| 906 KAGAWA ST. | PACIFIC PALISADES, CA 90272 | (310) 459-98 |

| Business address of Claimant | City, State and Zip Code | Business Telephone Number |
|---|---|---|
| SAME | | |

Give address to which you desire notices or communications to be sent regarding this claim:
906 KAGAW ST. PACIFIC PALISADES, CALIF. 90272

How did DAMAGE or INJURY occur? Please include as much detail as possible.

SEE ATTACHMENT

When did DAMAGE or INJURY occur? Please include the date and time of the damage or injury.

AUGUST 21, 2008, @ APPROXIMATELY 10:00 A.M

Where did DAMAGE or INJURY occur? Please describe fully, and locate on the diagram on the reverse side of this sheet. Where appropriate, please give street names and addresses or measurements from specific landmarks:

210 WEST TEMPLE STREET 18TH FLOOR, LOS ANGELES, CA, 90012, LOS ANGELES DISTRICT ATTORNEY'S OFFICE.

What particular ACT or OMISSION do you claim caused the injury or damage? Please give names of City employees causing the injury or damage and identify any vehicles involved by license plate number, if known.

SEE ATTACHMENT

Please list names and address of Witnesses, Doctors and Hospitals:

SEE ATTACHMENT

SEE PAGE 3                    THIS CLAIM MUST BE SIGNED AT BOTTE—

**PAGE 2**

What DAMAGE or INJURIES do you claim resulted?  Please give full extent of injury or damages claimed:

*SEE ATTACHMENT*

What is the AMOUNT of your claim?  Please itemize your damages:

*SEE ATTACHMENT*

If you have received any insurance payments, please give the names of the insurance companies:

*N/A*

For all accident claims please place on the following diagram the names of the streets where the accident occurred and the nearest cross-streets; indicate the place of the accident by an "X" and by showing the nearest address and distances to street corners.  Please indicate where North is on the diagram.

Note:  if the diagram does not fit the situation, please attach your own diagram.



| Signature of Claimant or person filing on claimant's behalf giving relationship to claimant: | Print Name: | Date: |
|---|---|---|

# OFFICE OF THE CITY CLERK
## City of Los Angeles
### Claim for Damages Form

Please mail the original signed form to (copies and faxes not accepted):

Address:      Office of the City Clerk
              200 North Spring Street
              Room 395, City Hall
              Los Angeles, CA  90012

Hours:        7:30am - 5:00pm, Monday-Friday
Phone:        213-978-1133

You may also bring the form to our Public Counter at the above address during regular business hours.

Reminder:     Please make a copy for your own records.

# OFFICE OF THE CITY CLERK
## City of Los Angeles
## Claim for Damages Form

Please mail the original signed form to (copies and faxes not accepted):

Address:          Office of the City Clerk
                  200 North Spring Street
                  Room 395, City Hall
                  Los Angeles, CA  90012

Hours:            7:30am - 5:00pm, Monday-Friday
Phone:            213-978-1133

You may also bring the form to our Public Counter at the above address during regular business hours.

Reminder:         Please make a copy for your own records.

What DAMAGE or INJURIES do you claim resulted?  Please give full extent of injuries or damages claimed:

*SEE ATTACHMENT*

What is the AMOUNT of your claim?  Please itemize your damages:

*SEE ATTACHMENT*

If you have received any insurance payments, please give the names of the insurance companies:

*N/A*

For all accident claims please place on the following diagram the names of the streets where the accident occurred and the nearest cross-streets; indicate the place of the accident by an "X" and by showing the nearest address and distances to street corners.  Please indicate where North is on the diagram.

Note:  if the diagram does not fit the situation, please attach your own diagram.



| Signature of Claimant or person filing on claimant's behalf giving relationship to claimant: | Print Name: | Date: |
| --- | --- | --- |
|  |  |  |

**PAGE 3**

## HOW DID DAMAGE or INJURY OCCUR

I allege that on August 21, 2008, the following conduct occurred: I was wrongfully terminated by the following people. Los Angeles District Attorney's Office through Janet Moore, Victor Rodriguez, Carol Burke, and Jacquelyn Lacey of the Los Angeles District Attorney's Office ("LADA's Office"), and Pam Brookwell of the Los Angeles Sherriff's Department took steps that cause me to be terminated because of my disabilities (mental; chronic/major depression/organic brain syndrome and dsylexia). Victor Rodriguez and Pam Brookwell filed false and untrue memos and complaints against me that trigged an emotional breakdown due to my major and chronic depression.

## WHAT PARTICULAR ACT OR OMISSION CAUSED THE INJURY OR DAMAGE

I was terminated because I had an emotional breakdown on August 14, 2008 and I cried when falsely accused of doing something wrong. My mental disabilities cause my emotional breakdown, and that breakdown was triggered by false, malicious, fabricated and untruthful statements made by the above individuals. I was terminated because the LADA's Office viewed me as "emotionally unstable" and improperly concluded I was a danger to the health and safety of other employees and myself. The position taken by the LADA's Office regarding my competence and abilities to deal with law enforcement are false.

Additionally, Victor Rodriguez forced me to write questions to exam witness and to read those questions for both direct and cross examination. I informed Victor Rodriguez about being dyslexia and I could not read to formulate questions because of my dyslexia, but he insisted that I comply with his demands. Victor Rodriguez' demands made cross and direct examination of witnesses much more difficult because my dyslexia interfered with my ability to smoothly conduct

cross and direct examination. Moreover, Victor Rodriguez' demand was inconsistent with the policy of the LADA's Office. The Training Division instructed all new hire DDA I's not to write any questions when conducting direct/cross examinations of witnesses. During the 20 years I have been a trial attorney, I never read questions during my direct and cross examinations.

Before my termination, I was a Deputy District Attorney I ("DDA I") with the Los Angeles District Attorney's Office. I was suffering from major and chronic/organic brain syndrome and dyslexia before and during my employment. I continue to suffer from these mental conditions. I informed the County of Los Angeles about my depression before I was hired during the physical examination process I had to complete before becoming a DDA I, and I informed Victor Rodriguez (my immediate supervisor at the East Los Angeles DA's Office) about my dyslexia in early July 2008.

Mr. Rodriguez told me to read police reports during my cross and direct examinations and develop questions from the police report. I explained I could not do so because I was dyslexic. I told Victor Rodriguez about my condition so he would understand I had to conduct direct/cross examination without referring to any written material. Mr. Rodriguez then demanded that I write my questions out for each witness I was presenting at Preliminary Hearings and give my questions to Terry Michel and/or him for review before I was scheduled to conduct Preliminary Hearings. He wanted me to read the questions during examination of witnesses. I felt I had to fulfill this demand to satisfy Victor Rodriguez because he rejected my explanation that I could not ask questions from written materials due to my dyslexia. I was uncompromising.

The Training Division of the LADA's Office trained me and my colleagues for one month before I started to work in the East Los Angeles DA's Office. During that training I and the other "new hires" were told/instructed NEVER write any questions out for direct or cross examination. In 20 years as a trial lawyer I never read questions on cross or direct examination. I always attempted to avoid reading in open Court because of my dyslexia. Victor Rodriguez' demand put additional burdens on me because my dyslexia interfered with my abilities to

conduct cross/direct examination in Preliminary Court when I was required to read the questions during direct/cross examination.

On June 30, 2008 I was involved in a child endangerment case (People v. Martinez). During my rebuttable case, two Sheriff's Deputies failed to appear, so I could not present the jury with evidence that I needed to impeach Defendant and his witnesses. I expressed frustration when I told Victor Rodriguez about this incident. He told me to make a complaint to the Sheriff's Subpoena Control Officer (Pam Brookwell) and write a memo regarding this continuing problem. I did as requested. Pam Brookwell blew off the complaint. Victor Rodriguez never gave my memo to the Sheriff's Department as promised.

In late July 2008 or early August 2008, Victor Rodriguez falsely accused me of wrongfully dismissing a case (People v. Bobavilla) after I was able to convince the Court to Hold the Defendant to Answer a Felony Information. Victor Rodriguez told me the day before the dismissal that "**we** had to dismiss the case." He did not tell me he wanted to dismiss the case. He did not tell me he had to make a record when he dismissed the case. He did not tell me that he or Terry Michel came to a special arrangement with Defendant's attorney as to when the case should be dismissed. The next day, I dismissed the case because Victor Rodriguez and Terry Michel were not in Court, and the Judge looked at me to move for dismissal when the Defendant's attorney appear ready and the Defendant was brought up from lock-up and I handled the Preliminary Hearing.

Within a minute, Mr. Rodriguez and Mrs. Mitchell entered the courtroom. Mr. Rodriguez looked at me with a very angry facial expression (wide open eye lids, bulging eyes, and foam at the sides of his month, intense facial/body language leaning forward towards me and standing next to me very closely as to invade my personal space). He said "Did you dismiss the case? Why did you dismiss the case?" "I never told you to dismiss the case." Mr. Rodriguez then went on to tell me in a loud voice in open court that I "should not have dismissed the case" because he needed to put something on the record to make the dismissal appear appropriate. I said:

"You told me that 'we' needed to dismiss the case. I handled the Preliminary Hearing. The case was called, the Defendant was out of lock up and

Defendant's counsel announced ready so Judge Injenikian looked at me to make an appearance. You were not in court. Mrs. Mitchell was not in court. You never told me not to dismiss the case and that you or Terry needed to dismiss it. I was the only Deputy District Attorney in court to appear."

I was in a state of disbelief and shock because of Victor Rodriguez' reaction, attitude and behavior in open Court. Realizing that Mr. Rodriguez was unprofessional, rude and angry, he called me into the witness interviewing room in Court. He then went on to explain that a dismissal of a 3 strike Defendant when the Court held him to answer the Felony Information was a "serious matter", and he needed to put something on the record to make it look like the dismissal was appropriate. Mr. Rodriguez then explained that he had to write a "memo to the file to cover [his] ass because if the Defendant goes out and kills somebody then [he] would be in big trouble."

Terry Mitchell told me at the meeting in the witness interview room that the situation was not my fault. She explained that there was an agreement between the Defendant's attorney and Mrs. Mitchell that the Defendant would be brought up at a certain time and he would announce ready at a certain time. However, the Defendant's attorney arrived early, requested the Defendant to be brought up from lock up early, and he announced ready early. Mrs. Mitchell said the situation was the fault of the Defendant's attorney.

On August 14, 2008, Pat Brookwell lodged a false complaint about me. I insisted that Deputies for the Los Angeles Sherriff's Department appear in Court when subpoenaed because they were legally obligated to appear. There were numerous Deputies who failed to fulfill their legal obligations. I complained to Victor Rodriguez and Pam Brookwell about this practice on June 30, 2008 and July 2008. Additionally, when Sherriff's Deputies failed to bring evidence to hearings that were necessary, I requested the Subpoena Liaison between the Sherriff's Department and East Los Angeles DA's Office to retrieve the evidence. He refused. He told me that was the job of the Detective on the case. When I explained I could not get a hold of the Detective, he continued to refuse. I then retrieved the evidence myself on at least 2 occasions.

In return, Pam Brookwell lodged a false complaint with Victor Rodriguez about my conduct in the East Los Angeles Sherriff's Station on August 14, 2008 when I requested copies of a videotape that the People had a legal obligation to turn over to the Defendants and their counsel. She claimed that I was "unreasonably demanding."

When Victor Rodriguez told me about this false complaint, I immediately denied the allegations because they were completely false. Victor Rodriguez then informed me that the complaint would have to go downtown to be handled by his boss (Janet Moore). I had an emotional breakdown due to my major and chronic depression/organic brain syndrome that triggered my emotional breakdown because I was falsely accused of wrongdoing.

I asked Victor Rodriguez to allow me to go home. He said not until I stopped crying. When I stopped, I again asked him if I could go home. He denied my request because he was waiting for Carol Burke and DA Investigators to show up. He said I was a liability to the DA's Office because the Office would be liable if I got into an accident. I wanted in Victor Rodriguez' office for approximately two hours until Carol Burke and the DA investigators arrived. I was then allowed to go home.

I was put on a paid leave of absence on August 14, 2008. I was told that there was going to be a full investigation about the complaint and I would be allowed to return to work on August 20, 2008. I was told that I would be able to explain my side regarding the August 14, 2008 events during the investigation. I attempted to explain the wrongful nature of the complaint and provide my side of the story, but Carol Burke of the LADA's Office said "this was not the time or the place." But she promised me there was going to be a full investigation and I was going to be able to talk about the events of August 14, 2008. Victor Rodriguez also told me that I was going to get the opportunity to talk to Janet Moore about the events of August 14, 2008 and the complaint.

Victor Rodriguez told me to go to the LADA's Office on August 21, 2008. I visited the downtown office of the DA's Office to give my version of the events of August 14, 2008. I went there expecting to talk about the events of August 14,

2008 and the false complaint that Pam Brookwell filed against me. However, Janet Moore or Jacquelyn Lacey and Julia Dixon-Silva (Attorney for the Employee Relations of the DA's Office) told me that they were not interested in discussing the facts. Instead, I was given a Termination Letter. The Termination Letter states that I was had an "inability to control my emotions" as grounds for my Termination. Additionally, the Termination Letter stated that I had "uncontrolled outbursts [that] pose the potential for serious harm to yourself and others."

My mental conditions did not prohibit me from performing my duties as a Deputy District Attorney. I have been suffering from these conditions for most of my life. I have practice law as a trial attorney for 20 years (over 14 years as an Associate and Partner with Pillsbury Winthrop and over 4 years as National Managing Counsel for Toyota. (Exhibit 1, my resume)

My psychiatrist has never told me that I was a danger to myself or others. She has the opinion that I am not a danger to myself or others. I am not a danger to my health and safety, or to the health and safety of others. In 20 years of practice, I have never hurt anyone.

Victor Rodriguez, Janet Moore, and Jacquelyn Lacey fabricated facts, made libelous and slanderous statements, and came up with false, untruthful and deceitful comments about my abilities as a trial lawyer to justify my termination. They claimed I was "incompetent" and they used false and fabricated facts to support this factual conclusion. At the same time, Victor Rodriguez stated in writing that I performed "very good" in Preliminary Court four days before I was put on paid leave of absence. (Exhibit "2")

During the 66 days I worked in the East Los Angeles DA's Office I had excellent relationships with all staff, secretaries, and other Deputy District Attorneys. I did not get into a single disagreement or argument with any of those employees. I was even complemented on how well I acted towards the staff and secretaries.

The above acts will support the following causes of action and prayers for relief:

1. Discrimination in violation of the American's with Disabilities Act
2. Wrongful Discharge in violation of Public Policy
3. Defamation
4. Libel
5. Slander per se
6. Negligence
7. Negligent Infliction of Emotional Distress
8. Intentional Infliction of Emotional Distress
9. Negligent Interference with Economic Advantage
10. Intentional Interference with Economic Advantage
11. Negligent Interference with Prospective Economic Relationships
12. Intentional Interference with Prospective Economic Relationships
13. Fraud
14. Oppression
15. Malice
16. Conspiracy
17. Compensatory Damages (past and future lost wages/future lost earning capacity)
18. Punitive Damages
19. Damages for emotional distress
20. Order seeking an injunctive relief to have my personnel file with the LADA's Office expunged & requiring the LA Sherriff's Department to implement procedures to force Deputies to fulfill their legal obligations and honor the subpoenas that are issued.

## LIST OF NAMES AND ADDRESS OF WITNESSES, DOCTORS AND HOSPITALS

A. Dimitrios P. Biller, 906 Kagawa Street, Pacific Palisades, CA 90272
B. Dr. Alice Rudnick, 11980 San Vicente Blvd., Suite 711, Los Angeles, CA 90049
C. Victor Rodriguez:  4848 Civic Center Way, East Los Angeles, Room 201, CA, 90022;
D. Glenn Sproul:  4848 Civic Center Way, Room 210 East Los Angeles, CA, 90012;

E. Rich (2nd Subpoena Control Liaison): 4848 Civic Center Way, Room 201, East Los Angeles, CA, 90012;

F. Pam Brookwell: East Los Angeles Sheriff's Department;

G. Filing Deputy for ELA DA's Office: 4848 Civic Center Way, Room 201, East Los Angeles;

H. Deputy Sanchez: East Los Angeles Sheriff's Department;

I. Sergeant of the Detective's Bureau working on August 14, 2008 during the afternoon: East Los Angeles Sheriff's Department;

J. Janet Moore: 201 N. Figueroa Street, Los Angeles, CA, 90012;

K. Person Most Knowledgeable re the computer systems at the Los Angeles District Attorney's Office, including e-mail preservation procedures: 210 W. Temple St. Los Angeles, CA 90012;

L. Terry Mitchell: 4848 Civic Center Way, Room 201, East Los Angeles, Room 201;

M. Carol Burke: 201 N. Figueroa Street, Los Angeles, CA, 90012; and

N. Person Most Knowledgeable regarding the proper procedures and requirements for Sheriff's Deputies to respond to subpoenas at the Sheriff's Department; and

O. Person Most Knowledgeable that the LADA Office in the IT Department regarding the maintenance, back-up tapes, and deletion policy under the Document Retention Policy for personal computers, servers, hard drives for personal computers, main frame computers, telephone/voice messages, e-mails and any other device used to collect and store ESI.

## DAMAGES AND INJURIES

I have sustained the following injuries and damages: (1) past lost wages, (2) future loss wages, (3) lost future earning capacity, (4) emotional distress, (5) pain and suffering for not being able to practice law and having to change my professional life.

## AMOUNT OF DAMAGES

I will retain an economist to provide specific information regarding my economic losses. At minimum, I planned to finish my legal career with the Los Angeles District Attorney's Office. I was earning $60,000 a year when I was terminated. This figure does not include the medical, dental, life insurance, disability, 401K and 457 contributions that the County of Los Angeles made to my retirement accounts, pension and other non-monetary benefits. I had a work life expectancy of 20 years (45 to 65).

Assuming the above income and benefits "averaged" over the course of 20 years approximately $150,000 (this does not taken into account promotions, increase wages for different positions and inflation), then my economic damages are $2,250,000.00.

It is difficult to calculate non-economic damages, and that is left to the preview of the jury. It is reasonable to expect a jury to return between $1,000,000.00 and $2,000,000.00 for non-economic damages. However, this is a quest because this area belongs to the jury.

Punitive Damages will be between 1 and 4 times the actual damages.

# RESUME

**DIMITRIOS P. BILLER**
**928 Hartzell Street**
**Pacific Palisades, CA 90272**
**(310) 454-0728**

**GOALS:**

Obtain a position as either Lead Trial Counsel or Chief Lieutenant with substantial trial responsibilities for a well respected law firm that needs a trial lawyer and a sophisticated litigator to handle challenging, difficult, and complex litigation and that has opportunities to increase revenues from existing clients and potential new clients through (a) excellent, efficient, and superior legal services and (b) business promotion efforts.

**WORK EXPERIENCE:**

**TOYOTA MOTOR SALES U.S.A., INC.**
**MANAGING COUNSEL, April 15, 2003 – September 17, 2007**

- **Reasons for My Hiring:**
  Toyota Motor Sales U.S.A. Inc. ("TMS") hired me because of my abilities to efficiently manage complex litigation, my trial experience, and background in obtaining successful results in trials, mass actions and class actions. TMS specifically wanted me to fix Toyota's serious and chronic rollover litigation that was costing Toyota significant settlement figures and encouraging the Plaintiffs' Bar to file more cases involving 4Runner rollover accidents. Additionally, TMS wanted me to manage, re-vamp and provide leadership to the National Rollover Program that was proceeding in an aimless direction.

- **How I Achieved Toyota's Needs:**
  When I arrived at TMS I analyzed the rollover situation, and developed a strategy to resolve Toyota's chronic rollover problems. I developed and implemented a strategy that gave Toyota a "Creditible Trial Threat" in rollover litigation. This strategy involved: (1) identifying serious, catastrophic injury cases involving on-road 4Runner rollover cases, (2) selecting cases that were prosecuted by highly skilled and respected Plaintiffs' trial lawyers, (3) picking venues that were viewed as plaintiffs' oriented because the judges and jury pools were sympathetic

towards injured plaintiffs and bent in favor of plaintiffs, (4) making sure the cases were prepared for trial by micro-managing outside counsel and being involved in all aspects of trial preparation and trial, and (5) taking these cases to trial.

I persuaded Toyota Motor Corporation ("TMC") in Japan to start taking 4Runner rollover cases to trial. It was very difficult to convince TMC to go along with this strategy because (1) Toyota had not taken a 4Runner case to trial for over 7 years, (2) one of the three previous 4Runner rollover trials in the previous 20 years resulted in Toyota paying Plaintiffs $12 million and a published Oregon Supreme Court decision affirming the verdict, and (3) Toyota is a very conservative company that is risk adverse and wants to keep a low profile to avoid negative publicity that a plaintiffs' verdict would generate.

By taking challenging cases to trial, and obtaining favorable verdicts, Toyota established a "Creditable Trial Threat", so Plaintiffs' counsel and plaintiffs became more apprehensive about taking unreasonable settlement positions, and Toyota obtained more leverage to negotiate favorable settlements and discourage the filing of frivolous cases.

Toyota had to take numerous rollover cases to trial in a short period of time to get leverage on the remaining cases, so time was of the essence. This strategy established a Credible Trial Threat because Toyota obtained 12 defense verdicts (including eight 4Runner rollover accidents) under my management, without any plaintiffs' verdicts, in a 36 month period. I was in trial every three months on average. These cases included the following:

- o **Kephart vs. Toyota:** Plaintiff was a 30 year old, innocent passenger who was wearing her seatbelt and was rendered a quadriplegic in an on-road 4Runner rollover accident. Jim McMannis represented plaintiffs. The case took 4 months to get a defense verdict;

- o **Perry vs. Toyota:** Plaintiff died in an on-road, rollover accident involving a Sequoia when he was partially ejected through the sunroof, although he was wearing his seat belt. Todd Tracy tried the case in Dallas, Texas. He is one of the most influential product liability trial attorneys in Texas;

o **Bracho vs. Toyota:** In a 4Runner rollover accident, a 3 year old child sustained serious and permanent brain injuries, two occupants were killed and the front seat passenger sustained serious facial disfigurement. This case was tried in Houston, Texas and in the same court where Toyota lost a case for $44,000,000. Rudy Cano, a well respected and connected trial lawyer, represented Plaintiffs;

o **Valdez vs. Toyota:** This case involved multiple deaths in a 4Runner rollover accident and Rob Ammons represented Plaintiffs. Mr. Ammons is considered one of the best product liability trial attorneys in Houston. The case was tried in Houston, Texas;

o **Kurylowicz vs. Toyota:** This case involved multiple deaths in an on-road 4Runner rollover accident resulting in the death of two children before the vehicle was recalled for handling and stability defects. The Notice for Recall was issued after the accident and stated that the vehicle had directional stability control defects. It was introduced in evidence;

o **Garza/Strum vs. Toyota:** This case involved front seat back failures causing two Hispanic women to sustain serious back injuries. The case was tried in the infamous "Valley" of Texas (composed of predominantly Hispanics) against John Merritt, a nationally recognized plaintiffs' trial attorney;

o **Naranjo vs. Toyota:** This case involved a on-road 4Runner rollover accident resulting in two deaths. Plaintiffs' counsel included Michael Weissman and Frank Guerroa of the Watts' Law Firm. This firm has recovered over $800,000,000 in plaintiffs' verdicts – including $200,000,000 against Ford Motor Company in 2005;

o **Hindi vs. Toyota:** This case also involved a on-road 4Runner rollover accident resulting in the death of the properly seat belted driver who left behind a wife and two small children. The case was tried before the infamous Judge T.J. Ward of the U.S. District Court in the Eastern District of Texas, Marshall Division;

o **Barahona vs. Toyota:** The most famous Plaintiffs' attorney, Mikal Watts, represented a 5 year old child who sustained catastrophic spinal cord injuries that rendered him a ventilated, quadriplegic. The case was tried before a Judge who Mikal Watts literally "bought";

o **Newman vs. Toyota:** Todd Tracy represented the family of a driver killed when his Camry was stopped at a red light and cargo in the truck slammed forward into the seat back of the driver. The case was tried in Austin, Texas, which is considered a very liberal jurisdiction;

o **Uy vs. Toyota:** Michael Wiessman represented plaintiffs in an on-road 4Runner rollover accident resulting in the death of the properly seat belted driver. The case was tried in Houston, Texas; and

o **Bradley vs. Toyota:** Frank Guerra of the Watt's Law Firm represented plaintiffs in a 4Runner rollover accident that rendered the driver a quadriplegic, although she was properly seat belted.

- **Results of My Performance:**
The above defense verdicts reduced Toyota's settlement figures and the number of rollover cases filed against Toyota, although its units in operation increased from 2003 to 2007.

o Toyota's settlement figures were reduced 50% in 2004 over the 2003 settlement figures;

o Toyota's settlement figures were further reduced 50% in 2005 over the 2004 settlement figures;

o Toyota's settlement figures were further reduced 50% in 2006 over the 2005 settlement figures;

o The 2006 settlement figures and attorney fees/litigation costs were reduced in 2006 to the same level as in 1997.

- **Reasons for the Results:**
These results were obtained because I did the following:

o Actively managed all aspects of case preparation from the time complaints were served, through trial and on appeal.

Monitored, assisted and directed outside counsel on all aspects of case preparation, evaluation and trial;

o   Established extensive guidelines for outside counsel on how to prepare, defend and evaluate lawsuits;

o   Required all outside counsel to prepare Discovery Plans at the commencement of litigation, revised & improved those plans; and closely monitor the development of cases to make sure all investigations, testing and discovery were completed;

o   Prepared corporate witnesses for deposition/trials, identified/reviewed/approved procedural motions to resolve cases, reviewed/approved all discovery responses, approved all vehicle tests for demonstrative purposes, retained appropriate expert witnesses, organized and attended all Engineering Evaluation Conferences, reviewed and approved all trial pleadings, attended all trials to assist trial counsel with witnesses and case presentation;

o   Prepared a Damages Analysis formula and required all outside counsel to adhere to formula when seeking settlement authority; adherence to the formula resulted in outside counsel seeking substantially less authority;

o   Attended all mediations and settlement conferences to personally negotiate settlements and used defense verdicts to push settlement figures down;

o   Developed guidelines for case summary reports that outside counsel had to submit to TMS and TMC before seeking any settlement authority or going to trial to make outside counsel prepare an outline of the trial themes and favorable/unfavorable evidence;

o   Provided advice to both TMS and management at TMS on how cases should be resolved (settlement/trial);

o   Provided legal advice to other Toyota entities on how to avoid legal issues (Word Management and E-Discovery);

o   Manage the National Rollover Program;

---

      o  Established guidelines for National Rollover Program to coordinate rollover lawsuits throughout the United States with National Counsel and Local Counsel in an effort to develop and pursue consistent positions on all defenses; and

      o  Developed strategies, evidence and pleadings to protect Toyota against punitive damages.

- **Managed E-Discovery:**
  Corporate America and international companies are paralyzed on what actions need to be taken to address the revision to the Federal Rules of Civil Procedure and the case law on E-Discovery.

- **Reasons for Seeking This Challenge:**
  I took the lead in this area because I cured Toyota's rollover litigation problems and I wanted a new challenge. Nobody in the Legal Services Department wanted to address these issues because of the complexities involved and the enormous amount of time that was needed, but I was thrusting for the challenge.

- **How I Achieved Success:**
  I used every case seeking electronically stored information ("ESI") under my management as an opportunity to confront E-Discovery issues, develop policies and procedures to satisfy E-Discovery obligations, and actually implemented these policies and procedures in real cases. These policies and procedures included:

  o  Revising Document Retention Policies for TMS and TMC to incorporate E-Discovery procedures and policies;

  o  Drafting case Management Conference template to be filed in Federal Court to comply with the revisions to the Federal Rules of Civil Procedure related to E-Discovery obligations;

  o  Developing evidence to prove Toyota satisfied E-Discovery rules;

  o  Counseling TMC in Japan on E-Discovery rules and laws to make ESI was being preserved;

  o  Designing common features of cases that required Toyota to preserve ESI;

o  Creating a template for Notices for Litigation Hold;

o  Formulating appropriate computer processes for issuance of Notices for Litigation Holds to all Toyota related entities;

o  Designing a computer base Calendar to track Notices for Litigation Holds;

o  Creating processes and procedures to conduct efficient and effective searches, collections, review, analysis and production of ESI for all Toyota related companies throughout the world;

o  Educating senior level executives, managers, and associates on E-Discovery legal and technical issues;

o  Establishing a protocol for Global E-Discovery Team;

o  Leading teams of attorneys and forensic experts in investigations and electronic searches for discoverable information used in litigation; and

o  Developing procedural legal remedies to protect highly sensitive and confidential ESI.

- **Results:**
  Toyota to produced ESI in active product liability cases for the first time under my management.  There were policies and procedures addressing E-Discovery issues for the first time.

- **Reasons for These Results:**
  I was able to educate TMC in Japan, and Senior Management at TMS, that it was less expensive to set up and follow E-Discovery procedures and policies than it was to be unprepared and sanctioned by the courts.

**PILLSBURY WINTHROP, Los Angeles**
**PARTNER, January 1, 1999 – April 14, 2003**

- **Reasons for Being Elevated to Partner:**
  Over a period of 8 eight years, I displayed:

o   Excellent trial skills;

o   Superior litigation abilities managing complex litigation;

o   Talents to handle a wide range of litigation including all aspects in maritime law (commercial & tort), product liability, business litigation, and class & mass actions; and

o   Strong abilities to generate revenues and to keep associates busy with interesting work; and

o   Very enthusiastic, self motivated, excellent work ethic and energetic attorney with top billable hours within the Firm.

- **How I Succeeded as a Partner:**
  I maintained a diverse, very profitable and lucative practice split evenly between Defense/Billable Hours and Plaintiffs' Contingency Fee practices. I was heavily involved in Firm activities and committees. I was actively engaged in business promotion efforts.

- **Results:**
  When I resigned in April, 2003, I was one of the most profitable Partners at the Firm. Below are some of the results:

  o   I was lead trial counsel for a certified National Class Action and appointed Class Counsel in a case against Sunset Life Insurance Company resulting in an $110,000,000.00 settlement and $14,500,000.00 in attorney fees. I supervised 15 attorneys and 5 paralegals to achieve class certification and prepare the case for trial;

  o   I represented a single disability policyholder in a bad faith denial of disability benefits case against Prudential Insurance Company of America resulting in a confidential seven figure settlement after 6 months of litigation immediately before trial. The realization rate for attorney fees in this case exceeded 300%;

  o   I was California State Counsel for a national manufacturer of recreational vehicles managing all cases in California involving all litigation (product liability, warranty claims, Song Beverly Act disputes and dealership disagreements,

and representative claims under Business & Professions Code Section 17200);

- o I was the "Name" lawyer for Protection & Indemnity Associates in personal injury and commercial disputes in maritime cases representing ship owners in Japan, China, Korea, England and Norway;

- o I was a member of the Firm's Professional Responsibility Committee and Chairman of the Sub-Committee on Internal Audits;

- o I trained young and junior level associates on trial preparation and how to conduct all aspects of trials.

- **Reasons for These Results:**
  I was very loyal to the Firm and its clients, so I made every effort to do the following in the cases I handled:

  - o I continued to have a passion and love for the practice of law, so I committed a tremendous amount of energy, time, and dedication to the Firm, my clients, and the cases I handled;

  - o I had clear vision and the ability to see where cases needed to be in terms of maturation to obtain the best results, so I nurtured cases from infancy to adulthood;

  - o I was very tenacious and unrelenting in the representation of my clients' interests, so I overcame many litigation obstacles that would have undermined many other attorneys;

  - o I had the strategic and analytical skills to move cases through the judicial system to obtain the best results for my clients; and

  - o I am an activator by nature, so I efficiently and swiftly moved contingency fee cases through the judicial system to limit the expenditure of the Firm's resources because I clearly understood the economics of law firms.

**SENIOR COUNSEL, January 1, 1998 – December 31, 1999**

- **Reasons for Promotion from Associate:**
  The Firm asked me to manage a significant mass action on behalf of 124 plaintiffs against Prudential Insurance Company of America for fraudulent sales practices involving complicated investment and insurance instruments because of my skills in handling complex litigation and my abilities to prepare and conduct trials. The Firm wanted the case resolved within 2 years to avoid protracted litigation because this was a contingency fee case.

- **How I Achieved the Firm's Goals:**
  I developed a very aggressive litigation strategy to get a test case ready for trial as soon as possible, obtained an order staying all other cases and announced ready for trial within one year. All the cases settled when the trial started for the test case. The following caused the case to resolve during trial:

  - Indentifying the most favorable case to serve as a test case at trial, so a settlement could be achieved for all plaintiffs;

  - Developing, implementing and leading a massive discovery plan that involved inspection of millions of documents and the taking of over 60 depositions throughout the United States in 120 days to prepare the matter for trial;

  - Coordinating and opposing intense law and motion practice designed to prevent the case from going to trial; and

  - Supervising a team of 20 attorneys to prosecute the mass action involving 124 plaintiffs, 60 defendants in 4 jurisdictions.

  - Preparing the test case for trial within 120 days while collecting substantial evidence that could be used in the mass action;

  - Appearing ready for trial and start the trial;

- **Results:**

---

The mass action resulted in a nearly 10 figure settlement that is confidential and attorney fees in the mid eight figures. The Firm had a "realization rate" of 1,000% on its investment.

- **Reasons for Theses Results:**
  I managed the case with a sense of urgency to efficiently and effectively get it through the judicial system in a very timely manner. I was able to analyze the challenging and new legal and factual issues in dispute quickly, and come to a complete understanding of this new area of the law within a relatively short period of time because of my learner tendencies. I used my strategic abilities to plan effective and efficient ways to resolve legal issues that were favorable for my clients. Being an activator by nature, I prepared and pushed the case to trial readiness to win at trial.

**ASSOCIATE ATTORNEY, December 12, 1989 – December 31, 1997**

- The Firm recognized early in my career that I had a strong work ethic and passion for the law that would translate into becoming a successful litigator and grow into a trial attorney. The Firm provided me with unique opportunities to independently handle maritime and product liability cases, and to grow into a trial attorney.

- **Trial Experience:**

  I successfully completed 5 jury and bench trials resulting in defense verdicts in Federal and State courts as sole trial attorney and sat second chair in a 30 days, multi-plaintiffs maritime jury trial in the Superior Court which also resulted in defense verdicts. I prepared and started another significant trial for the Firm's biggest and most important client that resulted in a favorable settlement for an amount that was below the settlement offered before trial.

  o Represented **Chevron** at trial in the United States District Court involving a multiple death case involving a pleasure craft hitting buoys securing oil tankers off the coast of Redondo Beach. The case settled during trial for an amount that was below the settlement offer before trial;

  o I obtained a defense verdict in the Superior Court for **ship owners and P & I Club** in a personal injury case involving a

longshoreman injured while loading cargo into a bulk carrier and complaining OSHA & Longshoremen & Harbor Workers' Compensation Act (LHWCA) violations;

o  I obtained a defense verdict in the United States District Court for **China Ocean Shipping Company** in a commercial dispute related to the shipment of garlic under the Carriage of Goods By Sea Act (COGSA);

o  I obtained a defense verdict in Superior Court for Ford Motor Company in a case arising from a multiple car accident involving a Ford employee;

o  I obtained a defense verdict in Superior Court for Ford Motor Company in a spontaneous combustion fire case involving allegations of transmission defects and claims under California's Song Beverly Act;

o  Represented **Ford Motor Company** in a product liability seat back failure case that was dismissed during trial in Superior Court;

o  Sat second chair in a maritime case in which two longshoremen were seriously injured. A pallet of wood fell on one longshoreman's leg, and another longshoreman blew out his knew jumping into the hold from the deck in an effort to "rescue" the other longshoreman. After a 30 day trial the jury returned defense verdicts.

o  1997 participant in Ford Motor Company's **"Next Generation Trial Attorney Program."** Ford Motor Company identified approximately 16 young lawyers throughout the United States to take its cases to trial and to replace its existing trial attorneys who were retiring. I spent 3 months at the Office of the General Counsel in Dearborn, Michigan to get more acquainted with all in-house counsel and engineers supporting the legal department. I analyzed all cases tried from 1995-1997 on behalf of Ford to inform Ford what patterns existed in the cases that resulted in defense and plaintiffs' verdicts, so Ford could identify those characteristics and use them in identifying good and bad trial candidates.

• **Appellate Experience:**

I drafted appellate briefs and motions, and I argued those matters before the Ninth Circuit and California Court of Appeals, 2nd District. The case against Sunset Life Insurance Company involved 9 separate appeals to the Court of Appeals before the case settled. The cases that were published included:

- o  Mina Wilner vs. Sunset Life Insurance Company, 78 Cal. App. 4th 552 (2000);

- o  J. Lauritzen A/S vs. Dashwood Shipping, Ltd., 65 F.3d 139 (9th Cir. 1995);

- o  Bank of San Pedro vs. Forbes West Star, Inc., 53 F.3d 273 (9th Cir. 1995); and

- o  Thomas vs. Newton Int'l Enterprise, 42 F.3d 1266 (9th Cir. 1999).

- **Litigation Experience:**
  I was responsible for all aspects of pre-trial discovery for the cases that were assigned to me. I took over 500 percipient witness and expert witness depositions; I have been involved in all aspects of law and motion practice, including numerous jurisdictional, pre-trial, discovery and summary judgment motions in Federal and State courts. Some of this experience included the following:

  - o  Prepared all aspects of numerous cases for trial prior to pre-trial resolution, including retention, preparation and defending expert/percipient witnesses, jury instructions, motions in limine, demonstrative evidence, motions to bifurcate issues, motions for directed verdicts, special verdict forms and trial/bench briefs;

  - o  Obtained summary judgment in multi-million dollar legal malpractice case for defenses involving numerous legal transactions over a 10 year period;

  - o  Obtained summary judgments in 3 separate personal injury cases involving the Longshoremen & Harbor's Worker's Compensation Act;

  - o  Obtained summary judgments in 4 cases involving claims under the Carriage of Goods By Sea Act;

- o Obtained dismissal via a Motion to Dismiss for Lack of Subject Matter Jurisdiction;

- o Obtained dismissal via a Motion for Forum Non-Conveniens;

- o Obtained complete dismissal of claims and partial dismissal of claims (punitive damages) via demurrers in product liability cases;

- o Negotiated numerous settlements in all forms of Alternative Dispute Resolution: Mediation, Court Ordered Settlement Conferences, and Voluntary Settlement Conferences; and

- o Successfully arbitrated over 25 cases in non-binding/binding arbitrations. These arbitrations involved (1) preparation of Arbitration Briefs (2) presentation of opening statements, (3) introduction of evidence in the form of witness testimony on direct and cross examinations, photographs/videotape, and documents, and (4) closing arguments.

- **Product Liability Experience:**
  Independent overall case responsibility for sophisticated product liability cases involving (1) airplanes, (2) automobiles, (3) diving equipment, (4) tires/rims, (5) prosthetic devices, (6) cranes, (7) recreational vehicles and (8) bicycles. Represented Ford Motor Company, Gulf Stream Coach, and AMC/Chrysler in catastrophic product liability defect allegations (rollover propensity, door latch, brake failure, seat instability, airbag deployment, crashworthiness, tire/rim failure and fires), Lemon Law, warranty cases and collision cases.

- **Maritime Experience:**
  Exclusively handled cases involving (1) unsafe work environment claims under the Longshoremen and Harbor Workers' Compensation Act, Jones Act and OSHA, (2) commercial/breach of contract disputes under the Carriage of Goods by Sea Act/Harter Act, (3) environmental claims under the Oil Pollution Act of 1990, (4) ship collisions, and (4) commercial litigation involving charter party disputes under Federal Common Law.

**LILLICK, McHose & Charles**

**Summer Clerk & Law Clerk, May 1988 – July 1989**

- Rotated through corporate, real estate and litigation departments for 3 months during the summer of 1988;

- Worked full time while completing final year in law school in 1988-1989;

- Researched legal issues, drafted memos regarding legal questions to provide answers, analysis and recommendations, prepared motions in product liability, maritime and personal injury cases.

**UNITED STATES DEPARTMENT OF JUSTICE, Organized Crime and Racketeering Section, Philadelphia Strike Force**
**Law Clerk, May 1987 – 1988**

- Conducted legal research and drafted memos on topics including: conspiracy, affirmative defenses, tax evasion, evidence, search and seizure, collateral estoppels, double jeopardy, RICO and electronic surveillance;

- Attended weekly seminars on criminal procedure and trial practice.  Observed hearings and trials in United States District Court.

**EDUCATION:**          **LOYOLA LAW SCHOOL, JURIS DOCTOR, 1989**

- Top 20%, 83.40 (100 Scale), Dean's List;

- International and Comparative Law Journal, Editor, 1988-1989;

- International and Comparative Law Journal, Staff Writer, 1987-1988.

**UNIVERSITY OF CALIFORNIA, LOS ANGELES, BACHELOR OF ARTS, 1985**

- Political Science/International Relations Major

- Top 15% of Graduating Class

**WRITINGS:**          Biller and Chiate, **Avoid Costly Mistakes When Defending Class Actions,** Class Action Litigation Report (June 28, 2002);

---

Wright, Bradley, and Biller, **The Ship, Stevedore, and Longshore Worker Triangle 1917 – 1995**, Journal of Maritime Law and Commerce, Vol. 26, No. 4, October, 1995;

Biller, **The Persian Gulf Protecting United States' Interests and Freedom of Navigation Through Military Force,** Loyola International and Comparative Law Journal, Vol. 11, 1989, No. 1.

| | |
|---|---|
| **LECTURER:** | Presented seminar to Korean Ship Owners' Association and Korean Ship Owners on how to avoid, prepare and defend claims under the Longshoremen & Harbor Workers' Compensation Act and oil pollution; |

- "Credible Trial Threat to Leverage Case Resolutions"

- "What is a Litigation Hold and Why Does It Exist"

| | |
|---|---|
| **SPECIAL RECOGNITIONS:** | Featured in **"Verdicts & Settlements"**, Daily Journal, April 19, 2002, regarding $110,000,000 national class action settlement involving Sunset Life Insurance Company; |
| | California Lawyer – **"A Dozen Litigators with a Bite."** |
| **INTERESTS:** | Family, traveling, weight lifting, sports, hiking, swimming, finance/investments and movies. |
| **PERSONAL:** | Born on October 20, 1962, Los Angeles, California.  Married to Janice S. Biller and father of Katrina Jade Biller and Luke David Biller. Lifelong resident of Los Angeles.  First Generation Greek. |

Very good!

D, m, tR, o)



## OFFICE OF THE CITY ATTORNEY
### ROCKARD J. DELGADILLO
### CITY ATTORNEY

December 10, 2008

Dimitrios P. Biller
906 Kagawa Street
Pacific Palisades, CA 90272

RE: Our Claim No.: C09-2039

Dear Mr. Biller:

The subject claim against the City has been referred to this office.

After reviewing the circumstances of the claim and the applicable law, it has been determined that the claim should be denied. The principal reason for denial of your claim is as follows:

**The County of Los Angles is a separate public entity and not part of the City of Los Angeles. (See enclosure for address.)**

This letter represents a formal notice to you that said claim has been denied. In view of this action, we are required by law to give you the following warning.

### ***WARNING***

**"Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action alleging state causes of action. The time within which federal causes of action must be filed is governed by federal statutes."**

**"You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately."**

Very truly yours,

THOMAS WONG
Claims Investigator

TW:am
Telephone: (213) 978-7071
Enclosure(s)

## PROOF OF SERVICE BY MAIL

I, Alfred Martinez, declare as follows:

I am over the age of 18 years and not a party to this action.  My business address is 200 North Main Street, Room 600, City Hall East, Los Angeles, California 90012, which is located in the county where the  mailing described below took place.

I am readily familiar with the business practice at my place of business for collection and processing correspondence for mailing via the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

On December 10, 2008, at my place of business at Los Angeles, California,  I mailed a Denial Letter for Claim Number C09-2039 by placing it, with postage thereon fully prepaid, for collection and mailing via the United States mail addressed as follows:

> Dimitrios P. Biller
> 906  Kagawa Street
> Pacific Palisades, CA 90272

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 10, 2008, at Los Angeles, California

_____
Alfred Martinez

<u>YOUR CLAIM SHOULD BE FILED WITH:</u>

(COUNTY)
Executive Officers of the Board of Supervisors
Room 383 - Hall of Administration
500 West Temple Street
Los Angeles, California  90012

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | __ FEPA  <br> X  EEOC | RECEIVED <br> 480.2009.01938 <br> MAR 27 2009 |

Los Angeles County, Los Angeles District Attorney's Office and EEOC
_State or local Agency, if any_                                    EEOC/LADO

| Name (_indicate Mr. Ms. Mrs._) <br> Mr. Dimitrios P. Biller | Home Phone (Incl. Area Code) <br> (310) 454-0728 | INTAKE Date of Birth <br> October 20, 1962 |
|---|---|---|

Street Address                        City, State and ZIP Code
928 Hartzell Street, Pacific Palisades, California 90272

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against me or Others. (_If more than two, list under PARTICULARS below._)

| Name <br> LA District Attorney's Office | No. Employees, Members <br> Over 1,000 | Phone No. (Include Area Code) |
|---|---|---|

Street Address                        City, State and ZIP Code
210 Temple Street, Los Angeles, CA 90012

| Name <br> Los Angeles County | No. Employees, Members <br> More than 1,000 | Phone No. (Include Area Code) <br> (213) 974-1080 |
|---|---|---|

Street Address                        City, State and ZIP Code
500 West Temple Street, Los Angeles, CA 90012

| DISCRIMINATION BASED ON (_Check appropriate box(es)._) <br><br> __ RACE   __ COLOR   __ SEX   __ RELIGION   __ NATIONAL ORIGIN <br><br> __ RETALIATION   __ AGE   XX DISABILITY   __ OTHER (Specify below.) | DATE(S) DISCRIMINATION TOOK PLACE <br> Earliest          Latest <br> July 2008      August 22, 2008 <br><br> __ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (_If additional paper is needed, attached extra sheet(s)_):
Before the LA District Attorney's Office hired me, I took a medical exam. I told the LA County doctor conducting the exam that I was suffering from serious depression, I was taking medication and I was in therapy. I underwent a one month training course with the DA's Office before being assigned to an area office. During my training I and all the students were told never read any questions to any witnesses. As a practicing lawyer for 20 years as a trial attorney before joining the DA's Office that was my custom and practice.

I was initially assigned to the East Los Angeles District Attorney's Office. I was instructed by my supervisor to read questions to witnesses on direct examination. I told my supervisor that I suffered from dyslexia, so I could not read questions and the examinations would not be fluid. He insisted that I write out all questions for all the witnesses I examined, that I give those questions to him and/or Deputy in Charge of Preliminary Hearings for review, and that I read questions during my examination of witnesses. I requested that I not be required to read questions to witnesses because of my dyslexia, but my supervisor insisted. This incident occurred in July 2008. Reading in public is a struggle for me, and I become very embarrassed because I cannot read fluidly. During these times, I lose focus and cannot track words.

Additionally, I complained to my supervisor and the Sheriff's Liaison about Sheriff's Deputies not appearing in Court in violation of subpoenas/court orders and failing to bring evidence to Court. On or about August 14, 2008, the Sheriff Liaison file a false complaint against me claiming I failed to follow proper protocol when I retrieved evidence for a Preliminary Hearing because the Deputy refused to bring the evidence to Court before the hearing (the Defendant's Attorney had a right to see/review the videotape of her client stealing a car before the Preliminary Hearing). Since my supervisor was putting me under a lot of stress and strain caused by reading questions during Preliminary Hearings, I had an emotional breakdown when he told me about the false complaint. I

requested to go home for the balance of the day (3 hours early), so I could calm myself. He refused and he insisted that I stay in his office until his supervisor came because I was a liability. The longer I stayed in his office the more upset I became. He stated that if I left the office and was involved in a car accident then the DA's Office would be liable. My emotional breakdown was the result of my supervisor (1) being hyper critical of me for illegitimate reasons and he constantly yelled at me, (2) insisting that I read questions during examinations, and (3) refusing to let me go home to collect my emotions.

He and his supervisor informed me on August 14, 2008 that there would be a full blown investigation regarding the complaint against me. I was sent home on a paid leave of absence and instructed not to come to work until the following week. On August 22, 2008 I was instructed to meet with administrators/management of the DA's Office. I was terminated on that day as soon as I walked into the office. There was never any investigation. I attempted to explain why the complaint was false and why the false complaint got me emotionally upset, but I was told there was not going to be any discussions.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br><br>_Charging Party Signature_<br><br>March 24, 2009<br>Date | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT<br><br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) March 24, 2009 |

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

(SEE ADDRESS CHECKED BELOW)

TY # (800) 700-2320

| | |
|---|---|
| H | 4800 Stockdale Hwy., Suite 215<br>Bakersfield, CA 93309<br>(661) 395-2729 |
| C | 1320 E. Shaw Avenue, Suite 150<br>Fresno, CA 93710<br>(559) 244-4760 |
| R/S | 611 West Sixth Street, Suite 1500<br>Los Angeles, CA 90017<br>(213) 439-6799 |
| M | 1515 Clay Street, Suite 701<br>Oakland, CA 94612<br>(510) 622-2941 |
| E | 2000 "O" Street, Suite 120<br>Sacramento, CA 95814<br>(916) 445-5523 |
| D | 1350 Front Street, Suite 1063<br>San Diego, CA 92101<br>(619) 645-2681 |
| A | San Francisco District Office<br>1515 Clay Street, Suite 701<br>Oakland, CA 94612<br>(510) 622-2973 |
| G | 2570 North First Street, Suite 480<br>San Jose, CA 95131<br>(408) 325-0344 |
| K | 2101 East Fourth Street, Suite 255-B<br>Santa Ana, CA 92705<br>(714) 558-4266 |

Mr. Dennis Tafoya
Dirctor EEO
Office of Affirmative Action
Los Angeles County
500 West Temple Street, Rm 780
Los Angeles, CA 90012

EEOC Number:
    480-2009-01938
Case Name:
    Dimitrios Biller
Date:    4/13/2009

## NOTICE TO COMPLAINANT AND RESPONDENT

This is to advise you that the above-referenced complaint is being referred to the California Department of Fair Employment and Housing (DFEH) by the U.S. Equal Employment Opportunity Commission (EEOC). The complaint will be filed in accordance with California Government Code section 12960. This notice constitutes service pursuant to Government Code section 12962.

**No response to the DFEH is required by the respondent.**

The EEOC will be responsible for the processing of this complaint. DFEH will not be conducting an investigation into this matter. EEOC should be contacted directly for any discussion of the charge. DFEH is closing its case on the basis of "processing waived to another agency."

## NOTICE TO COMPLAINANT OF RIGHT-TO-SUE

Since DFEH will not be issuing an accusation, this letter is also your right-to-sue notice. According to Government Code section 12965, subdivision (b), you may bring a civil action under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The lawsuit may be filed in a State of California Superior Court. Government Code section 12965, subdivision (b), provides that such a civil action must be brought within one year from the date of this notice. Pursuant to Government Code section 12965, subdivision (d)(1), this one-year period will be tolled during the pendency of the EEOC's investigation of your complaint. You should consult an attorney to determine with accuracy the date by which a civil action must be filed. This right to file a civil action may be waived in the event a settlement agreement is signed. Questions about the right to file under federal law should be referred to the EEOC.

The DFEH does not retain case records beyond three years after a complaint is filed.

Remember: This Right-To-Sue Notice allows you to file a private lawsuit in State court.

Sincerely,

*Jennifer Harlan*

JENNIFER L. HARLAN
Deputy Director, Employment

DFEH-200-02 (03/09)

EEOC Form 161 (2/08)    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Dimitrios Biller<br>906 Kagawa Street<br>Pacific Palisades, CA 90272 | From: Los Angeles District Office<br>255 E. Temple St. 4th<br>Los Angeles, CA 90012 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))* |  |
|---|---|---|
| EEOC Charge No. | EEOC Representative<br>Barbara J. Tucker,<br>Enforcement Supervisor | Telephone No.<br>(213) 894-1090 |
| 480-2009-01938 | | |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[X]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Olophius E. Perry,
District Director

4/13/2009
*(Date Mailed)*

Enclosures(s)

cc:    Dennis Tafoya
       Office of Affirmative Action
       LOS ANGELES COUNTY
       500 West Temple Street
       Los Angeles, CA 90012

**INFORMATION RELATED TO FILING SUIT**
**UNDER THE LAWS ENFORCED BY THE EEOC**

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* to you (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before *7/1/02* – *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

| Biller, Dimitrios | | 536443 | 9271A | | 08/21/2008 |
|---|---|---|---|---|---|
| **EMPLOYEE NAME** | | **EMPLOYEE NUMBER** | **ITEM NUMBER** | **STATUS** | **DATE** |

| Deputy District Attorney I | | 370-CO-ELA | **FROM** 05/05/2008 | **TO** 08/21/2008 |
|---|---|---|---|---|
| **POSITION** | | **DEPT.  DIV.  SUB.** | | **PERIOD** |

Page 2 of 5

## I. PROFESSIONAL SKILLS

Dimitrios Biller was assigned to the East Los Angeles Area Office for the first 90 day rotation of his DDA Grade I probation period.  Problems with his performance surfaced almost immediately.  Over the 90 day period, Mr. Biller's supervisor observed that Mr. Biller repeatedly struggled with questioning witnesses on both direct and cross-examination.  His questions were often confusing, disjointed, and disorganized.  Opening statements were inappropriately argumentative.  Closing arguments were also confusing and unpersuasive.  During one closing argument, Mr. Biller inappropriately shifted the burden of proof to the defendant thus risking possible reversal of the conviction.  On another occasion, a preliminary hearing involving forgery and counterfeiting was dismissed because Mr. Biller called an unqualified witness to the stand to render expert testimony after the witness had clearly told Mr. Biller that he could not give the expert opinion.

The judges before whom Mr. Biller appeared expressed concerns over his lack of competence.  One judge who presided over a child endangerment trial stated that Mr. Biller had done a "very bad job" and was concerned about how close Mr. Biller had come to committing prosecutorial misconduct by arguing facts not in evidence.  Another judge before whom Mr. Biller repeatedly appeared to conduct preliminary hearings expressed concerns over Mr. Biller's "incompetence" and "bad attitude" summing up her observations of his courtroom performance by saying that "he just doesn't get it".

Mr. Biller had difficulty organizing his materials in order to be properly prepared for court.  Mr. Biller's supervisor observed Mr. Biller's court files to be disorganized, sloppy, and co-mingled.

Mr. Biller was repeatedly counseled and on all of these performance issues and given advice and direction on how to improve.  However, despite these efforts to assist Mr. Biller in improving his performance, only slight and inconsistent progress was observed.

## II. ADAPTABILITY & PERSONAL RELATIONS

Even more troubling than Mr. Biller's persistent performance problems were problems involving Mr. Biller's attitude and behavior.  Mr. Biller often became unduly enraged over situations which are common occurrences in the life of a deputy district attorney.  His reactions to difficulties and disappointments were inappropriately extreme.  He seemed unable to control his emotions.  His behavior generated complaints outside the office from both the bench and law enforcement.  The judges before whom Mr. Biller appeared repeatedly complained of "bad attitude".  Law enforcement reported that Mr. Biller was unreasonably demanding, unable to deal with problematic issues without becoming angry, and often treated law enforcement personnel in a rude and condescending manner.

RATER'S SIGNATURE _____Janet J. Moore_____  DATE __8/21/08__
Janet Moore, Bureau Director

REVIEWER'S SIGNATURE _____Pamela M_____  DATE __8/27/08__
Pamela Booth, Bureau Director

DEPARTMENT HEAD _____Jacquelyn Lacey_____  DATE __8/21/08__
Jacquelyn Lacey, Assistant District Attorney

EMPLOYEE'S SIGNATURE _____Refused to sign._____  DATE __8/21/08__
Dimitrios Biller, Deputy District Attorney I

| Biller, Dimitrios | 536443 | 9271A | | 08/21/2008 |
|---|---|---|---|---|
| EMPLOYEE NAME | EMPLOYEE NUMBER | ITEM NUMBER | STATUS | DATE |

| Deputy District Attorney I | 370-CO-ELA | FROM 05/05/2008 | TO 08/21/2008 |
|---|---|---|---|
| POSITION | DEPT. DIV. SUB. | | PERIOD |

Page 3 of 5

Examples of these issues are as follows:

On June 26, 2008, Mr. Biller became enraged over erroneous rulings made by the judge in a child endangerment case. He returned to the office with a contorted expression on his face. His supervisor reported that Mr. Biller's body language and demeanor was that of a person out of control. The supervisor asked other DDAs to leave, brought Mr. Biller into his office, and remained quiet until Mr. Biller had somewhat calmed down. The supervisor reported that he did so because he was afraid of what Mr. Biller might do and was worried about enraging him further. The supervisor expressed to Mr. Biller that he was concerned about Mr. Biller's reactions and whether or not he was about to punch the wall. Mr. Biller replied that he was not. The supervisor then counseled Mr. Biller about the necessity of controlling his emotions.

On July 22, 2008, while conducting a felony vandalism preliminary hearing, Mr. Biller was unable to elicit testimony that the damage involved was over $400 as required by law. As the judge was reducing the charge to a misdemeanor, she looked over at Mr. Biller and, based upon what she saw, shouted out from the bench "That look better not be for me, Mr. Biller".

On July 29, 2008, Mr. Biller was being supervised by a senior Grade III DDA during his conduct of a preliminary hearing with gang enhancement allegations. The Grade III DDA saw that Mr. Biller had not properly laid the foundation for the enhancement and that the People were going to lose it if the state of the evidence remained as it was. The Grade III attempted to prompt and direct Mr. Biller as to the questions that needed to be asked. Rather than welcome the assistance from this senior DDA, Mr. Biller became indignant and resistant. The Grade III had to order Mr. Biller to "just do it!" before he would follow her advice. When Mr. Biller returned to the office, he angrily complained to his supervisor about the senior DDA "lecturing" him during the prelim. The supervisor described his demeanor as "livid". Mr. Biller only calmed down when it was made clear to him that the senior DDA's "interference" actually prevented dismissal of the gang enhancement.

On August 4, 2008, Mr. Biller conducted a preliminary hearing on a third strike defendant for possession of narcotics for sales. After the defendant had been held-to-answer, the supervisor discussed the case with Mr. Biller, more thoroughly reviewed the case file, and determined that the case should never have been filed due to problems of proof. Discussions with the Head Deputy of the Norwalk Branch followed and resulted in a decision to dismiss the case. Mindful that dismissal of a third strike defendant is a very serious matter and that the magistrate was unsupportive of the dismissal, proceedings were scheduled two days later in order give the supervisor time to work out what had to be put on the record. On the date that the matter was to be called, the supervisor arrived in court to perform the dismissal only to find out that Mr. Biller, without direction or permission, had already done so. Mr. Biller failed to make the necessary record. The supervisor later called Mr. Biller in to counsel him about his actions and his failure to make an appropriate record. Mr. Biller became distraught and cried in his supervisor's presence.

RATER'S SIGNATURE _____  DATE _7/21/08_
Janet Moore, Bureau Director

REVIEWER'S SIGNATURE _____  DATE _8/21/08_
Pamela Booth, Bureau Director

DEPARTMENT HEAD _____  DATE _8/21/08_
Jacquelyn Lacey, Assistant District Attorney

EMPLOYEE'S SIGNATURE _Refused to Sign_  DATE _8/21/08_
Dimitrios Biller, Deputy District Attorney I

| Biller, Dimitrios | | 536443 | 9271A | | 08/21/2008 |
|---|---|---|---|---|---|
| **EMPLOYEE NAME** | | **EMPLOYEE NUMBER** | **ITEM NUMBER** | **STATUS** | **DATE** |

| Deputy District Attorney I | 370-CO-ELA | **FROM** 05/05/2008 | **TO** 08/21/2008 |
|---|---|---|---|
| **POSITION** | **DEPT. DIV. SUB.** | | **PERIOD** |

Page 4 of 5

On August 14, 2008, Mr. Biller's supervisor received a complaint from a sergeant at East LA Sherriff's Station with whom our office has an excellent working relationship. The sergeant reported that she had been having ongoing problems with Mr. Biller and that she believed that he had significant "anger management" issues.

The sergeant reported that Mr. Biller did not work cooperatively with her court liaison deputy. He often jumped the chain of command to come directly to her with requests for assistance, such as getting evidence into court or locating missing deputies, thus inappropriately involving her with matters that could and should be handled by the court liaison. Mr. Biller was often inflexible when dealing with her deputies. When he wanted something, he wanted it NOW and was unwilling to factor in the deputies' difficulties in complying with requests.  In other situations, when all efforts to produce the item or person requested had failed, Mr. Biller would express severe frustration and anger.  Mr. Biller did not seem to grasp that what could be done had been done and that he would have to proceed without the desired item or person.  The sergeant also reported that Mr. Biller's interactions with her deputies were often rude, demeaning, and condescending.

The sergeant  further reported  an incident that occurred that very day.  Mr. Biller had been given a hand-off preliminary hearing to conduct.  He wanted a copy of a video tape.  When the court liaison deputy said that he would try to get it but that it would take a little time, Mr. Biller dismissed him and said that he intended to go over to the station himself right then and there to get it.  The deputy assigned to the case offered to go to the station to look for the tape but Mr. Biller insisted that he would get it himself.  The court deputy asked Mr. Biller if he could help to which Mr. Biller replied "Do I look like I need help?"  Both deputies accompanied Mr. Biller to the station because they were concerned that he would create a scene in the detective division.  Mr. Biller's supervisor  promised to speak with him about these issues.

Mr. Biller was called into his supervisor's office and informed of the Sheriff's sergeant's complaints.  Mr. Biller immediately became highly agitated and outraged.  He began crying uncontrollably.  He began pacing about the office back and forth from wall to wall.  He yelled that the sergeant was a "liar" and that what she claimed was "absurd" and "wrong".  He demanded to take a lie detector test.  He insisted that the sergeant should come over and "tell me to my face".  Mr. Biller categorically denied her "accusations" and continued to act highly agitated and to sob.  At times, he doubled over and said that he was about to vomit.

Mr. Biller's supervisor described Mr. Biller as "someone who looked as if they were going to erupt into violence".  The supervisor realized that Mr. Biller was so out of control that, not only would he not be able to complete his work for the day, he should be sent home immediately.  However, Mr. Biller was so overcome and distraught that the supervisor feared for his safety should he drive himself.  The supervisor called his director who dispatched two DA Bureau investigators and her special assistant to the East LA Area Office to pagebring the matter under control.  While waiting for the investigators to arrive, Mr. Biller calmed down

| RATER'S SIGNATURE | _Janet S. Moore_ | DATE | 8/21/08 |
|---|---|---|---|
| | Janet Moore, Bureau Director | | |
| REVIEWER'S SIGNATURE | _Pamela M_ | DATE | 8/21/08 |
| | Pamela Booth, Bureau Director | | |
| DEPARTMENT HEAD | _Jacquelyn Lacey_ | DATE | 8/21/08 |
| | Jacquelyn Lacey, Assistant District Attorney | | |
| EMPLOYEE'S SIGNATURE | _Refused to sign_ | DATE | 8/21/08 |
| | Dimitrios Biller, Deputy District Attorney I | | |

| Biller, Dimitrios | 536443 | 9271A | | 08/21/2008 |
|---|---|---|---|---|
| EMPLOYEE NAME | EMPLOYEE NUMBER | ITEM NUMBER | STATUS | DATE |

| Deputy District Attorney I | 370-CO-ELA | FROM 05/05/2008 | TO 08/21/2008 |
|---|---|---|---|
| POSITION | DEPT. DIV. SUB. | | PERIOD |

**Page 5 of 5**

considerably. After speaking with the investigators, Mr. Biller was allowed to drive himself home and was instructed not to report to work until further notice.

Mr. Biller's behavior and conduct has been highly disruptive to this office. His performance deficiencies have taken up an inordinate amount of his supervisor's time to the point that the supervisor feels he has neglected his other deputies in order to deal with Mr. Biller's issues. Mr. Biller's inability to control his emotions, his extreme reactions to routine commonplace set-backs, and his unpredictable and violent outbursts when upset pose the potential for serious harm to himself and others.

Mr. Biller has demonstrated that he does not possess the ability to calmly, rationally, and professionally deal with the demands of the position of Deputy District Attorney I. It is consequently recommended that his probationary period be ended and that he receive a rating a Unsatisfactory to receive final appointment as a Deputy District Attorney I.

RATER'S SIGNATURE _Janet S. Moore_   DATE 8/21/08
Janet Moore, Bureau Director

REVIEWER'S SIGNATURE _Pamela M_   DATE 8/22/08
Pamela Booth, Bureau Director

DEPARTMENT HEAD _Jacquelyn_   DATE 8/21/08
Jacquelyn Lacey, Assistant District Attorney

EMPLOYEE'S SIGNATURE _refused to sign_   DATE 8/21/08
Dimitrios Biller, Deputy District Attorney I

**FOR OFFICE USE ONLY**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Dimitrios P. Biller | CASE NUMBER |
| PLAINTIFF(S) | |
| v. | CV09 03079 GHK (RZx) |
| Los Angeles County, Los Angeles District Attorney's Office, Victor Rodriguez, and Pam Brookwell, Does 1-10 | |
| | **SUMMONS** |
| DEFENDANT(S). | |

TO:    DEFENDANT(S):    **FOR OFFICE USE ONLY**

A lawsuit has been filed against you.

Within ___20___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney,  Dimitrios P. Biller _____, whose address is  906 Kagawa Street, Pacific Palisades, CA 90272 _____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: May 1, 2009 _____

By: _CPowers_____

Deputy Clerk

(Seal of the Court)

**SEAL**

**FOR OFFICE USE ONLY**

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge George King and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV09- 3079 GHK (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
| --- | --- | --- |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.