1   Calvin R. House (Bar No. 134902)
    Email: calvin.house@gphlawyers.com
2   Jeremy R. Schwartz (Bar No. 258218)
    Email: jeremy.schwartz@gphlawyers.com
3   GUTIERREZ, PRECIADO & HOUSE, LLP
    3020 E. Colorado Blvd.
4   Pasadena, California  91107
    Telephone : (626) 449-2300
5   Facsimile: (626)449-2330

6   Attorneys for Defendants
    COUNTY OF LOS ANGELES, VICTOR
7   RODRIGUEZ and PAM BROOKWELL

8   Dimitrios P. Biller (Bar No. 142730)
    Email: ldtconsulting@verizon.net
9   906 Kagawa St.
    Pacific Palisades, CA 90272
10  Telephone: (310) 459-9870
    Facsimile: (310) 459-9879

11
    Plaintiff in propria persona
12
                   UNITED STATES DISTRICT COURT
13
                   CENTRAL DISTRICT OF CALIFORNIA
14

15

16  DIMITRIOS P. BILLER,                )  Case No. CV 09-03079-GHK (Rzx)
                                        )
17              Plaintiff,              )  **JOINT BRIEF OF THE PARTIES**
                                        )  **ON DEFENDANTS' MOTION FOR**
18       v.                             )  **SUMMARY JUDGMENT**
                                        )
19  LOS ANGELES COUNTY, et al.,         )  Date: June 14, 2010
                                        )  Time: 9:30 a.m.
20              Defendants.             )  Hon. George H. King
                                        )
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

1.    Second Cause of Action (discrimination based on Plaintiff's disabilities in violation of the Americans with Disabilities Act against Defendant County of Los Angeles) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.    There is no substantial evidence that Biller's major depression, organic brain disorder or dyslexia were motivating factors in his discharge . . . 1

      (i)    Defendants' Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      (ii)    Plaintiff's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          (a)    There is substantial evidence that the "Motivating" Reasons for Plaintiff's Termination were His Performance Issues Arising from Plaintiff's Dyslexia . . . . . . . . . . . . . . . . . . . . 5

          (b)    There is substantial evidence that the "Motivating" Reasons for Plaintiff's Termination were Plaintiff's Organic Brian Disorder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          (c)    Plaintiff suffered from Disabilities, was Qualified to be a DDA I, and Suffered Adverse Employment Action . . . . 21

   B.    There is no substantial evidence that the County failed to accommodate a known disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      (i)    Defendants' Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      (ii)    Plaintiff's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

2.    Third Cause of Action (defamation and slander per se against all defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   A.    Biller did not file a claim for damages . . . . . . . . . . . . . . . . . . . . . . . . . 31

      (i)    Defendants' Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

          (a) Substantial compliance does not save the claim . . . . . . . . . 32

(b)    The County was not required to tell Biller that his efforts did not constitute a claim . . . . . . . . . . . . . . . . . . . . . . . . 35

(ii)    Plaintiff's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B.    The allegedly defamatory statements were absolutely privileged under Civil Code section 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

(i)    Defendants' Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

(ii)    Plaintiff's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

C.    The statements were not defamatory . . . . . . . . . . . . . . . . . . . . . . 45

(i)    Defendants' Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

(ii)    Plaintiff's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

**Cases**

*Baker v. Los Angeles Herald Examiner,*
    42 Cal. 3d 254, 228 Cal. Rptr. 206 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

*Banks v. Dominican College,*
    35 Cal. App. 4th 1545, 42 Cal. Rptr. 2d 110 (1995) . . . . . . . . . . . . . . . . . . .   46

*Beck v. University of Wisconsin Bd. of Regents,*
    75 F.3d 1130 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Bradley v. Harcourt, Brace and Co.,*
    104 F.3d 267 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3, 4

*Browning v. Block,*
    175 Cal. App. 3d 423, 220 Cal. Rptr. 763 (1985) . . . . . . . . . . . . . . . . . . . . .   41

*Burch v. City of Nacogdoches,*
    174 F.3d 615, 621 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*C. A. Magistretti Co. v. Merced Irrigation Dist.,*
    27 Cal. App. 3d 270, 103 Cal. Rptr. 555 (1972) . . . . . . . . . . . . . . . . . . . .   33, 40

*Campanelli v. Regents of University of California,*
    44 Cal. App. 4th. 572, 51 Cal. Rptr. 2d 891 (1996) . . . . . . . . . . . . . . . . . . .   48

*Carver v. Bonds,*
    135 Cal. App. 4th 328, 37 Cal. Rptr. 3d 480 (2005) . . . . . . . . . . . . . . . . . . .   46

*City of San Jose v. Superior Court*
    12 Cal. 3d 447, 115 Cal. Rptr. 797 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*Coleman v. Quaker Oats Co.,*
    232 F.3d 1271 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

*Collings v. Longview Fibre Co.,*
    63 F.3d 828 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*Curtis T. v. County of Los Angeles,*
    123 Cal. App. 4th 1405, 21 Cal. Rptr. 3d 208 (2004) . . . . . . . . . . . . . . . . .   31

*Dark v. Curry County,*
    451 F.3d 1078 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*DeCuir v. County of Los Angeles,*
    64 Cal. App. 4th 75, 75 Cal. Rptr. 2d 102 (1998) . . . . . . . . . . . . . . . . . . . . .   41

*Del Real v. City of Riverside,*
    95 Cal. App. 4th 761, 115 Cal. Rptr. 2d 705 (2002) . . . . . . . . . . . . . . . .   34, 40

**JOINT BRIEF**

*Dong v. Board of Trustees,*
   191 Cal. App. 3d 1572, 236 Cal. Rptr. 912 (1987)  . . . . . . . . . . . . . . . . . . . .  46

*Forrester v. Rauland-Borg Corp.,*
   453 F.3d 416 (7th Cir. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Foster v. McFadden,*
   30 Cal. App. 3d 943, 106 Cal. Rptr. 685 (1973)  . . . . . . . . . . . . . . . . . . .  35, 39

*Furnco Constr. Corp. v. Waters,*
   438 U.S. 567, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978)  . . . . . . . . . . . . . . . . .  6

*Gould v. Maryland Sound Industries, Inc.,*
   31 Cal. App. 4th 1137, 37 Cal. Rptr. 2d 718 (1995)  . . . . . . . . . . . . . . . . . . .  46

*Head v. Glacier Northwest Inc.,*
   413 F.3d 1053 (9th Cir. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Hedberg v. Indiana Bell Tel. Co.,*
   47 F.3d 928 (7th Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Hofmann Co. v. E.I. Du Pont de Nemors & Co.,*
   202 Cal. App. 3d 390, 248 Cal. Rptr. 384 (1988)  . . . . . . . . . . . . . . . . . . . .  48

*Humphrey v. Mem'l Hosps. Ass'n,*
   239 F.3d 1128 (9th Cir.2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Imig v. Ferrar,*
   70 Cal. App. 3d 48, 138 Cal. Rptr. 540 (1977) . . . . . . . . . . . . . . . . . . . . . . .  42

*Jackson v. Paramount Pictures Corp.,*
   68 Cal. App. 4th 10, 80 Cal. Rptr. 2d 1 (1998)  . . . . . . . . . . . . . . . . . . . . . . .  46

*James v. San Jose Mercury News, Inc.,*
   17 Cal. App. 4th 1, 20 Cal. Rptr. 2d 890 (1993)  . . . . . . . . . . . . . . . . . . . . . .  46

*Jensen v. Hewlett-Packard Co.,*
   14 Cal. App. 4th 958, 18 Cal. Rptr. 2d 83 (1993)  . . . . . . . . . . . . . . . . . . . .  45

*Johnson v. State of California,*
   69 Cal. 2d. 782, 73 Cal. Rptr. 240 (1968)  . . . . . . . . . . . . . . . . . . . . . . . . . .  43

*Kahn v. Bower,*
   232 Cal. App. 3d 1599, 284 Cal. Rptr. 244 (1991)  . . . . . . . . . . . . . . . . . . .  49

*Karim-Panahi v. Los Angeles Police Dept.,*
   839 F.2d 621 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Kemmerer v. County of Fresno,*
   200 Cal. App. 3d 1426, 246 Cal. Rptr. 609 (1988)  . . . . . . . . . . . . . . . . . .  42, 43

*Lee v. Board of Civil Service Comrs.,*
   221 Cal. App. 3d 103, 270 Cal. Rptr. 47 (1990)  . . . . . . . . . . . . . . . . . . . . . .  41

*Lipman v. Brisban Elementary School District*,
    55 Cal.2d 224, 11 Cal.Rptr. 97 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Lockwood v. Wolf Corp.*,
    629 F2d 603 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Loehr v. Ventura County Community College Dist.*,
    147 Cal. App. 3d 1071, 195 Cal. Rptr. 576 (1983) . . . . . . . . . . . . . . . . . 33, 40

*Marino v. City of Los Angeles*,
    34 Cal. App. 3d 461, 110 Cal. Rptr. 45 (1973) . . . . . . . . . . . . . . . . . . . . . . . . 31

*Martinez v. County of Los Angeles*,
    78 Cal. App. 3d 242, 144 Cal. Rptr. 123 (1978) . . . . . . . . . . . . . . . . . . . . . . 38

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) . . . . . . . . . . . . . . . . . 2

*Morisky v. Broward County*,
    80 F.3d 445 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Moyer v. Amador Valley J. Union High School Dist.*,
    225 Cal. App. 3d 720, 275 Cal. Rptr. 494 (1990) . . . . . . . . . . . . . . . . . . . . . 46

*Munoz v. State of California*,
    33 Cal. App. 4th 1767, 39 Cal. Rptr. 2d 860 (1995) . . . . . . . . . . . . . . . . . . . 32

*Otis v. City of Los Angeles*,
    52 Cal. App. 2d 605, 126 P.2d 954 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Pacific Telephone & Telegraph Co. v. County of Riverside*,
    106 Cal. App. 3d 183, 165 Cal. Rptr. 29 (1980) . . . . . . . . . . . . . . . . . . . . 32, 37

*Phillips v. Desert Hospital Dist.*,
    49 Cal. 3d 699, 263 Cal. Rptr. 119 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Raytheon Co. v. Hernandez*,
    540 U.S. 44, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) . . . . . . . . . . . . . . . . . . . 3

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105  (2000) . . . . . . . . . . . . . 3, 7

*Santee v. Santa Clara County Office of Education*,
    220 Cal. App. 3d 702, 269 Cal. Rptr. 605 (1990) . . . . . . . . . . . . . . . . . . . . . 32

*Savage v. Pacific Gas & Electric Co.*
    21 Cal. App. 4th 434, 26 Cal. Rptr. 2d 305  (1993) . . . . . . . . . . . . . . . . . . . . 48

*Schaefer Dixon Associates v. Santa Ana Watershed Project Authority*,
    48 Cal. App. 4th 524, 55 Cal. Rptr. 2d 698 (1996) . . . . . . . . . . . . . . 33, 35, 39

*Schuler v. Chronicle Broadcasting Co. Inc.*,
    793 F.2d 1010 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Shively v. Bozanich,*
  31 Cal. 4th 1230, 7 Cal. Rptr. 3d 576 (2003) . . . . . . . . . . . . . . . . . . . . . . . .  31

*Snead v. Metropolitan Property & Cas. Ins. Co.,*
  237 F.3d 1080 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Stegall v. Citadel Broadcasting Co.,*
  350 F.3d 1061 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Stromberg, Inc. v. Los Angeles County Flood Control Dist.,*
  270 Cal. App. 2d 759, 76 Cal. Rptr. 183 (1969) . . . . . . . . . . . . . . . . . . . . .  34

*Taylor v. Principal Financial Group, Inc.,*
  93 F.3d 155 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Tiedemann v. Superior Court,*
  83 Cal. App. 3d 918, 148 Cal. Rptr. 242 (1978) . . . . . . . . . . . . . . . . . . . . .  41

*US Airways, Inc. v. Barnett,*
  535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002) . . . . . . . . . . . . . .  25

*Villiarimo v. Alha Island Air, Inc.,*
  281 F.3d 1054 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Westcon Const. Corp. v. County of Sacramento,*
  152 Cal. App. 4th 183, 61 Cal. Rptr. 3d 89 (2007) . . . . . . . . . . . . . . . . .  33, 40

*Wilson v. United States,*
  162 U.S. 613, 40 L. Ed. 1090, 16 S. Ct. 895 (1896) . . . . . . . . . . . . . . . . . . .  6

*Wright v. West,*
  505 U.S. 277, 120 L. Ed. 2d 225, 112 S. Ct. 2482 (1992) . . . . . . . . . . . . . .  6

*Yorty v. Chandler,*
  13 Cal. App. 3d 467, 91 Cal. Rptr. 709 (1970) . . . . . . . . . . . . . . . . . . . . . . .  46

**Statutes**

42 U.S.C. § 12112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Civ. Code § 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

Cal. Civ. Proc. Code § 1085 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Cal. Gov't Code § 24000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Cal. Gov't Code § 910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38, 39

Cal. Gov't Code § 910.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Cal. Gov't Code § 910.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Cal. Gov't Code § 911 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Cal. Gov't Code § 911.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Cal. Gov't Code § 911.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Cal. Gov't Code § 912.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Cal. Gov't Code § 915 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

Cal. Gov't Code § 945.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Cal. Gov't Code § 950.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 37

Cal. Gov't Code § 950.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 37

**Federal Rules**

Fed. R. Evid. 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Other Authorities**

2 J. Wigmore, Evidence § 278(2) (J. Chadbourn rev. ed. 1979) . . . . . . . . . . . . . . . 6

Ninth Circuit Model Civil Jury Instruction 12.8 . . . . . . . . . . . . . . . . . . . . . . . . . 25

**1.     Second Cause of Action (discrimination based on Plaintiff's disabilities in violation of the Americans with Disabilities Act against Defendant County of Los Angeles)**

**A.     There is no substantial evidence that Biller's major depression, organic brain disorder or dyslexia were motivating factors in his discharge**

***(i)     Defendants' Argument***

To prove disability discrimination, Biller must provide evidence that one of his disabilities was a motivating factor in his discharge. *Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005). That means that those involved in the decision to discharge must have been motivated, at least in part, by animus based on one of the disabilities. *Ibid.* If those involved in the decision were not aware of the disability and its accompanying limitations, that disability could not have been a motivating factor. *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 163-64 (5th Cir. 1996). Biller has identified his disabilities as depression/major depressive disorder, organic brain syndrome, and being dyslexic. [Comp ¶ 12; Biller Depo 91:22-92:9]

1. Biller cannot base his claim on his major depression or organic brain disorder, because no one involved in the decision was aware of those conditions. Although he claims that the County was on notice of those disabilities, he must provide evidence that the symptoms observed were "so obviously manifestations of an underlying disability that it would be reasonable to infer that his employer actually knew of the disability." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) ("The ADA does not require clairvoyance"); *see also Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996) ("Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA"). There is no such evidence in this case:

a. Although Biller points to the disclosures he made to the doctor retained to assess his fitness for duty [Biller Depo 27:11-20], he does not provide a link between that information and those involved in the decision to discharge him. The information

about his depression and organic brain disorder was stored at the Office of Occupational Health. The only information the District Attorney's Office received was notification that Biller was fit for duty. [Comp ¶ 12, 145; Biller Depo 28:1-14, 30:5-10, 36:9-38:22; Turkal Decl; Ex. 55] Those involved in Biller's discharge (Lacey, Moore, Silva and Rodriguez) did not know about the disclosures to the doctor, or his depression. [Rodriguez Depo 207:5-208:24, 209:14-210:10; Biller Depo 57:11-13, 69:8-18; Lacey Depo 63:13-19; Moore Decl; Silva Decl]

     b. Although Biller points to his emotional reactions to occurrences in the workplace, that is at best the sort of vague information about an unspecified incapacity that has been held insufficient to put the employer on notice of its obligations under the ADA. He did not tell anyone that his mental illness was causing his emotional reactions. [Biller Depo 69:8-18]

     c. Although Biller points to Judge Injejikian's offhand comment that Biller might be suffering from medical problems [Rodriguez Depo 113:11-114:5, 206:9-16; Ex. 40 (D381)], that likewise is too vague to put the District Attorney's Office on notice of a specific disorder. Further, there is no evidence that Judge Injejikian had any expertise in mental disorders that would justify reliance on her supposed assessment of Biller's mental condition.

     2. Although those involved in the decision did know about Biller's dyslexia [Biller Depo 82:25-83:9; Rodriguez Depo 68:20-69:23, 80:18-81:12; Ex. 40 (D376)], there is no evidence of animus toward Biller because of his dyslexia. Because there is no direct evidence of animus, Biller must rely on the *McDonnell-Douglas*[1] burden shifting analysis. In a disability discrimination case, that requires the plaintiff to establish a prima facie case with evidence that he (1) was disabled, (2) was qualified, and (3) suffered an adverse employment action because of his disability. *Snead v. Metropolitan Property & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001).

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Even if Biller's evidence establishes a prima facie case, the County has proffered legitimate non-discriminatory reasons for discharging Biller, by pointing to the issues identified in the report on probationer and letter of termination provided to Biller on August 21, 2008. [Lacey Decl; Ex. 59] Those reasons included expressions of concern about his lack of competence by judges before whom Biller had appeared [Rodriguez Depo 50:8-51:23, 113:11-114:5, 197:4-198:7, 206:9-16, 231:21-232:3; Ex. 40 (D381)], the assessments of Rodriguez and another experienced deputy district attorney that Biller was struggling to perform his job [Comp ¶ 86; Rodriguez Depo 33:20-34:18, 149:4-21, 153:20-154:20; 178:1-13], his over reactions to common occurrences in the life of a deputy district attorney, demonstrated by his breaking down in Rodriguez's office twice and becoming overly angry and upset. [Comp ¶ 119; Biller Depo 63:2-14, 67:20-22 98:24-103:7, 104:5-106:18, 127:2-128:4; Rodriguez Depo 47:24-48:14, 171:6-24, 184:11-185:24, 205:11-18; Ex. 44] The events culminated in the meeting in Rodriguez's office on August 14, when, by Biller's own account, " I went into shock, and I had a complete emotional breakdown. I -- I cried like I've never cried before." [Biller Depo 63:2-14]

Therefore, Biller must provide circumstantial evidence of pretext that is "both specific and substantial." *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1066-67 (9th Cir. 2003); *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 833-34 (9th Cir. 1995). The "only relevant question" upon evidence of a legitimate motive is "whether there was sufficient evidence from which a jury could conclude that [defendant] did make its decision based on [plaintiff]'s status as disabled despite [defendant]'s proffered explanation." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53, 124 S.Ct. 513, 520, 157 L.Ed.2d 357 (2003). The evidence would have to show that the County's reasons were unworthy of credence, such that a finder of fact might infer that the County was dissembling to cover up a discriminatory purpose. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105  (2000). It is

not enough to show that the reasons were "foolish or trivial or baseless," so long as they were honestly believed. *Villiarimo v. Alha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). The issue is not whether the employer was mistaken or irrational in making its decision, but whether the stated reason was the true reason. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006).

Here, to establish pretext, Biller relies primarily on his own accounts of the incidents in question and his own assessment of his performance. But, the fact that he disagrees with the accounts and assessments of others does not establish that the reasons proffered by the District Attorney's Office were pretexts for discrimination based on dyslexia. "However, an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact." *Bradley*, 104 F.3d at 270. *See also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir. 2000); *Schuler v. Chronicle Broadcasting Co. Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986).

Although Biller points to the claimed omission of favorable information from the report on probationer and the disagreement between Rodriguez and Brookwell over their conversation about Biller on August 14, 2008, those arguments do not establish pretext. Such arguments would be appropriate in an administrative challenge to the discharge under the Civil Service Rules or in a Superior Court writ proceeding challenging the District Attorney's Office's actions. But, they are not evidence that his disabilities were motivating factors in the discharge. Nor is Biller's claim that Ms. Dixon-Silva supposedly testified falsely, which is based on her not having listed reasonable accommodation coordinator as one of her duties while Ms. Lacey thought that it was. Biller never asked Ms. Dixon-Silva directly if that was her duty. There was no false testimony.

More importantly, it was Lacey who decided to discharge Biller [Lacey Depo 19:14-18, 63:20-22], and, therefore, it is Lacey's reasons that Biller must establish are pretexts for a discriminatory animus. She decided to discharge Biller for the reasons stated in the termination letter and report on probationer, after reading those

1   documents and some emails about Biller's performance, and consulting with Silva

2   and Moore. [Comp ¶¶ 10, 22; Lacey Depo 19:14-18, 41:1-7, 68:5-13; Ex. 59] Lacey

3   did not know about his depression, and was not motivated by his being dyslexic.

4   [Lacey Depo 42:11-21, 54:1-9, 60:21-61:22; Biller Depo 75:17-21; Lacey Decl]

5        Disagreements among others about the details of Biller's performance and

6   temperament cannot undermine the legitimacy of the basis for Lacey's decision. As

7   Lacey explained to Biller at her deposition after he gave his versions of the various

8   events and provided positive information about his performance:

9           "That's true with regard to what happened, but here's sort of the bottom line.

10          Our supervisor -- even if what you say is true, our supervisor is observing you

11          in such a -- he says in such an outrage, an uncontrollable outrage. I mean, we

12          don't send investigators out to calm situations like this down very often. It

13          doesn't happen. Normally people who are on probation, grade 1s, we expect

14          them to be at their best behavior. We expect them to be at their peak

15          performance. Whatever their A game is, we expect their attitude to be at that

16          level. So the idea that complaints are flowing in -- because we've sent many a

17          deputies to East L.A. They've gone through the same experience. I assume the

18          officers are not showing up for them either, and they're getting bad rulings I

19          know from the court." [Lacey Depo 74:25-75:18]

20  **(ii)**    **Plaintiff's Argument**

21  *(a)*    *There is substantial evidence that the "Motivating" Reasons for Plaintiff's*

22      *Termination were His Performance Issues Arising from Plaintiff's Dyslexia*

23       Defendants challenge Plaintiff to present direct or circumstantial evidence

24  establishing the reasons Plaintiff's wrongful discharge offered in the termination letter

25  are false and not worthy of belief. That's easy.  The leading United States Supreme

26  Court case on the issue holds:

27          "The fact finder's disbelief of the reasons put forward by the defendant

28          (particularly if disbelief is accompanied by a suspicion of mendacity) may,

together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." Id. at 511.

"Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See id. at 517  ("Proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Wright v. West, 505 U.S. 277, 296, 120 L. Ed. 2d 225, 112 S. Ct. 2482 (1992); see also Wilson v. United States, 162 U.S. 613, 620-621, 40 L. Ed. 1090, 16 S. Ct. 895 (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourn rev. ed. 1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v.  [*148]  Waters*, 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978) ("**When all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration").** **Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier**

**of fact to conclude that the employer unlawfully discriminated.**" (Emphasis added)

Roger Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149-149 (2000)

Simply put, the basis of Defendants' wrongful termination are pretexts because those alleged reasons are either factually wrong, or omitted materials facts that would prove them to be wrong. The three reasons given to justify Plaintiff's wrongful discharged from the Los Angeles District Attorney's Office ("LADA Office") as a County of Los Angeles ("COLA") employee were all pretexts. On August 21, 2008, Jacquelyn Lacey personally handed a Termination Letter and informed Plaintiff that he was no longer a Deputy District Attorney ("DDA") because of Plaintiff's alleged: (1) unsatisfactory performance in the area of ***Professional Skills***; (2) unsatisfactory in performance in the area of ***Adaptability***; (3) unsatisfactory performance in the area of *Personal Relations*.  **(Depo. of Lacey, pg. 66, ln. 5 - pg. 67, ln. 20, Ex. "59")** The letter goes on to provide two short paragraphs explaining the "reasons" of unsatisfactory performance in the area of "professional skills", on the one hand, and unsatisfactory performance in the areas of "adaptability" and "personal relations."  In both areas, Mrs. Lacey was given false information, or not all the material facts, so her decision is based on pretexts.

Defendant also relies on the Declarations of Julie Dixon-Silva and Jacquelyn Lacey.  Ms. Dixon-Silva claims she did not know about Plaintiff's depression, and Ms. Lacey claims her decision was based on the Report on Probation.  Ms. Dixon-Silva's declaration omits any reference to knowing that Plaintiff suffered from dyslexia; that omission is evidence. Ms. Dixon-Silva knew Plaintiff was dyslexic. Additionally, she was carbon copied on an e-mail that discusses Plaintiff's dyslexia interfering with his work performance.  **(Ex. 17, Bates stamped D-06643)**  Ms. Silva gave legal advice regarding Plaintiff's discharge.  **(Depo. Dixon-Silva, pg. 148, ln. 13, pg. 149, ln. 1)**

Ms. Lacey's Letter of Termination includes two very short paragraphs setting front the alleged reasons for Plaintiff's termination.  The initial paragraph focuses on performance issues.  First, she states: "Mr. Rodriguez expressed a concern that you appeared to have difficulty questioning witnesses on direct and cross-examination."  Defendant Rodriguez never saw Plaintiff conduct a cross-examination.  (**Decl. of Biller, Para. 10**)  Plaintiff had difficulty on direct examination only because Mr. Rodriguez forced Plaintiff to read questions.  That presents a problem for a dyslexic.  **(Decl. of Biller)**  However, Defendant Rodriguez never criticized Plaintiff on his skills related to cross examination.  In fact, the only comment Defendant Rodriguez made on Plaintiff's ability to conduct cross-examination was positive. He stated in his 90 Day Evaluation:

> On August 4, Mr. Biller conducted a preliminary hearing on a third-strike possession for sales case.  The defendant's brother took the stand for the defense and, over the advice of counsel, claimed that the seized contraband was his.  According to DDA Mitchell, Mr. Biller did an outstanding job cross-examining the defendant's brother.  The judge found him to be not credible and the defendant was held to answer to Norwalk."

**(Exhibit "44")**

Plaintiff's cross examination was "outstanding" because he did not read questions to the witness.  Instead, he asked questions developed at the moment based on the witness' appearance, attitude on direct, his direct examination, and answer he gave during the direct examination.  **(Decl. of Biller, Para. 11)** During Plaintiff's one month long training that the LADA's Office provided, Plaintiff was praised for his direct examination of a witness in a DUI.  Plaintiff's Evaluation stated: "He demonstrated a keen legal intellect, eloquence and composure throughout his performance of the mock exercises.  He delivered a model direct examination in a driving under the influence case."  **(Ex. "33")**   Plaintiff did not read questions during

those exercises, and instructors told Plaintiff and others do not read questions except for Gang Enhance and STEP Act questions.  **(Decl. of Biller)**

The second reason Ms. Lacey states in her letter is Plaintiff allegedly was "overly argumentative in your opening statements."  Defendant Rodriguez saw one opening statement (not arguments as Ms. Lacey mistakenly states).  However, Plaintiff stated "the evidence will show" during his opening. **(Decl. of Biller, Para. 13)**  Furthermore, Plaintiff made informal and formal request for production of the transcript prepared in <u>People v. Melendez</u> and Defendant's never produced it; when Plaintiff was working at the LADA's Office a transcript of the trial was prepared because the convicted Defendant was seeking an appeal.  **(Decl. of Biller, Ex. "67")** The transcript would prove Plaintiff was not "argumentative."

Third, Mr. Rodriguez believes Plaintiff's closing argument was "confusing" and "unpersuasive."  However, Plaintiff obtained a guilty verdict in that DUI, hit and run case. **(Decl. of Biller, Para. 8)** Obviously, the jury was not confused and was persuaded.

Fourth, Mr. Rodriguez observed and was "told by co-workers, judges and law enforcement that [Plaintiff] had a bad attitude, was easy to anger and overreacted to routine setbacks and disappointments.  This forth criticism does not have any merit and is lacking of any supportive facts.  Judge Injejikian did say Plaintiff "just doesn't get it", but that was during the first week he was in Preliminary Court.  On August 12, 2008 she called Plaintiff into chambers and asked:  "do you know what my staff and I were talking about over lunch?"  I said "what" and she replied: "I asked my staff who was that lawyer in court today.  You did an excellent job.  We have finally made a criminal lawyer out of you." **(Decl. of Biller, Para. 14)**  Furthermore, Commissioner Baird's criticisms have to be taken with a serious grain of salt.  Immediately following a child endangerment trial, I went to Defendant Rodriguez's office and complained about serious judicial errors Commissioner Baird committed.  Defendant

Rodriguez was so concerned he met with Commissioner Baird to express my views and she agreed she was in error.  She apologized. **(Biller Decl., Para. 41)**

Furthermore, Ms. Lacey wrote the Termination Letter based on incomplete, slanted and one-side and false information contained in the "Report on Probationer" that Janet Moore prepared. **(Depo. of Rodriguez, pg. 176, ln. 3 - 17, Ex. "50")** That Report was based on the 90 Day Evaluation that Defendant Rodriguez wrote. **(Depo. of Rodriguez, pg. 147, ln. 2 - pg. 148, ln. 2, Ex. "44")** The only document Jacquelyn Lacey reviewed before deciding to terminate Plaintiff was the Report on Probationer. **(Depo. of Lacey, pg. 58, ln. 9 - 59, ln. 4)** Therefore, she reviewed incomplete information and did not have the benefit of analyzing all the material facts before making a decision. Both the Report on Probationer and the 90 Day Evaluation omit material facts regarding Plaintiff's dyslexia. **(Exhibit "44" and "50")**

Janet Moore knew on July 23, 2008 that Plaintiff had dyslexia and that condition was causing him problems in Preliminary Court.  **(Depo. of Rodriguez, pg. 115, ln. 24 - pg. 116, ln. 25, Ex. 40, Bates stamped pg. D0373)**  The Report on Probationer focused on Plaintiff's performance issues arising from or connected to Plaintiff's disabilities. **(Decl. of Biller, Para. 17)** However, the Report on Probationer did not include any discussion about Plaintiff's disabilities and the mitigating factors that paint a completely different picture of Plaintiff's skills and abilities as a trial attorney and his interactions with law enforcement. Additionally, Defendant Rodriguez' 90 Day Evaluation did not discuss Plaintiff's disabilities and request for "reasonable accommodations." For example, the 90 Day Evaluation did **not** discuss the following issues and events:

- Plaintiff informed Defendant Rodriguez that he suffered from dyslexia **(Depo. of Rodriguez, pg. 136, lns. 12-25)**;

- Plaintiff told Defendant Rodriguez that he could not read out loud (**Depo. of Rodriguez, pg. 136, lns. 12-25**);

1     •    Defendant Rodriguez insisted that Plaintiff read out loud questions

2           during direct examination (**Depo. of Rodriguez, pg. 136, ln. 12 - 25**);

3     •    Defendant Rodriguez sent e-mails to the LADA's Office downtown to

4           inform his supervisors that Plaintiff was suffering from dyslexia

5           (**Exhibit "40", Bates stamped D-037**);

6     •    Julie Dixon-Silva, the Reasonable Accommodation Coordinator for the

7           Employee Relations Division of the LADA's Office (**Depo. of Lacey, pg.**

8           **20, lns. 4 - 22**), did not engage in a good faith effort with Plaintiff to

9           determine if there was a reasonable accommodation for Plaintiff, but she

10          knew that Plaintiff was in fact dyslexic (**Decl. of Biller, Exhibit "17",**

11          **Bates stamp D-06643**);

12     •    Jacquelyn Lacey believed that Julie Dixon-Silva's should have engaged

13          in a good faith process to determine if a reasonable accommodation was

14          available (**Depo. of Lacey, pg. 45, lns. 18-25**);

15     •    When Defendant Rodriguez learned on July 23, 2008 about Plaintiff's

16          dyslexia, he had an obligation to provide Plaintiff with a voluntarily

17          request for reasonable accommodations and start the interactive process,

18          but he did not. (**Depo. of Lacey, pg. 41, lns. 11-25**);

19     •    If Ms. Lacey knew that Defendant Rodriguez had a duty to provide

20          Plaintiff with notice of a voluntary request form for reasonable

21          accommodations and to start the interactive process, but did not, then

22          that would have influenced her decision. (**Depo. Lacey, pg. 41, ln. 11 -**

23          **pg. 42, ln. 13**)

24     •    Pamela Booth of the LADA's Office, and Mark Evans of the Employee

25          Relations Division of the LADA's Office exchanged e-mails

26          acknowledging Plaintiff may be requesting a reasonable accommodation

27          to address performance issues related to dyslexia and Julie Dixon-Silva

28

**JOINT BRIEF**

was carbon copied on that e-mail sent on July 23, 2008 (**Exhibit "17", Bates stamp D-06643**);

- COLA has an Employment Guidelines for the Reasonable Accommodation Process that indicates the COLA/LADA's Office received "Notice" that Plaintiff was making a demand for reasonable accommodations (**Exhibit "15", pg. 7**);

- There was not a sign in the East Los Angeles Office informing employees about the Voluntary Request Forms for "reasonable accommodations" in violation of the Guidelines (**Decl. of Biler, Para. 5**);

- Plaintiff was violently and aggressively confronted by Sheriff Deputies when he requested that Judge Injenikian Order the Deputies back to Court the next day because they were late on July 3, 2008 for a Preliminary Hearing (**Depo of Rodriguez, pg. 57, ln. 4 - pg. 61, ln. 15; Decl. of Biller Para. 5** );

- Defendant Rodriguez' belief that Plaintiff committed "Griffin Error" lacked foundation because he did not see Plaintiff's cross-examination of Defendant in <u>People v. Melendez</u> and did not know the nature of Defendant's testimony  (**Depo of Daniels, pg. 63, ln. 6 - pg. 65, 11; pg. 61, lns. 1-23, Ex. "35" and Ex. "67"**) );

- Defendant Rodriguez and nobody from his office saw Defendant's cross-examination of Defendant.  (**Decl. of Biller Para. 8**);

- The Report on Probationer also falsely states that Plaintiff called an unqualified expert to testify the counterfeit money was in fact counterfeit.  Plaintiff called an Expert Witness who was in fact qualified.  The Judge did not give his opinion substantial weight because he only reviewed  photocopies of the actual counterfeit because the Investigating

1    Sheriff Deputy did not find the real counterfeit. **(Decl. of Biller, Para.**

2    **26 and Ex. "67," D - 9108)**;

3    • The failure to bring the actual counterfeit money was the fault of the

4    Sheriff's Investigating Officer.  (**Depo. of Lacey, pg. 66, ln. 19 - pg. 67,**

5    **ln. 11**);

6    • The Report on Probationer falsely states that Plaintiff committed "Griffin

7    Error" in <u>People v. Melendez</u> because Defendant Rodriguez never heard

8    or saw the cross-examination of defendant, and the trial judge overruled

9    the single objection (**Bates stamp D-9108**);

10    • Ms. Lacey did not know that Plaintiff was confronted by 6 to 8 Sheriff

11    Deputies in an aggressive and violent manner when he requested the

12    Judge to Order them back the next day.  **(Depo. of Lacey, pg. 24, ln. 19 -**

13    **pg. 25, 12.)**;

14    • Defendant Rodriguez had a meeting with two of the most vocal and

15    aggressive Sheriff Deputies to explain that they should never confront a

16    DDA I as they confronted Plaintiff, but he did not include this

17    information in his 90 Day Evaluation **(Depo of Rodriguez, pg. 57, ln. 4**

18    **- pg. 61, ln. 15, Exhibit "44")**;

19    • Sheriff Deputies were routinely failing to appear in Court, and this was

20    an ongoing problem, because another Deputy was allegedly pulling

21    subpoenas from Sheriff Deputies' boxes (**Decl. of Biller; Depo. of**

22    **Rodriguez, pg. 54, ln. 4 - pg. 13**); and

23    • Plaintiff had a lot of problems with Sheriff Deputies not appearing in

24    Court (trial, evidentiary hearing and trial), so Defendant Rodriguez

25    instructed him to call Pam Brookwell to discuss the issues and prepare a

26    memo regarding that conversation so he could give it to the Lieutenant

27    of the East Los Angeles Sheriff's Station, but he never follow through.

28

**(Depo. of Rodriguez, pg. 21 ln. 23 - pg. 24, ln. 22, Ex. 41, Bates stamped D-0355, Decl. of Biller, Para. 21)**

The 90 day Evaluation that Defendant Rodriguez prepared included false information. A portion of that report states the following:

"On August 14, Sgt. Pam Brtookwell of the Los Angeles Sheriff's Department called me to complain about **Mr. Biller's attitude and demeanor**. Sgt. Brookwell supervises our court liaison and deputies' court appearances. Her complaint that morning arose out of Mr. Biller's need to generate a copy of a VHS tape."

"Sgt. Brookwell stated that Mr. Biller had gotten into a '**huff**' that morning and not gone through 'proper channels' to get the tape. She said that she's had prior contact with Mr. Biller and has found him to be a **person with anger management issues**. Sgt. Brookwell complained that it was **common for Mr. Biller to get 'huffy' and 'fly off the handle'**. She said he tended to **'blow things up to something bigger than it is'** and **would often get very upset about very minor problems**." (Emphasis added)

"Sgt. Brookwell also complained that Mr. Biller **'talks down' to deputies and in a demeaning' manner, as if he's ordering them**. She added that she has found him to be one of the most difficult deputy district attorneys to work with since assuming her current assignment in January, 2006. She also said this was the first time she called a D.A. supervisor to complain about a deputy district attorney." (Emphasis added)

**(Ex. "44," Bates Stamped D-0369)**

However, these alleged comments are simply not true. Pam Brookwell denied making these comments when she responded to Plaintiff's Requests for Admission. **(Ex. 57)** There was no possible way she could have made these comments because she never heard or saw Plaintiff communicate with any Sheriff Deputies. **(Depo. of Brookwell, pg. 40, ln. 1 - pg. 43, ln. 14.** Pam Brookwell did have a conversation

with Deputy Sheriff Glenn Spruil regarding Plaintiff's behavior inside the East Los
Angeles Sheriff's Station on August 14, 2008, but her conversation with Defendant
Rodriguez did not even come close to the description he attributed to Plaintiff. Pam
Brookwell described her conversation with Defendant Rodriguez regarding Plaintiff's
behavior as: "**loud, demanding, and basically not willing to listen to common
reason**." (Depo. of Brookwell, pg. 40, ln. 1 - pg. 53, 21) The Filing Deputy at the
East Los Angeles Office testified that many DDA Is are loud and he did not consider
Plaintiff a threat to anybody. **(Depo. of Nishinaka, pg. 73, ln. 25 - pg. 75, ln. 11)**

Janet Moore did not include the following positive facts in her Report on
Probationer that Defendant Rodriguez included in his 90 Day Evaluation:

- Plaintiff "has worked hard and diligently to improve his performance";
- "[A]s this rotation comes to an end, he is showing progress";
- "[H]is performance has improved in some categories from unsatisfactory to improvement needed or competent"

**(Ex. 44, Bates stamped page D-0363)**

The cover page to the Report on Probationer is not include a single check next
to "competent", although Defendant Rodriguez made not of that improvement in his
90 Day Evaluation. Janet Moore also conveniently left out Plaintiff's performance on
the two days before August 14, 2008 wherein Defendant Rodriguez described
Plaintiff's performance in Preliminary Court as: (1) "improved significantly just from
August 8"; (2) "his questions were less confusing and he elicited coherent
testimony"; (3) "he stuck to the sample direct examination questions and elicited the
necessary testimony with significantly less difficulty"; (4) "[h]e did a very good job
marking documents for identification offered to prove 'predicate acts'"; (5) "his
performance was very good." Defendant Rodriguez wrote in the 90 Day Evaluation
that Plaintiff "did a very good job" regarding his August 13, 2008 Preliminary
Hearing he observed - the day before Plaintiff's last day as a DDA I. **(Ex. "44", Bates**

**stamped page D-0368)** Defendant Rodriguez even gave Plaintiff a note stating "very good!" (**Depo. of Rodriguez, pg. 156, ln. 24 - pg. 157, ln. 15, Ex. "45"**)

Plaintiff informed his supervisor that he suffered from dyslexia and that was causing him problems in Preliminary Court. **(Decl. of Biller, Exhibit "40")** Defendant Rodriguez instructed Plaintiff to write his questions for each witness and read the question during direct examination. However, Plaintiff told Defendant Rodriguez that he could not read out loud because of his dyslexia. **(Depo. of Biller, pg. 136, ln. 12 - pg. 137, pg. 16)**

The LADA's office even admitted that Plaintiff's dyslexia caused Plaintiff's performance problems. Mark Evans of the Employee Relations Division of the LAPD wrote an e-mail to Pamela Booth on August 15, 2008 stating:

"Apparently at some point Mr. Biller told Victor Rodriguez that he was dyslexic. Although his issues do not appear to be related to dyslexia it could be viewed as a request for accommodation and potentially an issue."

**(Decl. of Biller, Ex. "17", Bates stamp D-06644)**

In response to Mr. Evans comments, Pamela Booth stated: "Based upon Mr. Biller's comments regarding dyslexia, I gather you believe we should slow things down a bit a (sic) proceed to determine:

Is he requesting an accommodation?

Does he have the medical diagnosis to support his claimed disability?

What would be a reasonable accommodation under the circumstances?

\* \* \*

"I can see how it might have had something to do with the poor performance issues demonstrated - lack of organization and lack of focus."

**(Depo. of Evans, pg. 17, ln. 2 - pg. 24, ln. 19, Exhibit "17", Bates stamped D-06643- D-06644)**

Furthermore, Jacquelyn Lacey admitted that under the Employment Guidelines for the Reasonable Accommodations Process that COLA uses (**Ex. "15"**), Plaintiff's

comments reflected in July 23, 2008 e-mail (**Ex. "40"**) were sufficient "notice" to alert the LADA's office that it should initiate the reasonable accommodation process. (**Depo. of Lacey, pg. 41, ln. 11 - pg. 42, ln. 12 and Ex. 40, Bates stamped D-0371**) However, the LADA's Office did not initiate that process and there was not any reasonable accommodations provided to Plaintiff. (**Decl. of Biller**) Ms. Lacey agreed also testified that if she would have know about the e-mail and a failure to initiate the interactive process to determine if there were reasonable accommodations, that would have affect her decision. **Id.**

Ms. Dixon-Silva was the "Reasonable Accommodation Coordinator" for the LADA's Office. (**Depo. of Lacey, pg. 19, ln. 12 - pg. 20, pg. 21**) Julie Dixon-Silva was directly involved in the decision to terminate Plaintiff. (**Depo. of Dixon-Silva, pg. 48, ln. 20 - pg. 51, ln. 11**) Julie Dixon-Silva knew that Plaintiff's performance issues arose out of his dyslexia because she was carbon copied to the e-mail exchanged between Mark Evans and Pamela Booth. Ms. Dixon-Silva was also aware of the situation that occurred on August 14, 2008. (**Depo. of Dixon-Silva, pg. 50, ln. 24 - pg. 52, ln. 14**) Janet Moore was obviously involved in the decision making process because she wrote the Report on Probationer that contained false information and omitted material facts. She was also receiving e-mails from Defendant Rodriguez regarding Plaintiff's performance issues, dyslexia, and the events of August 14, 2008. (**Depo. of Evans, Exhibit "17", Bates stamped D-06643- D-06644**) However, Ms. Dixon-Silva falsely testified in this case when asked to describe her deputies; she did not include the Reasonable Accommodation Coordinator." (**Depo. of Dixon-Silva, pg. 48, ln. 6 - pg. 49, ln. 10**) The dishonest behavior of one of the decision makers regarding Plaintiff's termination is additional proof the reasons stated in the Termination Letter were a pretext.

(b)     *There is substantial evidence that the "Motivating" Reasons for Plaintiff's Termination were Plaintiff's Organic Brian Disorder*

The events of August 14, 2009 were a substantial factor and motivating reasons leading to the termination of Plaintiff.   As her second reason for terminating Plaintiff, Jacquelyn Lacey wrote in her Termination Letter the following:

> "On August 14, 2008, you were called into your supervisor's office and informed that a sergeant from the Sheriff's Department had made a complaint about you. You immediately became highly agitated and outraged. **You began crying uncontrollably. (This was the second time in the last month that you had cried in front of Mr. Rodriguez) You began pacing about the office back and forth from wall to wall.** You yelled that the sergeant was a 'liar' and that what she claimed was 'absurd' and 'wrong'. You demanded to take a lie detector test. You insisted that the sergeant should come over and 'tell me to my face.' **You categorically denied her 'accusations' and continued to act highly agitated and to sob. At times, you doubled over and said that you were about to vomit**."

**(Decl. of Biller, Ex. "59")**

The highlighted portions of the above quote are classic symptoms of depression.  It was obviously that Plaintiff was having an emotion/mental meltdown because of depression or other mental illness.  (Decl. of Dr. Alice Rudnick)  Instead of focusing on Plaintiff's emotion state and engaging in a good faith inter-active process, Plaintiff was shut down. Plaintiff wanted to inform Defendant Rodriguez and Ms. Burke why he reacted in the manner he did, and to provide them all the facts, but they refused to listen.  However, they both promised Plaintiff there would be a full investigation in which he would be heard.  Those promises were never fulfilled.

**(Decl. of Biller, Para. 29)**

Defendant Rodriguez admitted that he did not have any personal knowledge about Plaintiff's interaction with law enforcement and he could not say that Plaintiff was "demanding", had a "bad attitude", got "angry", get into a "huff", "fly off the handle" and it was not inappropriate for Plaintiff to get evidence from the Sheriff's

Station.  (**Depo. of Rodriguez, pg. 108, ln. 24 - pg. 110, ln. 3**)  As discussed infra
Pam Brookwell denied making any complaints to Defendant Rodriguez that Plaintiff
had "anger management issues", being "demeaning to officers as if he was ordering
them around" or flying off the handle and getting "huffy."  (**Exhibit "57"**) Therefore,
Plaintiff was right when he denied acting in a manner that Defective Rodriguez
described.

Deputy Sheriff Glenn Spruill was the Deputy Plaintiff talked to on August 14,
2008 about getting the videotape that Plaintiff had to give to Defense Counsel, and
the main event resulting in Plaintiff's termination.  Deputy Spruill called Pam
Brookwell and told her that Plaintiff was "upset" or "hot" because his deputy was not
available and he needed evidence.   He also testified that he has seen 10 other Deputy
District Attorneys get "hot" or "upset."  He did not use any of the words that
Defendant Rodriguez attributes to Defendant Brookwell.  (**Glenn Spruill's depo. pg.
19, ln. 3 - pg. 21, 25**)  Defendants did not identify any "co-workers" that had any
complaints about Plaintiff.  The only co-worker providing testimony in this case said
the opposite; the Filing Deputy did not consider Plaintiff a threat to himself or others,
he believed Plaintiff was emotionally stable, and he was polite and professional.
(**Depo of Nishinaka, pg. 73, ln. 25 - pg. 75, ln. pg.11**)  Additionally, Glenn Spruill
had similar comments: Plaintiff was Professional and civil, and did not yell (**Depo. of
Spruill, pg. 25, ln. 1-7**) He further stated that Plaintiff was not rude, demeaning, and
demanding when he saw Plaintiff inter-act with Sheriff Deputies.  (**Depo. of Spruill,
pg. 28, ln. 10 -  p. 29, ln. 16**)

With regard to the August 14, 2008 event based on the false accusations by
Defendant Rodriguez **or** Defendant Brookwell, Plaintiff had a Post Traumatic Stress
Disorder episode arising from his Organic Brain Disorder. (Decl. of Dr. Rudnick)
Defendants' admission that Plaintiff was terminated for the symptoms of his mental
illness is proof that Defendants discriminated against Plaintiff because of his mental
illness.  The events of August 14, 2009 as memorialized in Exhibit "42" completely

contradict the single paragraph in the termination" letter.  Plaintiff was not "outraged" or "agitated."  **(Decl. of Biller, Para. 30, Ex. "42")**  Based on the evidence developed in this case, Defendant Brookwell admits that she did not make the statements Defendant Rodriguez attributed to her.

**Defendant Rodriguez fabricated the events of August 14, 2008.** Defendant Rodriguez stated in the 90 Day Evaluation that Pam Brookwell informed him that she believed Plaintiff had "anger management issues." (**Depo. of Rodriguez, pg. 147, pgs. 2 - 19, Ex. "44"**) However, Ms. Brookwell denied making any such statements. (Decl. of Biller, Ex. "57") Defendant Rodriguez also reported that Ms. Brookwell stated:

> "Sgt. Brookwell stated that Mr. Biller had gotten into a **'huff'** that morning and not gone through 'proper channels' to get the tape. She said that she's had prior contact with Mr. Biller and has found him to be a person with **'anger management issues'**. Sgt. Brookwell complained that it was common for Mr. Biller to get **'huffy'** and **'fly off the handle'**. She said he tended to **'blow things up to something bigger than it is'** and would **often get very upset about very minor problems**."  (Emphasis added)

(**Depo. of Rodriguez, Ex. "44", Bates stamped D-0369**)

However, Sgt. Brookwell denied making such statements. (**Decl. of Biller, Ex. "57"**) There is a very good reason Sgt. Brookwell could not make these statements; she never saw or heard Plaintiff interact with any Sheriff Deputies. (**Decl. of Biller, Ex. "57"**) These false and untruthful accusations triggered a Post Traumatic Stress Disorder episode that was a result of his Organic Brian Disorder. (**Decl. of Dr. Rudnick**)  The true facts are set forth in Exhibit "**42**." (**Decl. of Biller**)

Defendant told Carol Burke and Defendant Rodriguez that he suffered from an emotional breakdown when he voluntarily resigned from Toyota. **(Decl. of Biller, Para. 29, Ex. "42")**

Prior to August 14, 2008, Plaintiff put his immediate supervisor on notice that Plaintiff was suffering from a mental disorder. After Victor Rodriguez wrongfully blamed Plaintiff for improperly dismissing a three strike defendant, Plaintiff became emotional. **(Depo of Biller, pg. 99, ln. 1 - pg. 103, ln. 18)** Even Superior Court Judge Injenikian believed that Plaintiff was either lying about his background or suffered from a medical condition that <u>adversely affected his mental capacity</u>. **(Exhibit "40", Bates stamped page D-0379)** Defendant Rodriguez reported:

> "Dimitri is actually a very hard worker, is very enthusiastic, and receptive to criticism, but his performance so far has been very perplexing. He works very hard, but it's usually on collateral issues and then fails to adequately address necessary areas. Since July15, he has been appearing in front of Judge Maral Injejikian. She cannot reconcile his vast prior experience (he was a civil lawyer for about 20 years, including working as a partner at a major law firm and managing counsel at Toyota. He tried several jury trials in federal court) with his performance in her court. **In fact, she has concluded that either Dimitrios is lying (ala Patrick Cowenberg) about his prior experience or suffered some type of medical condition which has affected his mental faculties**. Just yesterday, she called me into chambers to see if I had learned else about his background, still incredulous and perplexed." (Emphasis added)

**(Ex. "40", Bates stamped page D-0379)**

Plaintiff did not lie about his background. **(Decl. of Biller, Para. 2 -4; Ex. "6")** Plaintiff's emotional and mental conditions were caused when he was forced to resign from TMS because of ethical violations TMS committed and because of a false internal complaint a colleague and supervisor filed against Plaintiff while working at TMS. **(Depo. of Biller, pg. 85, ln. 2 - pg. 98, ln . 23)**

(c)    *Plaintiff suffered from Disabilities, was Qualified to be a DDA I, and Suffered Adverse Employment Action*

Prior to joining the Los Angeles District Attorney's Office on May 6, 2008, Plaintiff had a very successful career as a civil law practitioner. He worked for almost 14 years as lawyer with Pillsbury Winthrop (and its predecessor firm - Lillick, McHose & Charles) from an associate to Partner. **(Decl. of Biller, Para. 2 - 4, Ex. "60")** Seeking a life style change, Plaintiff took a position with TMS as Managing Counsel for the Toyota's National Rollover Program. He managed 12 cases through trial and obtained 12 defense verdicts. **(Decl. of Biller, Ex. 60)**

Plaintiff encountered serious problems with the discovery process at TMS, and attempted to change processes and procedures to comply with law. Plaintiff's supervisor and colleague (Eric Taira and Alicia McAndrews), however, filed an internal complaint about Plaintiff's efforts. Plaintiff was forced to resign to fulfill his ethical obligations under Rule 5-220 of the Rules for Profession Conduct; Plaintiff became suicidal as a result of the Major Depressive Disorder that ensued due to his forced resignation. **(Decl. of Biller, Para. 3)** Plaintiff's psychiatrist, Dr. Alice Rudnick, instructed Plaintiff to take eight months off of work until March or April 2008. **(Decl. of Biller, Para. 3)** Dr. Rudnick predicted that Plaintiff would have a Post Stress Traumatic Disorder episode if he were exposed to the same conduct that caused Plaintiff to resign from TMS. **(Decl. of Dr. Alice Rundick)**

After taking eight months off of work, the LADA's Office selected Plaintiff's application as one of the few fortunate people to get to the next level. Plaintiff took an oral examination, and scored in the 1st Band. The oral examination reports described Plaintiff as an "Excellent candidate. Outstanding in all areas" and "Strong, persuasive, or skills. He demonstrated common sense and integrity." **(Depo. of Daniels, Ex. "31")** Plaintiff then went through a one-month long training course. **(Depo. of Daniels, Ex. "32")** Upon completion of that training, Plaintiff received an evaluation that stated:

> "DDA I Dimitrios Biller arrived early for work each day and brought intensity, enthusiasm, and a passion for learning as much as possible. He initially seemed

reluctant to embrace certain suggested terms of art such as the recommended question for eliciting STEP Act evidence from a witness. However, it soon became clear that he was simply a hard worker who challenged himself to analyze the issues and develop his own wording for eliciting testimony. He responded positively to critiques about the value of using scripts for certain exercises after he missed an element in one case while improving. He demonstrated a keen legal intellect, eloquence and composure throughout his performance of the mock exercises. He delivered a model direct examination in a driving under the influence case. He interacted easily with the members of his class and the members of the training staff. The trainers rated his performance a 4.7 with potential to perform at a higher level."

**(Depo of Daniels, pg. 42, ln. 6 - 46, ln. 25, Ex. "33")**

The score of 4.7 out of 5 was a "superior score." The score also reflected somebody who had the skills and talents to be a DDA I. **(Depo. of Daniels, pg. 43, lns. 2-14)**

Plaintiff was assigned to the LADA's Office in East Los Angeles for his first 3 month rotation. On the first day at the ELA Office (May 9, 2008), Plaintiff asked Defendant Rodriguez, his immediate superior and Deputy in Charge of the East Los Angeles Office, if he could have an access key to get into the office at 6:00 a.m. because Plaintiff was an "early bird." Defendant Rodriguez gave Plaintiff the access key the next day. Plaintiff did not inform Defendant Rodriguez at that time that he suffered from dyslexia and needed the access key to work early on reading reports, so there was not any reasonable accommodation discussion at this time. **(Decl. of Biller, Para. 5)**

Plaintiff worked in Misdemeanor Court during June, 2008. He conducted Evidentiary Hearing on a Motion to Suppress Evidence. Based on the cross-examination of Defendant and his best friend, Judge Lu decided that Defendant was not believable or credible and she denied the motion. Plaintiff informed

Defendant Rodriguez of this result and the details about Sheriff Deputies failing to appear. **(Decl. of Biller, Para. 6)** This experience is not reflected in the 90 Day Evaluation.

Plaintiff also presented a DUI trial in which he obtained a guilty verdict. The key to winning this case was the cross-examination that Plaintiff performed on the Defendant because Plaintiff had to lay the foundation of facts that the 911 caller witness would establish as false in the rebuttal case. Additionally, the Defendant was dishonest about the driver of the car, so Plaintiff got Defendant on cross-examination to commit to numerous false facts that were simply unbelievable. Although Defendant Rodriguez was critical of Plaintiff's closing argument as "unpersuasive and because he believed Plaintiff "shifted the burden of proof" and committed "Griffin Error", those criticisms are invalid because Defendant Rodriguez did not see or hear the cross-examination of Defendant and plaintiff obtained a guilty verdict. **(Decl. of Biller, Para. 8)**

Plaintiff then split his time in "Drug Court" and "Preliminary Hearing Court" between July 2, 2008 and his last day at work as a DDA I on August 14, 2008. On the first day in Preliminary Court, Plaintiff informed Judge Injenikian that he suffered from dyslexia and requested that Judge Injenikian have some patience with Plaintiff. He also requested the use of a podium. Plaintiff had approximately three weeks in Preliminary Court. During this time, Plaintiff was critical of Sheriff Deputies who failed to appear in Court on time or at all. **(Decl. of Biller)**

Plaintiff's disabilities interfered with his performance while at East Los Angeles, however, he showed significant improvement the two days prior to August 14, 2008. Judge Injenikian invited Plaintiff into her Chambers on August 12, 2008 to tell him that he did an excellent job that day in Preliminary Court; she went on to say that "we made a criminal lawyer out of you." **(Decl. of Biller)**

The uncontroverted facts supra clearly established that Plaintiff was and continues to suffer from disabilities recognized under the American's with

Disabilities Act in the form of Organic Brian Disorder and Dyslexia. **(Decl. of Dr. Alice Rudnick)** Furthermore, in addition to being in civil practice for almost 20 years, Plaintiff was more than qualified to be a DDA I with the LADA's Office. The results of his oral examination and final score after the one-month long training course firmly establish this element of proof.  Yet, LADA and COLA terminated Plaintiff on the false accusation he could not get along with law enforcement and he lack the professional skills needed for the job.

**B.      There is no substantial evidence that the County failed to accommodate a known disability**

*(i)      Defendants' Argument*

        To prevail on his claim for failure to accommodate, Biller must prove (1) that he requested an accommodation for known limitations resulting from a known disability [*US Airways, Inc. v. Barnett*, 535 U.S. 391, 400, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002); *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) ("An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations, a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate"); 42 U.S.C. § 12112(b)(5)(A); Ninth Circuit Model Civil Jury Instruction 12.8.], and (2) that there was a reasonable accommodation available that would have enabled him to perform the essential functions of his job. [*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137-38 (9th Cir.2001) ("Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute *if a reasonable accommodation would have been possible*"); *Dark v. Curry County*, 451 F.3d 1078, 1088 (9th Cir. 2006) (plaintiff "has the *burden of showing the existence of a reasonable accommodation* that would have enabled him to perform the essential functions of an available job")] An accommodation is not reasonable if it would

require the employer to change the essential functions of the employee's job. *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999).

Members of the District Attorney's Office knew that Biller suffered from dyslexia, and that, as a result, he had problems reading and that it was very difficult for him to read out loud. [Biller Depo 58:17-59:4; Rodriguez Depo 68:4-71:11; Ex. 40] Although trying cases, examining witnesses and arguing his case are essential functions for a Deputy District Attorney I [Rodriguez Depo 47:2-7; Lacey Decl ¶ 5; Ex. 102], there was no evidence that Biller's dyslexia required an accommodation for him to perform them. Indeed, the evidence is to the contrary. When the District Attorney's Office discharged him, Biller had made it through college and law school, 13 and a half years at a private law firm as an associate and then a partner, four years as a managing attorney at Toyota, and his training at the District Attorney's Office. He was able to complete the substantial reading required in each position without any accommodations. [Comp ¶ 9; Biller Depo 7:19-10:12, 10:22-25, 15:16-18:7, 112:14-113:5, 113:13-23; Ex. 54] At the East Los Angeles Office, Biller read police reports, looked over evidence, prepared motions, wrote out questions, and examined witnesses at trial and in preliminary hearings. [Comp ¶¶ 41-48, 68, 88-90; Biller Depo 46:9-11, 48:24-25, 56:4-13] During depositions in this case, Biller read portions of exhibits to deponents. [Rodriguez Depo 176:3-181:7, 192:5-197:11, 200:17-23; Silva Depo 88:22-89:1, 93:19-96:2, 102:16-23, 104:16-105:1, 151:19-152:24] As Biller himself puts it, he "is a very skilled trial attorney who has succeeded in every position he has held as an attorney." [Comp ¶ 15]

The only accommodations that Biller sought for his dyslexia were a little more time to familiarize himself with the scripts for proving certain elements of criminal charges, and that he not be made to read out loud. [Comp ¶ 153; Biller Depo 64:5-16, 82:14-84:11] He made those requests during a discussion with Rodriguez on July 22, 2008. [Rodriguez Depo 70:3-18, 76:20-25; Biller Depo 46:12-16]

Biller had as much time as he wished to familiarize himself with the scripts. Rodriguez had provided him with an access card to get into the office as early as he wished. [Biller Depo 40:19-41:3, 42:7-17, 45:15-22; Rodriguez Depo 30:18-31:5] Rodriguez did not impose a deadline for becoming familiar with the scripts. Although Rodriguez did ask Biller to write out his questions so that an experienced deputy district attorney could review them, it is undisputed that sometimes a deputy district attorney has to read questions. [Lacey Depo 38:16-39:3; Biller Depo 54:19-24] For example, there are a set of elements that must be established to support gang allegation enhancements. The District Attorney's Office instructed deputy district attorneys during training to use a prepared script to establish those elements, so that none would be missed. [Biller Depo 113:24-115:9] Biller himself "recognized the value of using scripts for certain exercises after he missed an element in one case." [Ex. 33] Until Biller could memorize the questions, there was no choice but to read them. [Lacey Depo 42:14-21 "Like the gang script, you've got to read it"] It would have been unreasonable to allow Biller to depart from the scripts and damage the prosecution's case as a result.

In any event, Rodriguez's instructions did not hamper Biller's performance. Indeed, by August 12, Rodriguez noted that Biller had improved significantly in his questioning at preliminary hearings. [Rodriguez Depo 101:4-102:8; Ex. 44 (D0368)] Biller said that he almost got to the point of memorizing the gang enhancement script enough so that he could look at the script for a word that would trigger a sequence of questions. [Biller Depo 114:14-115:18]

Biller's failure to read questions from a script did not contribute to his discharge. While the report on probationer that formed the basis for Lacey's decision states that Biller struggled with questioning witnesses, the struggle resulted from questions that were confusing, disjointed and disorganized.

*(ii)*   ***Plaintiff's Argument***

In almost 20 years of practicing law, Plaintiff NEVER read questions to witnesses on direct or cross-examination. The LADA's Training Division instructed Plaintiff NEVER read questions except for Gang Enhancement and STEP Act situations. Defendant Rodriguez demanded and insisted that Plaintiff write out his questions and **read** questions to witnesses on direct examination. Defendant Rodriguez did not seem to care or understand the difficulty Plaintiff would have with reading questions to witnesses. Plaintiff told Defendant Rodriguez that he could not read questions out loud because of his dyslexia. **(Decl. of Biller, Para. 17)**

Defendants argue that Defendant Rodriguez gave Plaintiff an access key card so he could work early in the morning and that this was a reasonable accommodation. Defendants' position is simply false and dishonest. Plaintiff has always been an "early bird" and has started work at 6:00 a.m. most of his career. Plaintiff asked Defendant Rodriguez for an access key card on June 7, 2008 on his first day of work because he wanted to start work early. Defendant Rodriguez gave Plaintiff that access key card. However, there was absolutely no discussion between Plaintiff and Defendant Rodriguez that the access key card was needed as a "reasonable accommodation." Plaintiff did not tell Defendant Rodriguez that he was suffering from dyslexia at that time. Again, Defendants assertion that Defendant Rodriguez gave Plaintiff a key access card as a "reasonable accommodation" is **NOT** true. **(Decl. of Biller, Para. 18)**

Defendants argue that Plaintiff had sufficient time to learn scripts and Plaintiff has a history of employment positions that required reading.  Plaintiff is not stupid. Plaintiff can read.  Defendants' argument ignores the problems associated with dyslexia.  Plaintiff simply has significant difficulty reading questions out loud. Plaintiff was never REQUIRED to read questions during direct examination in private practice. Furthermore, it obviously takes Plaintiff a lot longer to read.  While reading, the words will jump to cause Plaintiff to pause or not read the words in a

proper order.  Plaintiff did graduate from University and Law School, but that has absolutely no bearing on Plaintiff's ability to read out loud in a fluid manner and the amount of time it takes him to read.  Plaintiff's questioning on direct while reading questions were disjointed, disorganized and confusing because Plaintiff could not read the questions in a fluid manner due to his dyslexia. (**Decl. of Biller, Para. 19**)

When Plaintiff told Defendant Rodriguez that he could not read questions to witnesses, Defendant Rodriguez insisted that he read the questions from outlines he ordered Plaintiff to prepare. He also required Plaintiff to present the outlines to DDA Terry Mitchell, Supervisor of the Preliminary Hearing Court. Plaintiff did in fact create and provide those outlines of questions to Ms. Mitchell, but she never made any changes and was never critical of the questions. However, when conducting direct examination of witnesses, she was very critical. Plaintiff simply could not read from scripts and outlines of questions. Not forcing Plaintiff to read questions on direct examination was a "reasonable accommodation" that Defendant Rodriguez denied Plaintiff. **(Decl. of Biller, Para. 15 & 16)**

When Plaintiff had an emotional breakdown on August 14, 2008 as a result of being falsely accused **(Decl. of Biller, Ex. "42")** he simply needed to take the afternoon off and go home. Plaintiff made that request. However, Defendant Rodriguez refused to allow Plaintiff to go home because he viewed Plaintiff as a liability to the County of Los Angeles. Instead, Defendant Rodriguez made Plaintiff wait in his office for approximately 3 hours until DA Investigators arrived with Carol Burke. Taking time off from work for a couple of hours is in fact a "reasonable accommodation" that Defendant Rodriguez denied Plaintiff. **(Decl. of Biller, Para. 22)**

Defendants knew or should have known that Plaintiff was suffering from a mental condition. Judge Injinikian told Defendant Rodriguez that she believed that Plaintiff suffered from a medical condition that affected his mental capacity. Defendant now refers to her comments as "off the cuff"; in reality, she understood

Plaintiff's mental condition because Plaintiff was in her Court almost every day from July 14, 2008. On August 6, 2008, Defendant Rodriguez wrote an e-mail to Janet Moore expressing the concerns of Judge Injinikian's comments. (Depo. of Rodriguez, pg. 90, pg. 4 - pg. 91, ln. 24) Defendant Rodriguez believed Judge Injinikian believed Plaintiff was "psychotic", but he never reported that to his supervisor or Janet Moore. (Depo. of Rodriguez, pg. 114, ln. 18 – pg. 115, 14)

Plaintiff became emotional after he dismissed the Defendant in <u>People v. Bodavilla</u> because Defendant Rodriguez was angry at Plaintiff and blamed Plaintiff for the dismissal. (**Depo. of Biller, pg. 99, ln. – pg. 103, 22**) Defendant Rodriguez and Janet Moore knew or should have knowledge that Plaintiff was suffering from depression. On August 14, 2007, Plaintiff had an emotional breakdown because he was being falsely accused of having a bad attitude and mistreating law enforcement; Plaintiff asked to go home to calm himself, but that request was denied. (**Depo. of Biller, pg. 61, ln. 15 – pg. 75, ln. 25**)

It is absolutely clear from the evidence and analysis above in Sections 1(i) - (iii), and the admissions of Jacquelyn Lacey that the inter-active process to determine if reasonable accommodations should have taken place on July 23, 2008, Defendants denied Plaintiff "reasonable accommodations." Defendants do not even mention the failure to provide Plaintiff with a reasonable accommodation related to his depression that became obvious on August 14, 2008; let Plaintiff go home early for one day. Defendants even refused to engage in an inter-active process to determine if there was a reasonable accommodation. When Plaintiff asked Defendant Rodriguez to let him go home early, he said "no" because Plaintiff was a liability to the County. With regard to dyslexia, Plaintiff was denied a reasonable accommodation because he was forced to read questions on direct examination.

## 2.     Third Cause of Action (defamation and slander per se against all defendants)

### A.     Biller did not file a claim for damages

#### *(i)     Defendants' Argument*

To pursue a state tort claim against a public entity or a public employee in this Court, the plaintiff must comply with the claim filing requirements of the California Tort Claims Act. *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 627 (9th Cir.1988). The Act requires a prospective plaintiff to file a claim for damages with the public entity he wishes to sue and with the public employer of any public employee whom he wishes to sue individually. Cal. Gov. Code §§ 945.4, 950.2, 950.6. The County of Los Angeles is a public entity within the terms of the Tort Claims Act. *Curtis T. v. County of Los Angeles*, 123 Cal. App. 4th 1405, 1415, 21 Cal. Rptr. 3d 208, 215 (2004). The District Attorney is an officer of the County of Los Angeles. [Cal. Gov't Code § 24000; Comp ¶¶ 3, 16] Defendants Rodriguez and Brookwell are employees of the County. [Comp ¶¶ 7, 16]

The claimant must file his claim under the Tort Claims Act within six months after it accrues. Cal. Gov't Code § 911.2. A defamation claim accrues upon publication of the allegedly defamatory statements. *Shively v. Bozanich*, 31 Cal. 4th 1230, 1247, 7 Cal. Rptr. 3d 576, 587 (2003). The last publication of the statements on which Biller bases his defamation claim occurred no later than August 21, 2008, when Biller received the discharge letter from Jacquelyn Lacey and Julie Dixon Silva. Biller has not presented a claim for damages to the County [Medina Decl], and could not now file one on time.[2]

Although Biller presented a claim to the *City* of Los Angeles on November 7, 2008 [Comp ¶ 1; Ex. 100], that does not authorize a lawsuit against the *County* of Los Angeles. The City and the County are separate legal entities. *Marino v. City of Los*

---

[2] See Cal. Gov't Code § 911.4 (any application to present a claim late must be filed no more than a year after the claim accrues).

*Angeles*, 34 Cal. App. 3d 461, 464, 110 Cal.Rptr. 45, 47 (1973); *Otis v. City of Los Angeles*, 52 Cal. App. 2d 605, 611, 126 P.2d 954, 958 (1942). One who presents his claim to the wrong public entity may not pursue a lawsuit against the correct entity. *Munoz v. State of California*, 33 Cal. App. 4th 1767, 1779-80, 39 Cal. Rptr. 2d 860, 866 (1995); *Santee v. Santa Clara County Office of Education*, 220 Cal. App. 3d 702, 713-14, 269 Cal. Rptr. 605, 611-12 (1990). That is particularly appropriate here, because the City of Los Angeles informed Biller of his error on December 10, 2008, when he still had over two months to file an appropriate claim with the County. [Comp ¶ 1; Ex. 101]

Although Biller claims in the separate statement that the allegations in his complaint about presenting a claim to the City of Los Angeles are "not evidence," the objection lacks merit. Admissions in a party opponent's pleading (even if unverified) are admissible evidence, and therefore can serve as the basis for summary judgment. *Lockwood v. Wolf Corp.,* 629 F2d 603, 611 (9th Cir. 1980); Fed. R. Evid. 801(d)(2) ("A statement is not hearsay if ...  The statement is offered against a party and is (A) the party's own statement").

Although Biller knew about the claim presentation requirement in plenty of time to file a timely claim with the County, he now seeks to avoid the consequences of his failure to do so by claiming that documents from other proceedings involving the County were the equivalent of a claim for damages. Biller instituted those proceedings well after he filed his claim with the City, and well after the City informed him of the need to file a claim for damages with the County. The doctrines that he relies on do not provide any basis for avoiding the consequences of failure to present a claim for damages to the proper entity.

*(a) Substantial compliance does not save the claim*

Although Biller invokes the substantial compliance doctrine, that doctrine does not apply if the claimant makes no attempt to present a claim, but later tries to argue that some other document served the same purpose as a claim. *Pacific Telephone &*

*Telegraph Co. v. County of Riverside*, 106 Cal. App.3d 183, 188, 165 Cal. Rptr. 29, 31 (1980) (doctrine applies "[w]here there has been an attempt to comply"). For example, a contractor's letter to an agency head demanding payment of its invoices did not substantially comply with the claim presentation requirement, because it "was never intended and never treated as the functional equivalent of a formal claim." *Schaefer Dixon Associates v. Santa Ana Watershed Project Authority*, 48 Cal. App. 4th 524, 533, 55 Cal. Rptr. 2d 698, 703 (1996). Similarly, a subcontractor who filed a claim of lien as part of a mechanic's lien process could not later claim that it also constituted a claim that would support a direct lawsuit for damages. *C. A. Magistretti Co. v. Merced Irrigation Dist.*, 27 Cal. App. 3d 270, 275, 103 Cal. Rptr. 555, 558-59 (1972).

Here, Biller relies on his August 26, 2008 appeal from his discharge as a probationary employee, and the Superior Court proceeding that he filed on October 6, 2008. These were not attempts to comply with the requirement. Although the appeal refers to some legal theories that would justify filing a lawsuit if he were not reinstated, it was intended to reverse the discharge decision through an administrative process, *not* to put the County on notice of a claim for damages. [Biller Depo 76:1-16] In *Loehr v. Ventura County Community College Dist.*, 147 Cal. App. 3d 1071, 195 Cal. Rptr. 576 (1983), an employee's request for reinstatement was not substantial compliance, because it "was merely a demand that the Board reinstate plaintiff as superintendent of the district or face possible legal action. The only mention of damages appears as a passing reference to the availability of such relief under the federal Civil Rights Act. Nowhere in the letter is there a claim for money damages, nor, for that matter is there even an estimate of the amount of any prospective injury, damage or loss."

Further, Biller's appeal was directed to the Director of Personnel, not, as required, to the County clerk, secretary, auditor or governing body. Cal. Gov't Code § 915(a). That by itself is a fatal defect. In *Westcon Const. Corp. v. County of*

*Sacramento*, 152 Cal. App. 4th 183, 200-04, 61 Cal. Rptr. 3d 89, 101-04 (2007), for example, the Court of Appeal explained that presenting a claim to the County's engineer was not equivalent to presenting it to the County through one of the persons specified in section 915. "Notice to a subordinate employee of the public entity may not serve these purposes. As is often the case, the individual known to the claimant may be the very person who committed the wrongdoing that is the subject of the claim. This may be the last person who would want to pass a claim on to his or her employer. Thus, giving notice to a subordinate employee may not assure that the public entity has an opportunity to review the claim before suit is filed." *See also Del Real v. City of Riverside*, 95 Cal. App. 4th 761, 770, 115 Cal. Rptr. 2d 705, 711 (2002) (submitting letter to public employee not identified in section 915 could not constitute substantial compliance, and noting that "Summary judgment has been affirmed on the basis of failure to comply with section 915 alone").

Likewise, the Superior Court petition that Biller filed cannot constitute substantial compliance. It was not an attempt to present a claim, but a request that the court "preserve the record." [Biller Depo 79-11-22] The California Court of Appeal rejected a similar argument in *Stromberg, Inc. v. Los Angeles County Flood Control Dist.*, 270 Cal. App. 2d 759, 765, 76 Cal. Rptr. 183, 188 (1969). There, the plaintiff argued that it had substantially filed with the claim presentation requirement by serving the complaint in its judicial action on the public entity. "The argument that the complaint in the first lawsuit conveyed all of the information required under section 910, Government Code, thus it fulfills the claim requirements is unsound if for no other reason than that nothing in the record supports even a suggestion that the Board was ever placed on notice that the complaint was intended by plaintiff to be a claim or had any knowledge that it was meant to function as a claim or that it ever considered it as anything more than a complaint that started a lawsuit against defendant District."

(b)     *The County was not required to tell Biller that his efforts did not constitute a claim*

Although Biller argues that the County was required to give him notice of any defect in his "claim," under Government Code section 910.8 and the *Foster* case, such a duty does not arise if the documents in question "were never intended and never treated by anyone as a purported Tort Claims Act 'claim.'" *Schaefer Dixon*, *supra*, 55 Cal. Rptr. 2d at 706. In *Foster*, by contrast, the public entity replied to the letter in question, and "by its reply to the letter, identified the letter for what it was - an unlabeled and deficient claim by plaintiff against the district for unstated damages for undescribed injuries he allegedly suffered in an identified but undescribed recent accident involving a specified employee of the district." *Foster v. McFadden*, 30 Cal. App.3d 943, 947, 106 Cal. Rptr. 685, 687 (1973). Here, there is no evidence that the County treated either Biller's appeal or his Superior Court petition as a claim.

--------------------

Biller knew that he should present a claim for damages under the Government Code to the County of Los Angeles, and knew what presenting a claim meant. But he filed it with the wrong entity – the City of Los Angeles, and did not correct his error when informed of it. He cannot now argue that he was complying with the requirement when he submitted a document as part of an entirely separate administrative appeal of his discharge or when he filed a proceeding against the County in Superior Court.

*(ii)     Plaintiff's Argument*

Julie Dixon-Silva is a county employee and works as a County Counsel. She was assigned to the LADA's office as the Chief Legal Advisor to the District Attorney. **(Depo. of Dixon-Silva, pg. 20, lns. 1 -7)** Almost immediately after Plaintiff's termination, Plaintiff sent a complaint letter that was carbon copied Julie Dixon-Silva setting forth all of Plaintiff's contentions, claims, and damages. **(Depo. of Dixon-Silva, pg. 47, ln. 13 - pg. 55, ln. 6, Exhibit "6")**   Ms. Dixon-Silva

requested that the County of Los Angeles Human Resources conduct an investigation. (Depo. of Dixon-Silva, pg. 156, ln. 20 - pg. 157, ln. 18, Ex. 25 and Ex. 27)  County of Los Angeles Investigator Phillip M. Peters was assigned to conduct an investigation. **(Depo. of Dixon-Silva, pg. 155, ln. 2 - pg. 157, ln. 18, Exhibits 23, 25, and 27)**

The complaint letter set in motion an investigation of the claims, and an opportunity to settle the case.   However, the County of Los Angeles refused to attend mediation. **(Decl. of Biller, Para. 34)** The contentions in the August 26, 2008 letter to Ms. Dixon-Silva of the County of Los Angeles are almost identical to the allegation contained in the complaint. **(Decl. of Biller, Para. 34)**  Plaintiff never reinstatement of his position through the complaint letter; Plaintiff sought to mediate a resolution with the County of Los Angele and requested forward pay, back pay, all benefits, and compensation for emotion distress. (**Ex. 6, pg. 36**)  In essence, the complaint letter clearly satisfied the two purposes of Government Code Sec. 910: (1) the County of Los Angeles conducted an investigation, and (2) the County of Los Angeles gave the LADA's Office an opportunity to settle this case at mediation, but the LADA's Office declined.

Defendants' argument that the August 26, 2008 complaint letter sent to Dixon-Silva does not include any does not include any discussion about a lawsuit, damages and claims is ignoring the complaint letter. <u>Plaintiff did NOT ask to be reinstated</u>. (**Decl. of Biller, Ex. 6**)  In the conclusion section Plaintiff asks for specific damages in return he would not file a complaint. (**Ex. 6**)  In fact, the complaint letter formed the basis of the Federal Complaint. (**Decl. Biller, Para. 34**)

Additionally, Plaintiff filed a Petition to Preserve Evidence and Testimony at the same time. (**Decl. of Biller, Ex. "62"**)  Plaintiff served the Petition on the Deputy Clerk of the County of Los Angeles, Victor Rodriguez, and Pam Brookwell on October 6, 2008 - less than six weeks after Plaintiff was wrongfully terminated. (**Decl. of Biller, "63"**)  The Petition sets forth all the requirements of Cal. Gov. Code

§§ 945.4, 950.2, 950.6.   The Petition sets forth (1) claimant's name, address and telephone number, (2) the claims that will be sought when the appropriate time comes, (3) the factual basis of the claims, (4) the individual employees who are responsible for the damages, and (5) the type of damages that will be sought.  (**Decl. of Biller, "63**")

Defendants now argue that the Petition is not a "notice of claim" because it involved a different proceeding.  The fact of the matter remains that the Petition put the County of Los Angeles, Defendant Rodriguez, and Defendant Brookwell on notice that a lawsuit is imminent, so they had the opportunity to conduct an investigation and to settle the case before the lawsuit was filed.  **Those are the actual purposes of serving a Notice of Claim.**

The State of California has developed the "substantial compliance" exception. Under that exception:

"Where there has been an attempt to comply but the compliance is defective, the test of substantial compliance controls. Under this test, the court must ask whether sufficient information is disclosed on the face of the filed claim 'to reasonably enable the public entity to make an adequate investigation of the merits of the claim and to settle it without the expense of a lawsuit.'"

Pacific Telephone & Telegraph Co. v. County of Riverside (1980) 106 Cal.App.3d, 183, 188.

The California Supreme Court explained the purpose and importance of the substantial compliance doctrine.

"It is well settled that the purpose of the claims statutes "is to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation. [Citations.]" ( _City of San Jose v. Superior Court_ (1974) 12 Cal. 3d 447, 455 [115 Cal. Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223].) To achieve this purpose, section 911.2 requires a claimant to present a claim to the public

entity within a specified time after accrual of the cause of action. In medical malpractice cases, the action accrues on claimants' actual or constructive discovery of the malpractice. ( *Martinez v. County of Los Angeles* (1978) 78 Cal. App. 3d 242, 245 [144 Cal. Rptr. 123].)"

"Section 910 identifies the information a proper notice of claim should include to enable a public entity to investigate and evaluate the claim to determine whether settlement is appropriate. Prior to a 1987 amendment, section 910 provided that when a claim is presented, it 'shall show: 4 [para.] (a) The name and post office address of the claimant; [para.] (b) The post office address to which the the person presenting the claim desires notices to be sent; [para.] (c) The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted; [para.] (d) A general description of the . . . injury, damage or loss incurred so far as it may be known at the time of presentation of the claim; [para.] (e) The name or names of the public employee or employees causing the injury, damage, or loss, if known; and [para.] (f) The amount claimed as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.'"

**"When a public entity receives a document which contains the information required by section 910 and is signed by the claimant or her agent as required by section 910.2, the public entity has been presented with a "claim" under the act, and must act within 45 days or the claim is deemed to have been denied. (§ 912.4.) Once a claim is denied or deemed to have been denied, the claimant may then proceed to file a lawsuit. (§ 945.4.)"** (Emphasis added)

Paul E. Phillips v. Desert Hospital District (1989) 49 Cal. 3d 699, 705-707.

Furthermore, even a letter sent to an employee responsible for an accident working for a Sanity District and to the Sanity District is deemed sufficient notice of a claim; the failure of the Sanitary District to give the claimant and his lawyer reasonable notice of the defect resulted in a waiver of the public entity's right to raise failure to comply as a defense.  Foster v. McFadden (1973) 30 Cal.App.3d 943, 947-949. Therefore, Defendants have "waived", pursuant to Government Code Sections 910 and 911, the defense of non-compliance .

In this case, Plaintiff substantially complied by sending Julie Dixon-Silva, County of Los Angeles Counsel assigned to the LADA's Office, the August 26, 2008 complaint letter containing all the information required above. That letter caused an investigation, and gave the County an opportunity to settle the case. The County of Los Angeles decline to participate in mediation. **(Decl. of Biller, Para. 34 - 36)** Plaintiff's Petition to Perpetuate Testimony and Preserve Evidence also served as a Notice of Claim because it also included all the information required and it was served on the Deputy Clerk Katherine Medina.  **(Decl. of Biller, Ex. "62")**  The same person providing a declaration that in which she states a Notice of Claim was not served on the County.

Lastly, the other cases Defendants cite are also inapplicable.  In this case, Julie Dixon-Silva is not an employee for a **Los Angeles District Attorney's Office**.  Julie Dixon-Silva is an attorney for the County of Los Angeles.  (**Depo. of Dixon-Silva, pg. 20, lns. 2-7**)  She is one of 250 lawyers for the **County of Los Angeles**. (**Depo. of Dixon-Silva, pg. 20, ln.16 – pg. 21, ln. 1**)  Moreover, the Petition to Preserve Evidence was directly served on the County Clerk and assigned to outside counsel. Both documents contain all the information that is required.

Defendants' reliance on Dixon v. Santa Ana Watershed Project Authority (1996) 48 Cal. App. 4th 524 is misplaced because that case involved a series of letters that plaintiff submitted to the Project Manager regarding a contract dispute but plaintiff never threatened litigation.  Id. at 536, n. 3.  This case involves only one

letter and Petition that fully discuss litigation as a consequence of no settlement. Defendants' citation to <u>C.A. Magistretti Co. v. Merced Irrigation Dist.</u> (1972) 27 Cal.App.3d 270 is also inapplicable to this case.  In <u>C.A. Magistretti</u>, the trial court found that a "claim of lien" for labor and materials was not a claim because the "claim for lien" did not give the public entity any information regarding the underlying facts of the dispute and theories of liability.  Id. at 559.   Defendants' reliance on <u>Loehr v. Ventura County Community College Dist.</u> (1983) 147 Cal.App.3d 1071 is completely misplaced and intentionally misinterpreted.  The letter in <u>Loehr</u> did not come close to setting forth any of the requirements need to present a "claim."  Id. at 1082-1083.

Defendants' reliance on <u>Weston Construction Corporation v. County of Sacramento</u> (2007) 152 Cal.App.4th 183 fails for the same reasons stated above.  This case involves plaintiff who provided contracting services to the County and there were numerous "over charges" plaintiff requested.  Plaintiff put a package of overcharges together and sent it to a subordinate engineer working for the County. Id. at 200-201.  In this case the August 26, 2008 letter was sent to an attorney for the County of Los Angeles (Julie Dixon-Silva); alternatively, the Petition was served directly on the County of Los Angeles Deputy Clerk. Similarly, <u>Del Real v. City of Riverside</u> (2002) 95 Cal.App.4th 761, 770 involved the same situation.  Plaintiff in that case was involved in an accident and her attorney sent a letter directly to the Police Officer for the City of Riverside who was involved in the crash requesting information.  Plaintiff did not send any letter to the City.  Id. at 765.

Defendant's reliance on both <u>Stromberg, Inc. v. Los Angeles County Flood Control Dist.</u>, 270 Cal.App.2d 759, 765 and <u>Schaefer Dixon Associates v. Santa Ana Watershed Project Authority</u>, 48 Cal.App.4th 524 are not applicable to the factual scenario in this case.  In <u>Stromberg</u> involved the filing of a "complaint" with the Superior Court and Plaintiff argued that the complain was a notice of claim.  But there was no action by the Board of Supervisors.  *Id.* at 765.  <u>Schaefer Dixon</u>

Associates is completely inapplicable.  In that case, the plaintiff relied on a single letter out of numerous letters regarding a dispute; however, plaintiff never made a claim for damages and did not threaten litigation.  Id. at 534.  Both the complaint letter and Petition clearly indicated that litigation would commence if the case was not settled, and both gave Defendants' an opportunity to investigate and settle before litigation.

**B.     The allegedly defamatory statements were absolutely privileged under Civil Code section 47**

*(i)     Defendants' Argument*

California Civil Code section 47(b) provides an absolute privilege for statements in"any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure."[3] Because the privilege is absolute, the defendant's motives and state of mind are irrelevant. Even "wilfully false statements" are protected. *Tiedemann v. Superior Court*, 83 Cal. App. 3d 918, 927, 148 Cal. Rptr. 242, 248 (1978).

Here, the Los Angeles County Civil Service Rules establish a process for discharging probationary employees like Biller. [Comp ¶¶ 2, 9; Ex. 103] Under Rule 18.05, the employee's department must provide written notice specifying the grounds and particular facts on which the discharge is based. The employee may respond within 10 days, and may appeal the discharge to the County's director of personnel. Under Rule 4.01(A), if the employee claims that the director of personnel's decision was the product of discrimination he may appeal to the Civil Service Commission. The superior courts may review proceedings concerning the discharge of probationers and decisions by the director of personnel under Civil Procedure Code section 1085. *Lee v. Board of Civil Service Comrs.*, 221 Cal. App. 3d 103, 270 Cal. Rptr. 47 (1990); *Browning v. Block*, 175 Cal. App.3d 423, 220 Cal. Rptr. 763 (1985); *DeCuir v.*

---

[3] Chapter 2 of Title 1 of Part 3 contains the provisions related to writ of mandate proceedings in sections 1084 through 1097.

*County of Los Angeles*, 64 Cal. App. 4th 75, 75 Cal. Rptr. 2d 102 (1998). The process includes the preparation of the 90-day evaluation, the report on probationer and the termination letter. [Lacey Depo 58:14-25]

Such proceedings concerning the employment of public employees come within the absolute privilege of section 47(b). *See Kemmerer v. County of Fresno*, 200 Cal. App. 3d 1426, 1439, 246 Cal. Rptr. 609, 618 (1988) ("Insofar as written and oral statements or other publications may have been made in the implementation of the policy decision to undertake disciplinary proceedings and which may have involved ministerial acts, the employees are protected by the privilege for publication made in connection with official proceedings") *Imig v. Ferrar*, 70 Cal. App. 3d 48, 55 138 Cal. Rptr. 540, 543 (1977) ("Procedures for the discipline, suspension, or removal from office of police officers of the City of Los Angeles are specified in ... the Los Angeles City Charter and ... the Los Angeles Administrative Code, and are therefore official proceedings authorized by law").

Here, the statements by Rodriguez in the 90-day evaluation and the statements in the report on probationer and letter of termination were part of the official County process for terminating a probationary employee. The statements in Rodriguez's emails were part of his responsibility to keep his supervisors informed about matters that would be part of the final report on probationer. [Rodriguez Depo 147:2-148:2; Ex. 44] Brookwell's statements to Rodriguez about Biller's interactions with deputy sheriffs from the East Los Angeles station were also part of the proceeding, because they led to the statements that appeared in the official written notice to Biller. [Brookwell Depo 38:4-39:3, 52:22-53:24, 80:3-81:20, 82:25-84:7] *See Imig*, *supra*, 138 Cal. Rptr. at 543 ("a communication to an official administrative agency, which communication is designed to prompt action by that agency, is as much a part of the 'official proceeding' as a communication made after the proceedings have commenced"); *Kemmerer*, *supra*, 246 Cal. Rptr. at 617 (absolute immunity under section 47(b) invoked because, "[i]f every public entity employee who was found to

1  have committed an act of misconduct and later disciplined were allowed to bring a

2  tort action against his coworkers and superiors, this would certainly bode ill for the

3  continuing efficiency and morale of the civil service system").

4  *(ii)*    ***Plaintiff's Argument***

5       Defendants are not entitled to invoke Civil Code Section 47 as a defense to

6  Plaintiff's allegations. The defamatory statements and writings that Defendant

7  Rodriguez or Defendant Brookwell conveyed orally and in writing were not conveyed

8  as part of the process to terminate Plaintiff; the defamatory/slanderous statements

9  were purely "ministerial acts."

10      In order to take advantage of the 47(b) defense, the defamatory/slanderous

11  statements by public officials have to be the product of a "discretionary act" in

12  connection with a judicial or administrative proceeding.  Kemmerer v. County of

13  Fresno (1988) 200 Cal.App.3d 1426, 1437.  "Ministerial acts" are not protected by

14  Civil Code Section 47(b).  The California Supreme Court ruled:

15      "Although it may not be possible to set forth a definitive rule which would

16      determine in every instance whether a governmental agency is liable for

17      discretionary acts of its officials, various factors furnish a means of deciding

18      whether the agency in a particular case should have immunity, **such as the**

19      **importance to the public of the function involved, the extent to which**

20      **governmental liability might impair free exercise of the function, and the**

21      **availability to individuals affected of remedies other than tort suits for**

22      **damages."**  (Emphasis added)

23  Lipman v. Brisban Elementary School District (1961) 55 Cal.2d 224, 230.

24      The California Supreme Court later adopted the Johnson v. State of California

25  (1968) 69 Cal.2d. 782 and further stated: "Our proposed distinction, sometimes

26  described as that between the 'planning' and 'operational' levels of decision -

27  making."  Id. at 793-794.

28

Using the above test, there is not a factual basis to invoke 47(b).  First, Defendant Brookwell was not performing any "function" that was important to the public. Defendant Rodriguez claims Defendant Brookwell told him that Plaintiff had (1) "anger management issues"; (2) "gotten into a 'huff'"; (3) "very common for him to get 'huffy' and to 'fly off the handle'"; (4) "blow things up to something bigger than it is"; (5) "often he would get very upset about very minor problems"; (6) "'talks down' to officers and in a 'demeaning manner' like he is 'ordering them around." **(Depo. of Rodriguez, Exhibit "40", Bates stamped D-0380)** Defendant Brookwell denied making any of these statements as Defendant Rodriguez claims, so Defendant Brookwell's answers to Request for Admissions is evidence that the above statements are false. A jury must decide if Defendant Rodriguez is being truthful, or whether Defendant Brookwell is lying. Defendant Brookwell did not have any duty any conduct or statements Plaintiff may have made on August 14, 2008.

Gossip between a Sheriff Deputy and Deputy District Attorney is not a function important to the public.  Gossip certainly does not have any planning purpose. Since Defendant Brookwell's slanderous statements made to Defendant Rodriguez, and the e-mail he wrote to Janet Moore, did not serve any function, those communications did not have any importance to the public.  Furthermore, Defendant Rodriguez was not involved in making the decision to terminate Plaintiff.  Jacquelyn Lacey made the ultimate decision to terminate Plaintiff after consulting with Janet Moore and Julie Dixon-Silva.  **(Depo. of Lacey, pg. 23, lns. 6-10)**

Governmental liability will not impact the free expression of the function. There is already in place an acceptable practice and administrative proceeding to discipline and/or discharge Deputy District Attorneys.  Lastly, tort remedies for defamation are the only remedies available to Plaintiff.

Furthermore, Defendant Brookwell's alleged statements, and Defendant Rodriguez August 14, 2008 e-mail repeating what Defendant Brookwell allegedly told him were not made in the course of any judicial or administrative proceeding or

investigation for any such proceedings.  Defendant Rodriguez sent an e-mail repeating the defamatory statements without conducting any investigation - not even talking to Glenn Spruill.  (**Depo. of Rodriguez, pg. 103, ln. 21 - pg. 104, ln. 14, Ex. "40", Bates stamped D-0380**)  Defendant Rodriguez was not involved with the August 14, 2008 incident.  (**Depo. of Rodriguez, pg. 104, lns. 8-104**)  In fact, Defendant Rodriguez never saw or hear Plaintiff act demeaning, fly off the handle, exhibit a bad attitude or any anger, talk down, and get in a huff with any Officers because he never saw Plaintiff interact with Officers.  (**Depo. of Rodriguez, pg. 108, ln. 24 - pg. 109, ln. 25**).  Therefore, Defendant Rodriguez did not have any personal knowledge regarding the substance defamatory statements.  To even suggest that Defendant Brookwell's alleged statements to Defendant Rodriguez, and his e-mail repeating those statements are part of a "judicial proceeding" does not make any sense.

Under the "operational" and "planning" test, the defamatory statements are not protected by 47(b).  The defamatory statements were not made in the course of planning any policy.  However, the libelous/slanderous statements were made at the operational level.  A couple of Sheriff Deputies (Glenn Spruill and Pam Brookwell) got together and told Defendant Rodriguez serious lies, or Defendant Rodriguez came up with the defamatory statements to get Plaintiff fired.

**C.    The statements were not defamatory**

*(i)    Defendants' Argument*

"A publication 'must contain a false statement of fact' to give rise to liability for defamation. ... A statement of opinion 'cannot be false and is outside the meaning of libel.'" *Jensen v. Hewlett-Packard Co.*, 14 Cal. App. 4th 958, 970, 18 Cal. Rptr. 2d 83, 89 (1993). Job performance criticisms like those on which Biller purports to base his defamation claim are ordinarily not actionable because they constitute opinion. As the *Jensen* court explained, "we express our strong judicial disfavor for libel suits based on communications in employment performance reviews." 18 Cal. Rtpr. 2d at

84.[4] *See also Banks v. Dominican College*, 35 Cal. App. 4th 1545, 1554, 42 Cal. Rptr. 2d 110, 116 (1995) (statements about a discharged student teacher's unsuitability for a teaching position were not actionable); *Gould v. Maryland Sound Industries, Inc.*, 31 Cal. App. 4th 1137, 1154, 37 Cal. Rptr. 2d 718, 728 (1995) (accusing employee of poor performance was "clearly a statement of opinion"); *Dong v. Board of Trustees*, 191 Cal. App. 3d 1572, 1583-85, 236 Cal. Rptr. 912, 919-21 (1987) (professor's charges of academic misconduct against colleague were not actionable).

Here, the defamation claim is based on (1) Brookwell's statements to Rodriguez, (2) Rodriguez's comments in his emails to his superiors about Biller's progress, and (3) the statements in the 90 day evaluation, the report on probationer and the termination letter about Biller's performance as a Deputy District Attorney I. Those statement are opinions about Biller's employment performance. They are not actionable under California law.

The six allegedly defamatory statements that Biller identifies below (at page 47) as the basis for his claim are, at best, the type of "'rhetorical hyperbole,' exaggeration, and other colorful language" that California courts have time and again held is not actionable. *Jackson v. Paramount Pictures Corp.*, 68 Cal. App. 4th 10, 30, 80 Cal. Rptr. 2d 1, 12 (1998). *See Yorty v. Chandler*, 13 Cal. App. 3d 467, 91 Cal. Rptr. 709 (1970) (depicting a former mayor of Los Angeles in a straitjacket was not defamation, but rhetorical hyperbole); *Carver v. Bonds*, 135 Cal. App. 4th 328, 346-47, 37 Cal. Rptr. 3d 480, 494-95 (2005) ("he's a liar" not defamatory); *James v. San Jose Mercury News, Inc.*, 17 Cal. App. 4th 1, 14-15, 20 Cal. Rptr. 2d 890, 898 (1993) (accusing attorney of "sleazy sleight-of-hand" not defamatory); *Moyer v. Amador Valley J. Union High School Dist.*, 225 Cal. App. 3d 720, 725-26, 275 Cal. Rptr. 494, 497-98 (1990) (teacher was "babbler" and the "worst" not defamatory).

---

[4] The performance review in *Jensen* stated that the employee had been "the subject of some third party complaints," "was not carrying his weight," exhibited a "negative attitude in dealing with others," lacked "direction in his project activities" and was "unwilling to take responsibility for the projects he oversaw."

*(ii)* ***Plaintiff's Argument***

Defendants are completely wrong when arguing that Plaintiff is complaining about the alleged statements of Defendant Brookwell in the 90 Day Evaluation. Plaintiff is complaining about e-mails containing false statements as discussed <u>supra</u>. Those statements are not "opinions" about Plaintiff. "Anger" is a provable fact. When somebody has "anger management issues", then a person's "anger" is not in "control" and needs to be "managed" or the person needs to learn techniques to control anger. **(Decl. of Biller, Exhibit "68")** Each of the defamatory words have specific definitions, so they are provable facts, not opinion.

Furthermore, the six defamatory statements are inherently false because there is not any admissible evidence provided by any percipient witness who saw and heard Plaintiff engage with Sheriff Deputies that Plaintiff had (1) "anger management issues"; (2) "gotten into a 'huff'"; (3) "very common for him to get 'huffy' and to 'fly off the handle'"; (4) "blow things up to something bigger than it is"; (5) "often he would get very upset about very minor problems"; (6) "'talks down' to officers and in a 'demeaning manner' like he is 'ordering them around." **(Depo. of Rodriguez, Exhibit "40", Bates stamped D-0380)** The only admissible evidence is that Plaintiff did not. **(Decl. of Biller, Para. 40)** Neither Defendant Brookwell, nor Defendant Rodriguez, can make the factual assertions about Plaintiff's interaction with Sheriff Deputies because they did not see Plaintiff in the East Los Angeles Station on August 14, 2008.  The Report also states Plaintiff was "**demeaning**" to law enforcement. **(Ex. 50, page 4 of 5)**

Defendants cannot have it both ways.  Defendants cannot "justify" Plaintiff's termination with the same words and descriptions they call "exaggerations" or "rhetorical hyperbole. "  If the descriptions of Plaintiff regarding his interaction with law enforcement are "exaggeration" or "rhetorical hyperbole" , then those descriptions are "pretexts" to Plaintiff termination.

Anger" has been extensively studied to the point where there are different types of anger that have different behavioral traits.  There is "passive" anger, and "aggressive" anger.  (**Ex. 66, pg. 4 or 15**)  The Report on Probationer stated Plaintiff is unable to "deal with problematic issues with getting **angry**.  (**Ex. "50", pg. 1**)  Again the word "**anger**" is used in the same report on page 4. The report also states that Plaintiff has "**anger management issues.**"  The science of psychology has progressed to the point where "anger management issues" has been defined.  (**Ex. "66"**)

Again, Defendants cannot have it both ways.  On the one hand use the above factual words to describe Plaintiff's behavior and to justify Plaintiff's termination; one the other hand Defendants argue that the words are "'rhetorical hyperbole,' exaggeration, and other colorful language."  If Defendants cannot use the words to terminate Plaintiff, but then argue the words are "rhetorical hyperbole or exaggeration" to avoid defamation.

Unfortunately, the three player involved in making defamatory statements are pointing their figures at each other. Only a jury can decide who made the above defamatory statements. If Judge King determines that the "statement could be reasonably construed as either fact or opinion, the issue should be resolved by a jury." Campanelli v. Regents of Univ. of Cal. (1996) 44 Cal. App.4th. 572, 578. If a statement can be proven to be false or true, then it falls within the definition of defamation. Savage v. Pacific Gas & Electric Co. (1993) 21 Cal.App.4th 434, 445. The "totality of the circumstances" test is used in California to determine if a statement is fact or opinion. Baker v. Los Angeles Herald Examiner (1986) 42 Cal.3d 254, 260. "The court must put itself in the place of an average reader and decide the natural and probable effect of the state." Hofmann Co. v. E.I. Du Pont de Nemours & Co. (1988) 202 Cal.App. 3d 390, 398. Furthermore, "some statements are ambiguous and cannot be characterized as factual or nonfactual as a matter of law. 'In these circumstances, it is for the jury to determine whether an ordinary reader would have

1   understood the article as a factual assertion." <u>Kahn v. Bower</u> (1991) 232 Cal.App.3d
2   1599, 1608.

3       Plaintiff was never out of control when he got angry because he was at all
4   times in complete control of his physical and mental being. He displayed all the signs
5   of controlling his anger on August 14, 2008 and immediately after the <u>Bodavilla</u>
6   dismissal. (**Decl. of Biller, Para. 40; and Dr. Rudnick**). The point is that "anger
7   management issues" is a provable fact. The other five statements are also provable
8   facts.

9       Plaintiff's complaint identifies all the defamatory statements.  For example,
10   Plaintiff claims Defendant Rodriguez factual assertion that Plaintiff shifted the
11   burden of proof during closing argument (Griffin error) is simply not true because
12   Defendant Rodriguez did not see or hear the cross-examination of Defendant.
13   Defendant Rodriguez statement of fact that Plaintiff struggled with his
14   "cross-examination" is also not true and can be proven not to be true because the only
15   information about Plaintiff's ability to conduct cross-examination the
16   cross-examination of the Defendant's brother in <u>Bodavilla</u>. The statement that
17   Plaintiff did not call a qualified expert witness to the stand is not true because the
18   witness was qualified but his reliance on photocopies of counterfeit money resulted in
19   opinions that the Judge did not weight heavily.  (**Decl. of Biller, Para. 26**)  The
20   statement of fact that Plaintiff had "slight but inconsistent progress" is also not true
21   because Defendant Rodriguez wrote on Plaintiff was showing significant
22   improvement.  (**Exhibit "44"**)  Defendant Rodriguez' statement that "Plaintiff had
23   difficulty organizing his materials in order to be properly prepared for court" is also a
24   false statement.  Plaintiff always organized counsel's table very morning only to have
25   Terry Mitchell to disorganize it.  (**Decl. of Biller**)

26
27
28

None of the cases Defendants cite describe the six phases that Plaintiff has identified as not defamatory.

DATED: May 14, 2010          GUTIERREZ, PRECIADO & HOUSE, LLP

                              By: s/
                              _____
                              Calvin House
                              Attorney for Defendant
                              COUNTY OF LOS ANGELES, LOS
                              ANGELES COUNTY DISTRICT
                              ATTORNEY'S OFFICE, VICTOR
                              RODRIGUEZ and PAM BROOKWELL

DATED: May 14, 2010          DIMITRIOS P. BILLER, in pro per

                              By: _____
                              Dimitrios P. Biller
                              Plaintiff

JOINT BRIEF

**PROOF OF SERVICE**

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

   I declare that I am a resident of the County of Los Angeles, State of California; I am over the age of 18 years and not a party to the within action; my business address is 3020 Colorado Blvd, Pasadena, California 91107.

   On this date, I served the foregoing **JOINT BRIEF OF THE PARTIES ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

**Attorneys for Plaintiff:**
Dimitrios P. Biller, In Pro Per
906 Kagawa Street
Pacific Palisades, CA 90272


X    BY MAIL - I placed such envelope for deposit in the U.S. Mail for service by the United States Postal Service, with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pasadena, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

X    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed May 14, 2010, at Pasadena, California.


/s/_____
Margaret Bennici

**JOINT BRIEF**